## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WILLIAMS FUND PRIVATE EQUITY GROUP, INC.<br>140 Highway One<br>Lewes, DE 19958<br><br>Petitioner,<br><br>v.<br><br>DAVID ENGEL<br>1102 Oak Knoll Terrace<br>Rockville, MD 20850<br><br>Respondent. | Case No.: _____ |

## APPLICATION TO VACATE ARBITRATION AWARD
## AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

COMES NOW, Petitioner Williams Fund Private Equity Group, Inc., by and through undersigned counsel, and seeks an order vacating the Arbitration Award entered in favor of Respondent David Engel by the American Arbitration Association in the District of Columbia on September 27, 2006, which was received by Petitioner on October 3, 2006. Petitioner further seeks an order directing a rehearing of this matter before a new arbitrator who is chosen in accord with the American Arbitration Association procedures for a commercial arbitration, or in the alternative, remanding this matter to the original arbitrator for an explanation of the Award and reconsideration regarding damages.

### PARTIES

1.      Petitioner Williams Fund Private Equity Group, Inc. is a Delaware corporation that endeavored to purchase a Virginia company known as Engel Corporation t/a Budget Communications (hereinafter, "the Company") from Respondent via a stock purchase agreement

and corresponding security agreement. Petitioner demanded arbitration under the stock purchase

agreement and security agreement for, *inter alia*, breach of contract; Petitioner's claim was

denied in its entirety by the arbitrator.

2.      Respondent David Engel is a citizen of the State of Maryland and the individual

who endeavored to sell the Company to Petitioner via a stock purchase agreement and

corresponding security agreement. Respondent is the recipient of the Arbitration Award, in

which the arbitrator rescinded the stock purchase agreement under Virginia law and found in

favor of Respondent in the amount of $204,758.42.

## JURISDICTION AND VENUE

3.      Jurisdiction is founded in this court pursuant to 28 U.S.C. 1332 because the

parties are citizens of different states, to wit the State of Delaware and the State of Maryland, and

the amount in controversy exceeds the statutory amount of $75,000.00 in that Petitioner seeks

$263,544.12, exclusive of interest and costs. Moreover, the subject Company is a Virginia

corporation and the arbitrator determined, and the parties agreed, that Virginia substantive law

controlled the arbitration.

4.      Venue is founded in this court pursuant to 28 U.S.C. 1391 because the Parties

hereto participated in an arbitration before a single arbitrator of the American Arbitration

Association in Washington, DC on August 14, 2006 and August 15, 2006 based upon (1) the

arbitration clause in a Stock Purchase Agreement (hereinafter, the "SPA") executed by the

Parties effective September 2, 2005[1], attached hereto as Exhibit 1, and (2) the arbitration clause

in a Security Agreement (hereinafter, the "SA") executed by the Parties effective September 13,

2005[2], attached hereto as Exhibit 2. The arbitration clauses in each of the Agreements – the SPA

---

[1] The SPA was executed by Engel Corporation t/a Budget Communications, as well as by the Parties. See Exhibit 1.
[2] The SA was executed by Engel Corporation t/a Budget Communications, as well as by the Parties. See Exhibit 2.

and the SA – specified that arbitration was to be held in Washington, DC by the American

Arbitration Association under its commercial rules. See Exhibit 1, §§ 13.1, 14.2(b); see Exhibit

2, § 2(b). Further, the SPA states that the courts in Washington, DC have exclusive venue and

jurisdiction with respect to any dispute or controversy. See Exhibit 1, §15.7.

5.    Moreover, pursuant to 9 U.S.C. § 10(a)(4), the court in and for the district

wherein the arbitration award was made -- in this case the District of Columbia -- may make an

order vacating the award upon the application of any party to the arbitration where the arbitrators

exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award

upon the subject matter submitted was not made.[3] It is primarily on these grounds that Petitioner

seeks relief. Additionally, Petitioner seeks relief under 9 U.S.C. § 10(a)(2) based upon the

evident partiality of the arbitrator.

## ARGUMENT

### A. The Arbitrator Exceeded His Powers

6.    The Award in favor of David Engel (hereinafter, "Engel") was based upon

Virginia substantive law[4], whereby the arbitrator found that the Stock Purchase Agreement is

void and unenforceable by law, and whereby the arbitrator granted Respondent its requested

remedy of rescission and sole ownership of all corporate shares of the Company, and whereby

Respondent was awarded $204,758.42.[5]

---

[3] The laws of the District of Columbia and the Commonwealth of Virginia with regard to vacating an arbitration award based upon the grounds that the arbitrator exceeded his/her powers are substantially similar to the federal rule. See D.C. Code §§ 16-431, 16-4303; see Va. Code Ann. § 8.01-581.010.

[4] The choice of law provision in the SA specified that Virginia law controls. See Exhibit 2 § 6. The parties consented to Virginia law as the substantive law to be used during arbitration. Conversely, the SPA did not make a choice of governing law, but rather specified only that "disputes or controversies arising out of or in connection with the interpretation or performance [of the SPA]…shall be adjudicated by…the American Arbitration Association and, if applicable, the courts, in Washington, DC…". See Exhibit 1 § 15.7.

[5] See Exhibit 3, Award of Arbitrator, attached hereto. The arbitrator also awarded Engel the amounts he had disbursed for the fees and expenses of the American Arbitration Association and the compensation and expenses of the arbitrator in connection with the hearing, to be paid by WFPEG.

7.      The claim of Williams Fund Private Equity Group, Inc. (WFPEG) was denied in its entirety by the arbitrator. WFPEG had requested damages based upon breach of contract in the amount of $210,565.18.[6]  WFPEG further requested recovery of control of the Company. Alternatively, as requested by the arbitrator, WFPEG addressed the remedy of rescission. Under a rescission remedy – which WFPEG contended was wholly unsupported by the record – WFPEG requested $263,544.12, which constituted the total funds paid to Engel by WFPEG under the SPA.

8.      Engel requested rescission and damages therefrom in the total amount of $560,309.56. (Additionally, Engel requested treble damages for a total request of $2,241,258.24, which was denied.)

9.      In the Award, the arbitrator failed to itemize or otherwise explain how he arrived at the Award figure of $204,758.42, despite the fact that both WFPEG and Engel had provided the arbitrator with itemized lists of alleged damages by which each arrived at his respective damage figures under the different remedy scenarios.

10.     Contrary to long established precedent, the arbitrator granted rescission yet failed to place *both* parties in the positions they respectively held before the date they entered into the SPA and SA. See Handbook on Remedies § 9.4 at 622 (the general rule…is that plaintiff must make restoration of what he got under the contract in order to get rescission, and his inability to do so will not excuse such restoration. In such a case, he may be permitted to recover damages, but rescission will be barred by his inability to make restoration); see Richard A. Lord, Williston on Contracts § 69; 50 (4th ed.) (ordinarily, one cannot in equity seek to rescind a contract on the ground of fraud and, at the same time, retain the benefits derived from that contract); see

---

[6] This amount included lost profits of $108,615.43, $36,000 in unauthorized salary Mr. Engel paid to himself, and payment of WFPEG's attorneys fees and costs as of August 28, 2006 in the amount of $65,949.75.

National Life Ins. v. Hanna, 122 W. Va. 36, 7 S.E. 2d, 52, 54 (W. Va. 1940) (any person demanding the rescission of a contract to which he is a party must restore or offer to restore to the other party whatever he may have received under the contract in the way of money, property, or other consideration or benefit (quoting 3 Black on Rescission and Cancellation (2d ed.) § 617)).

      11.    In Virginia, if rescission is granted, the contract is terminated for all purposes, and the parties are restored to the *status quo ante*. McLeskey v. Ocean Park Investors, Ltd., 242 Va. 51, 54 (1991). Where a party elects to rescind the contract, as Engel did in this case and which the arbitrator evidently supported by the Award, he may do so only where he can restore what he had received. Wilson v. Hundley, 96 Va. 96, 100-101 (1898); see also United Leasing Corp. v. Res. Bank, 58 Va. Cir. 96 (2002); Virginia-Carolina Rubber Co. v. Flanagan, 150 Va. 276, 280, 142 S.E. 376 (1928). The arbitrator blatantly flouted these well known legal principles in making his decision in that he absolutely failed to make WFPEG whole by restoring to WFPEG the $263,544.12 it has paid to Engel under the SPA – or any part thereof – or to even take such payments into account whatsoever in the Award.

      12.    Not only did the arbitrator fail to order Engel to return the $263,544.12 WFPEG had paid into the Company, the arbitrator actually ordered WFPEG to pay to Engel an additional $204,758.42, plus the costs and expenses of arbitration. Even assuming *arguendo* that the arbitrator can point to support in the record for his award to Engel of $204,758.42, the only possible fair and equitable award based upon Virginia law would have been to offset the award to Engel by the monies previously paid by WFPEG to Engel and award Engel the difference between the two figures, or $58,785.70.

      13.    An arbitration award may be vacated pursuant to 9 USCS § 10 where it is shown

5

that there was partiality on part of arbitrator, that arbitrator exceeded his authority, or that award was rendered in manifest disregard of law. Aerojet--General Corp. v America Arbitration Asso. (1973, CA9 Cal) 478 F.2d 248; see also Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 2006 U.S. Dist. LEXIS 14967 (citing LaPrade v. Kidder Peabody & Co., 345 U.S. App. D.C. 358, 246 F. 3d 702, 706 (D.C. Cir. 2001)). To vacate an award on the grounds of manifest disregard, the court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case. LaPrade, 246 F.3d at 706. Because the arbitrator in this case knew the applicable Virginia law on rescission as evidenced by his referencing it in the Award[7], and the law was clearly defined and applicable to the underlying case, and nevertheless the arbitrator decided to ignore the law, his decision should be overturned for manifest disregard of law.

### B. The Arbitrator Was Compromised By Threat and By Reviewing Certain Documents Unfairly Prejudicial to Petitioner and

14.     Pursuant to 9 U.S.C. § 10(a)(4), the Court should vacate the arbitration because there was evident partiality on the part of the arbitrator for which Respondent and Respondent's counsel are wholly responsible.

15.     Respondent's counsel inappropriately threatened the arbitrator during the arbitration hearing, as follows:

> Mr. Arbitrator, David Engel is asking you principally to unwind this transaction because of the fraud and the inducement and because of the criminality and illegality that went along with the scheme. And essentially if you find for the claimant in this case, there's really no other conclusion but that you and AAA, the legal process, would be aiding and abetting this fraud, this criminality. And we ask that you don't become a participant in that, and you do not allow this fraud to be – to reach its conclusion...

---

[7] See Exhibit 3 ¶ 1.

6

Transcript of Arbitration Hearing, August 15, 2006 (Day 2), at Page 422, lines 9-21.

16.    Additionally, Respondent filed a brief with the arbitrator regarding matters which were false and highly and unfairly prejudicial. While the arbitrator ultimately ruled in the Award that the brief submitted by Respondent, entitled "Respondent David Engel's Submission Concerning Related Proceedings," along with its Exhibits, marked as L8, L9 and L11, the prejudicial effect of these documents and their presentation, plus Respondent's counsel's threat, so permeated and colored the proceeding, that the Award and the Award process is called into question.

17.    Placing the arbitrator on notice that he and the American Arbitration Association would be "aiding and abetting" a fraud and/or criminality, compromises beyond doubt the impartiality of the arbitrator and cries out for the court to vacate the award and remand the proceeding for a new arbitration before a new arbitrator.

## CONCLUSION

WHEREFORE, for the foregoing reasons and grounds, Petitioner respectfully requests that the Court vacate the Arbitration Award and order a new arbitration by a new arbitrator in accordance with the American Arbitration Association procedures for commercial arbitration, or alternatively, that the Court remand this matter to the original arbitrator for an explanation of the Award and reconsideration regarding damages in accord with the foregoing.

7

Dated: December 29, 2006

Respectfully submitted,

**WILLIAMS FUND PRIVATE EQUITY GROUP, INC.**

By Counsel

Joseph A. Artabane
D.C. Bar No. 201830
ARTABANE & BELDEN, P.C.
818 18th Street, N.W.
Washington, D.C. 20006
(202) 861-0070 (telephone)
(202) 861-2939 (facsimile)

STOCK PURCHASE AGREEMENT

AMONG

ENGEL CORPORATION t/a BUDGET COMMUNICATIONS
DAVID ENGEL

And

WILLIAMS FUND PRIVATE EQUITY GROUP, INC.

SEPTEMBER 2, 2005

STOCK PURCHASE AGREEEMNT

AGREEMENT made and entered into as of the 2nd      day of
SEPTEMBER, 2005, by and among WILLIAMS FUND PRIVATE EQUITY
GROUP, INC., ("Purchaser"), DAVID ENGEL (the "Seller") and
ENGEL CORPORATION t/a BUDGET COMMUNICATIONS (the "Company").

## WITNESSETH:

WHEREAS, the Company is engaged in the sal    e of printing, design, and copying and related products thereto (the "Business"); and

WHEREAS, the Seller owns of record one thousand (1,000) shares of common stock in the Company, which constitutes one-hundred and 00/100 (100.0%) percent of the issued an    d outstanding stock of the Company.

WHEREAS, the Seller agrees to sell, assign, transfer and deliver to the Purchaser, and the Purchaser agrees to purchase from the Seller, one thousand (1,000) shares of the Company, to be purchased by Purchaser on the C    losing Date, upon the terms and conditions contained in this Agreement, together with all schedules and exhibits delivered in connection herewith, all of which are incorporated herein by reference (collectively the "Stock Purchase Agreement").

NOW, THEREFORE, in consideration of the mutual covenants and agreements, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally t    o be bound hereby, agree as follows:

## ARTICLE ONE - PURCHASE OF STOCK AND REAL PROPERTY

Section 1.1.    Purchased Stock .    Upon the terms and subject to the conditions contained in this Agreement, on the Closing Date (as defined below), the Seller shall    sell, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase from Seller one thousand (1,000) of the Company's common stock, which constitutes one hundred (100%) percent of the issued and outstanding shares of stock of the Company (the "Purchased Stock") as of the Closing Date.

Section 1.2    Purchase Price.    The purchase price for the Purchased Stock shall be the sum of Three Hundred Ten Thousand and 00/100 ($310,000.00) Dollars plus or minus the Section 1.5 Credits (the "Purchase Price").

Section 1.3    Closing Payment.    On the Closing Date, Purchaser shall pay to the Seller the amount of One Hundred Fifty Five Thousand and 00/100 ($155,000.00) Dollars plus or minus the Section 1.5 Credits (the "Closing Payment"), payable in immediately available funds.

2

Section 1.4.    Deferred Payments.    The remaining $155,000 of
the Purchase Price (the "Deferred Payments") shall be
payable as follows.  Within twenty (20) days of the Closing
Date, the Purchaser shall pay to the Seller Forty Th ousand
and 00/100 ($40,000.00) Dollars. Within forty (40) days of
the Closing Date, the Purchaser shall pay to the Seller
Forty Thousand and 00/100 ($40,000.00) Dollars.   Within
sixty (60) days of the Closing Date, the Purchaser shall pay
to the Seller For    ty Thousand and 00/100 ($40,000.00)
Dollars. Within ninety (90) days of the Closing Date, the
Purchaser shall pay to the Seller Thirty Five Thousand and
00/100 ($35,000.00) Dollars. At Closing, an amount equal to
the next ensuing Deferred Payment, Forty Thousand and 00/100
($40,000.00) Dollars, shall be deposited in escrow in
immediately available funds with an escrow agent of
Purchaser's choice and released by the escrow agent on the
appropriate date, and upon such release of payment, the next
ensuing Defe rred Payment will be placed into escrow.
Payment of the Deferred Payments shall be secured by a
pledge of Purchased Stock to Seller, and a blanket lien on
the Company's assets, pursuant to a form of Security
Agreement reasonably acceptable to the parties             (the
"Security Agreement"), which shall be governed by the
Uniform Commercial Code as adopted by the Commonwealth of
Virginia.

Section 1.5.    Credits.    The Cash Down Payment and Purchase
Price will be adjusted on the Closing Date, dollar for
dollar downward, to the extent that the Section 2.5 Accounts
Receivable plus the Section 2.10 Checking Account Balance
minus the Section 4.1 Accounts Payable is less than Zero.
The Purchase Price will be adjusted, dollar for dollar
upward, to the extent that the Sect       ion 2.5 Accounts
Receivable plus the Section 2.10 Checking Account Balance
minus the Section 4.1 Accounts Payable is more than Zero.
Any such adjustments shall first be applied to the Closing
Payment of the Purchase Price, and then to the Deferred
Payments, if applicable.

## ARTICLE TWO - ASSETS AS OF CLOSING DATE

On the Closing Date, the Assets of the Company (the "Company
Assets") shall be as is detailed in Sections 2.1      - 2.11
herein in all material respects, subject to the operation of
the Business    through the Closing Date in the ordinary

3

course; with no expenditures, except in the ordinary course
of business, or pledging of collateral or purchase of
capitalized equipment between execution hereof and the
Closing Date.  However, the Company shall be e    ntitled to
make distributions or other payments to the Seller and other
expenditures of cash, subject to the Purchase Price
adjustment provisions of Section 1.5 above.

Section 2.1.    Tangible Personal Property.    All of the
machinery, equipment, furniture, fixtures, supplies, rolling
stock and other vehicles, computers tools, dies, spare
parts, and other similar items which are owned by the
Company, or which will be owned by the Company as of the
Closing Date, or which are owned by the Seller as of the
Closing Date and are related to the Business, all of which
are listed in Exhibit 2.1, attached hereto and incorporated
herein by reference (collectively the Tangible Personal
Property").

Section 2.2   Operating Leases.   All of the operating leases
with regard  to items of personal property in which the
Company has any interest as a lessee or a sublessee set
forth on Exhibit 2.2 attached hereto and incorporated herein
by reference, or any additional operating leases in which
the Company will have any interest as       a lessee or a
sublessee as of the Closing Date (collectively the
"Operating Leases").

Section 2.3    Intangible Personal Property.   All of the
patents, technology, industry or technological innovations
and/or know -how, trademarks, servicemarks, trade names
business names, copyrights, other intellectual property    ,
rights, trade secrets, corporate names, including but not
limited to the exclusive right to use the name Budget
Communications, and all derivatives thereof, and other
intangible Assets and all appli cations therefore which are
owned by or licensed to the Company, or which will be owned
by or licensed to the Company as of the Closing Date, or
which will be owned by the Seller as of the Closing Date and
related to the Business, all of which are listed i n Exhibit
2.3 attached hereto and incorporated herein by reference
(collectively the "Intangible Personal Property").

Section 2.4   Inventory.  Inventory items which are owned by
the Company, or which will be owned by the Company as of the
Closing Date, or which will be owned by the Seller as of the
Closing Date and related to the Business (collectively the
"Inventory").    Seller hereby authorizes Purchaser, or
Purchaser's agent to conduct such Inventory Report as
necessary pursuant to this Section 2.4 on t he Closing Date.

4

To the extent that the Inventory is less than Thirty
Thousand and 00/100 ($30,000.00) Dollars, Purchaser will be
entitled to a dollar for dollar credit against the Purchase
Price to be applied against the Deferred Payments.    The
Inventory on the Closing Date shall be identified in Exhibit
2.4, attached hereto and incorporated herein by reference.

Section  2.5   Accounts and Notes Receivable.   All of the
accounts and notes receivable which are owned by the
Company, or which will be owned   by the Company as of the
Closing Date (collectively the "Accounts and Notes
Receivable"), all of which are listed in Exhibit 2.5
attached hereto and incorporated herein by reference.
Purchaser has the right to reject any receivables over
ninety (90) days by assigning same to Seller on the Closing
Date, and receiving a dollar for dollar credit against the
Cash Down Payment and Purchase Price.  If any unrejected
accounts receivable on Exhibit 2.5 are not collected by the
Company prior to the date that the final Deferred Payment is
due to Seller, Purchaser shall have the right to assign such
receivables to Seller, and notify Seller and the escrow
agent that the amount of such uncollected receivables shall
be deducted from the final Deferred Payment.

Section 2.6   Commercial Data.   All of the books, records,
files, customer lists, invoices, accounts, surveys, plans,
specifications, blueprints, chemical formulas, engineering
data, computer software programs and all data files related
thereto, permits, and other     similar documents, and
information which are owned by or licensed to the Company,
or which will be owned by or licensed to the Company as of
the Closing Date (collectively the "Commercial Data").

Section 2.7   Contracts.   All of the contracts to which the
Seller is a party, or will be a party as of the Closing
Date, attached hereto and incorporated herein as Exhibit 2.7
(collectively the "Contracts").

Section 2.8     Customer Deposits .   All of the customer
deposits to which the Company is a party as of   the Closing
Date (collectively the "Customer Deposits").  To the extent
that the Company shall have received any deposits or pre
payments for shipment for work that has not commenced, or
for which inventory or supplies have not been purchased as
of the Clo sing Date, these amounts shall be deducted from
the Closing Payment.

Section 2.9.    Work in Progress.   All work in progress by
the Company in the ordinary course of conducting the

5

Company, all of which is listed in Exhibit 2.9 attached hereto and incorporated herein by reference.

Section 2.10. Cash or Checking Accounts . The cash and sums in the Business checking accounts as of the Closing Date, which at a minimum will be One Hundred ($100.00) Dollars (the "Minimum Balance"). Seller warrants and covenants that there be sufficient moneys in the Company checking account on the Closing Date to cover any checks that have been written but not yet cleared.

Section 2.11   Other Assets.   All of the (a) insurance policies which are currently in force or which wil   l be in force as of the Closing Date, naming the Company or the Seller as an insured (to the extent that the same are assignable or transferable to Purchaser), (b) prepaid expenses shown on the books of the Company as of the Closing Date which are incurred in the ordinary and usual course of its business, including but not limited to security deposits (c) deposits with and refunds or rebates due from any landlord, insurance company, utilities, payroll companies, customs, or suppliers to the Company, or any other person or entity shown on the Closing Date,   (d) post office boxes and telephone numbers utilized by the Company, and (e)   other miscellaneous Assets which are owned by the Company, or owned by the Company as of the Closing Date and relate to the Business (collectively the "Other Assets").

## ARTICLE THREE - EXCLUDED ASSETS.

Notwithstanding anything contained herein to the contrary, there are no excluded Assets of the Company. All Assets of the Company as of the Closing Date are intended to be retained by the Company pursuant to this Stock Purchase Agreement, whether or not any specific Asset is listed in Sections 2.1 to 2.12 herein.

## ARTICLE FOUR - LIABILITIES AS OF CLOSING DATE

On the Closing Date, the Liabilities of the Company (the "Company Liabilities") shall include and be limited to:

Section 4.1.   Current Unsecured Debt and Accounts Payable. All of the accounts payable and accrued expenses to which the Company is responsible (including credit card) listed in Exhibit 4.1 attached hereto an   d incorporated herein by reference, and such additional amounts as are incurred in the ordinary course of business through the Closing Date.

Section 4.2. Purchase Orders.   All purchase orders for the purchase of inventory issued by the Company in the o rdinary course of conducting the Company.

Section 4.3. Employee Fringe Benefits and Accrued Vacation . Outstanding fringe benefits and accrued vacation of the Company employees, excepting those to be released, including to Seller, all of which are listed in Exhibit 4.3, attached hereto and incorporated by reference.

Section 4.4   Credit Card Debt .   All credit card debt of the Company will be retained by the Company.  Copies of the latest credit card statements will be attached hereto and incorporated he reto by reference as Exhibit 4.4.  At such time as Seller is removed from liability with respect to such credit card debt, Purchaser will be solely responsible for decisions related to use of Company credit cards post  - closing.

Section 4.5. Leases.  The Company will retain certain copier and postage meter leases, as well as the lease for its premises, attached hereto and incorporated herein by Seller, as Exhibit 4.5.  To the extent applicable, Seller will be removed from liability from these leases no later      than ninety (90) days after the Closing Date, or these leases will be paid off.

*The following liabilities in Section 4.6 through 4.8 shall be paid off by Seller on the Closing Date.*

Section 4.6      Secured Debt .  On the Closing Date, out of the Closing Payment proceeds to Seller, Purchaser to pay off the Company's secured debt loan with *GE Capital*            . Seller to obtain a payoff letter as directed by Purchaser immediately prior to the Closing Date.

Section 4.7.    Released Liabilities .  On the Closing  Date, the Company shall receive a release from Seller as to any outstanding shareholder or member, or outstanding payroll or fringe benefit to any shareholder or member, attached hereto and incorporated herein as Exhibit 4.7.

Section 4.8. Outstanding Payroll and Taxes .   Seller shall pay out of the Closing Payment all outstanding payroll and commissions, and all outstanding workmen's compensation, payroll taxes, sales tax and income taxes that are accrued and outstanding as of the Closing Date.

7

ARTICLE FIVE - CLOSING.

Subject to the terms and conditions of this Stock Purchase
Agreement, the consummation of the transaction provided for
herein (the "Closing") shall take place at the offices of
the Company or the Seller's attorney on September 8, 2005.
The Closing shall be effective as of 7:00 A.M., eastern
time, on the Closing Date.   Purchaser has the right to
delay Closing Date up to twenty (20) days for logistical
conflicts.  At the Closing, Seller and Purchaser shall
execute a certificate evidencing  the fact that the Closing
has occurred and is effective, said certificate attached
hereto and incorporated herein by reference as Exhibit 5.1
(a).  The Closing shall be effective once said certificate
has been signed, the Closing Payment has been delivered    to
Seller, and the Deferred Payment has been delivered to the
escrow agent as provided in Section 1.4, notwithstanding the
fact that certain of the documents and other instruments to
be delivered at Closing shall not have been delivered and
the fact revis ions to certain of the schedules referred to
in this Stock Purchase Agreement are intended to be made
after the Closing Date to properly reflect the matters
referenced therein as of the Closing Date.  The Closing will
occur on the Closing Date pursuant to         certain Escrow
Instructions, attached hereto and incorporated herein by
reference as Exhibit 5.1. (b).

ARTICLE SIX  -   DOCUMENTS TO BE DELIVERED BY SELLER TO THE
PURCHASER WITHIN THREE (3) DAYS OF EXECUTION OF THIS STOCK
PURCHASE AGREEMENT

The following  documents will be delivered by Seller to
Purchaser within three (3) business days of executed Stock
Purchase Agreement, and updated at Purchaser's reasonable
request between then and the Closing Date.

Section 6.1.    Balance Sheets .   Year end 2002 balance
sheets, 2003, and 2004 balance sheet, and 2005 year to date,
which will be Exhibit 6.1.

Section 6.2.   Income and Expense Statements.  Year end 2002,
2003 and 2004 and 2005 year to date Income and Expense
Statements, which will be Exhibit 6.2.

Section 6.3 .    Tax Returns .   A copy of the last three
filed Federal annual tax returns, which will be Exhibit 6.3.

Section 6.4.   Insurance Policies.   A copy of all insurance policies in effect with respect to the Company, which will be Exhibit 6.4.

Section 6.5.   List of Employees.   A list of all present and past employees, since the year 2002, their starting date, annual salary, home addresses, phone numbers, and job descriptions, which will be Exhibit 6.5.
Section 6.6.   Licenses and Permits.   A copy of all licens es and permits maintained by the Company or used in the Business, which will be Exhibit 6.6.

Section 6.7.   Customer List.   A master customer list of all customers who have ordered services or products from the Company within two years of the Closing Date    , including contact names, telephone numbers and addresses (the "Master Customer List"), which will be Exhibit 6.7.

Section 6.8.   Accounts Receivable Report .   A list of all outstanding account and notes receivable due the Company, complete with address    and phone numbers, which will be Exhibit 6.8.

Section 6.9.       Written License, Distribution and Sales Agency Contracts .   A copy of all written license, distribution and sales agency contracts, which will be Exhibit 6.9.

Section 6.10.   Employment Manual .   A copy of the Company employment manual, if any, which will be Exhibit 6.10.

Section 6.11  Real Property Lease.   A copy of the Real Property Lease where the Business is located in Reston, Virginia.

Section 6.12     Certificate of Non  -Contamination.   A certificate from Seller certifying that to the knowledge of the Seller, there is no asbestos, hazardous and/or toxic wastes on or about the Leased Real Property, which will be Exhibit 6.12.

## ARTICLE SEVEN  -  DOCUMENTS TO BE EXECUTED ON THE CLOSING DATE

Section 7.1     Certified Resolutions     Company, and the Purchaser shall have received a copy of each other's Company's resolutions, having been duly adopted approving the consummation of the transaction contemplated hereby,

9

attached hereto and incorporated herein as Exhibits 7.1 (a), and 7.1 (b).

Section 7.2. Removal of Signatory . Seller shall deliver to Purchaser a copy of all letters removing Seller and Seller's designees as a signatory from the Company checking accounts.    The Removal of Signatory is at tached hereto and incorporated herein by reference as Exhibit 7.2.

Section 7.3. Resignation of Officers. On the Closing Date, Seller irrevocably resigns as an officer and employee of the Company, as evidenced by Exhibit 7.3, attached hereto and incorporated herein by reference.

Section 7.4. Covenant Not to Compete. In consideration of this transaction, Seller agrees for a period during and for five (5) years after the Closing Date, not to directly or indirectly, as an owner, partner, joint venturer, e mployee, independent contractor, consultant, distributor, or shareholder (of more than one (1%) percent of the outstanding voting stock of a company), engage in, establish, invest in, have an interest in, or associate in any fashion with, or perform any pr ofessional services on behalf of, a company which maintains a place of commerce within 100 miles of Reston, Virginia, or actively solicits commerce from persons or entities located within 100 miles of Reston, Virginia organized in whatever form, and directly or significantly indirectly engaged in the Business. The Covenant Not to Compete is attached hereto and incorporated herein by reference as Exhibit 7.4.

Section 7.5 Covenant Not to Contact or Solicit Customers . In consideration of this transaction, S eller agrees for a period during and five (5) years after the Closing Date, not to directly or indirectly, as an owner, partner, joint venturer, employee, independent contractor, consultant, distributor, or shareholder (of more than one (1%) percent of the outstanding voting stock of a company), (a) contact on behalf of a competing company or on Seller's own behalf, any customer the Company as of the Closing Date, and (b) attempt to solicit on behalf of a competing company or on Seller's own behalf, any cus tomer of the Company as of the Closing Date to provide goods or services provided by the Business.    The Covenant Not to Contact or Solicit Customers is attached hereto and incorporated herein by reference as Exhibit 7.5.

Section 7.6.      Covenant Not to S olicit Employees . In consideration of this transaction, Seller agrees for a period during and for five (5) years after the Closing Date,

10

not to directly or indirectly, as an owner, partner, joint
venturer, employee, independent contractor, consultant,
distributor, or shareholder (of more than one (1%) percent
of the outstanding voting stock of a company), solicit,
divert, hire or attempt to solicit, divert, or hire any
employee of the Company.  The Covenant Not to Solicit
Employees is attached hereto and in    corporated herein by
reference as Exhibit 7.6.

Section 7.7.  Employment Agreement .  On the Closing Date,
Company will execute an Employment Agreement as contained in
Exhibits 7.7, attached hereto and incorporated herein by
reference, with Seller for a term    of ninety (90) days
("Training Period") at $19.11 an hour, so that Seller may
train his replacement.   Purchaser may extend the ninety
(90) days at $35.00 per hour.  Seller acknowledges that upon
the Closing Date, he will be employee of the Company, and
his obligations to the Company and right to be involved in
the operation of the Company after closing are at the
exclusive direction of Purchaser

## ARTICLE EIGHT - CONDITIONS PRECEDENT

Section 8.1.    Due Diligence .  Purchaser to have ten (10)
business d ays from the execution date hereof (the "Due
Diligence Period") to review the books and records of the
Company.   If Purchaser's due diligence team determines any
irregularities in the Company's financial records during
said due diligence, or notices a rec        ent decline in
performance of the Company, then Purchaser may declare this
Stock Purchase Agreement null and void at any time prior to
the expiration of the Due Diligence Period.

Section 8.2    Key Employees to Stay with Company    .  At
Purchaser's sole discre tion, Purchaser may terminate this
Agreement prior to Closing if Purchaser is advised in
writing by any key employee of the Company that such key
employee will resign from the Company prior to or post    -
Closing and the Company has not made arrangements prior   to
Closing to replace such key employee with a reasonably
acceptable replacement.   These employees include Chris
Radford, Christine Andreoni, Bryan Russell, Christine Morse,
David Lewis, Diane Falk, Vinh Nguyen, and Tamara Gawthrop.

Section 8.3.  Seller B ound upon Signature .  Once the Stock
Purchase Agreement is fully executed, Seller must proceed to

11

closing, and in the event that Seller refuses to close,
Purchaser is authorized to take all steps to effectuate
closing, and Seller consents to such authority.

## ARTICLE NINE  - SELLER'S AND THE COMPANY'S REPRESENTATIONS AND WARRANTIES

The Seller, and Company hereby represent and warrant to
Purchaser as follows, subject to the exceptions and
qualifications set forth on the Disclosure Schedule attached
hereto and made a part hereof:

Section 9.1  Corporate Status.  Company is a corporation
duly organized, validly existing and in good standing under
the laws of the state of Virginia and have the corporate
power and authority to own and operate its properties and to
carry on it business as now being conducted, and to enter
into and to perform its obligations under this Stock
Purchase Agreement and the and Ancillary Documents (as
hereinafter defined) to which it is a party.  Company is
duly qualified to do busin ess and is in good standing in
each state in which failure to be so qualified would have a
material adverse effect on Company's financial position or
its ability to conduct its business in the manner now
conducted.

Section 9.2  Ownership of Shares, Power  and Authority to
Sell.  The Seller owns all rights, title and interest in and
to the Purchased Stock being sold and the Purchased Stock
will be, on the Closing Date, free and clear of any liens,
encumbrances, adverse rights and claims of any kind
whatsoever.  The Seller has the power and authority to sell
the Purchased Stock being sold hereunder to Purchaser
pursuant to this Stock Purchase Agreement free and clear and
to execute, deliver and otherwise perform this Stock
Purchase Agreement and the Ancillar y Documents to which it
is a party.

Section 9.3.  Authorization.  The Company has full legal
right, power and authority to conduct its business and
affairs.  The Company has full legal right, power and
authority to enter into and perform its obligations
hereunder, without the consent or approval of any other
person, firm, governmental agency or any other legal entity.
The execution and delivery of this Stock Purchase Agreement,
the execution and delivery of each Ancillary Document to
which the Company  is a party, and the performance by the
Company of its obligations thereunder, are within the
corporate powers of the Company, and have been authorized by

12

all necessary corporate action properly taken, have
received all necessary governmental approvals, if 'any were
required, and to the knowledge of the Seller, do not
contravene or conflict with any current provision of any
material law, any applicable judgment, ordinance, regulation
or order of any court or governmental agency, the Articles
of Incorporation or Bylaws of the Company or any agreement
binding upon the Seller or the Company or its properties.
The officer of the Company executing this Stock Purchase
Agreement, and all the documents relating to the
transactions contemplated hereby to which the C ompany is a
party (the "Ancillary Documents") is duly authorized to act
on behalf of the Company.  Spousal consent forms are
attached hereto and incorporated herein by reference.

Section 9.4     Validity and Binding Effect  .    The Stock
Purchase Agreement an  d the Ancillary Documents are the
legal, valid and binding obligations of the Seller and the
Company, as appropriate, enforceable in accordance with
their respective terms, subject to (i) limitations imposed
by bankruptcy, insolvency, moratorium or other s imilar laws
affecting the rights of creditors, and (ii) the exercise of
judicial discretion in accordance with general principles of
equity.

Section 9.5.      Capitalization.   Company issued and
outstanding capital stock consists solely of one thousand
(1,000) shares of common stock (or securities or rights
convertible into such shares) represent one  -hundred (100%)
percent of the shares that are issued and outstanding. At
the Closing Date, the Seller will transfer one thousand
(1,000) shares in the Company t   o Purchaser and Purchaser
will be the owner of one hundred (100%) percent of the
issued and outstanding shares the Company.

Section 9.6     No Conflicts .    To the knowledge of the
Seller, the consummation of the transactions hereby
contemplated and the perf ormance of the obligations of the
Seller and the Company under and by virtue of this Stock
Purchase Agreement or the Ancillary Documents will not
result in any breach of, or constitute a default under, any
material mortgage, security deed or agreement, dee     d of
trust, lease, bank loan or credit agreement, corporate
charter or bylaws, agreement or certificate of limited
partnership, license, franchise or any other instrument or
agreement to which the Seller or the Company is a party or
by which the Seller or    the Company or its respective
properties may be bound or affected or to which the Seller
or the Company have not obtained an effective waiver which
could reasonably be expected to have a material adverse

13

effect on the Company or its future operations taken    as a whole.

Section 9.7  Litigation.   There are no actions, suits, or proceedings pending or, to the knowledge of the Seller, overtly threatened against or affecting the Seller, Company or the Company Assets, at law or in equity, before any court, fede ral, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, and, to the best of Seller's and the Company's knowledge, no basis exists. for any such action, suit, or proceeding.

Section 9.8   Other Agreements; No Defaults .   The Seller and the Company are not parties to any indenture, loan or credit agreement, lease or other agreement or instrument, or subject to any charter or corporate restriction that could, by virtue of containing terms and conditions     other than usual and customary for the circumstances, reasonably be expected to have a material adverse effect other than arising as a result of a default thereunder) on the business, properties, assets, operations or conditions, financial or otherwise, o f the Company, or the ability of the Seller or the Company to carry out its obligations under this Stock Purchase Agreement and the Ancillary Documents to which it is a party.   To the knowledge of the Seller, the Company is not in default in any respect in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any agreement or instrument material to its business to which it is a party, and no other default by Company or event has occurred and is  continuing that with notice or the passage of time or both would reasonably be expected to constitute a material default by Company or event of material default by Company or event of material default by Company under any of same.

Section 9.9   Compliance with Law .   To the knowledge of Seller, the Company has obtained, or in the ordinary course of business will obtain, all necessary material licenses, permits and approvals and authorizations necessary or required in order to conduct its business and affai    rs as heretofore conducted and as hereafter intended to be conducted.   To the knowledge of the Seller, the Company is in compliance with all material laws, regulations, decrees and orders known to be applicable to it (including but not limited to laws, re gulations, decrees and orders relating environmental, occupational and health standards and controls, antitrust, monopoly, restraint of trade or unfair competition), to the extent that noncompliance, in the

14

aggregate, cannot reasonably be expected to have                    a
materially adverse effect on its respective business,
operations, property or financial condition and will not
materially adverse affect the Company's ability to perform
its obligations under this Stock Purchase Agreement and the
Ancillary Documents.

Section 9.10.  Statements Not False or Misleading .  To the
knowledge of Seller, no representation or warranty given as
of this date hereof by the Seller or the Company contained
in this Stock Purchase Agreement or any exhibit attached
hereto or any statement   in any document, certificate or
other instrument required by the terms hereof furnished to
Purchaser, to the knowledge of the Seller, contains or will
contain any material untrue statement, or omits or will omit
to state any material fact which is necessa  ry in order to
make the statements contained therein not misleading.
There is no fact known to the Seller which materially
adversely affects, or in the future could reasonably be
expected to materially adversely affect, the business,
operations, cash flo ws, affairs, prospects, properties or
assets or the condition, financial or otherwise, of the
Company which has not been disclosed in this Stock Purchase
Agreement, the exhibits, the Ancillary Documents, or in any
documents, certificates, information or wr itten statements
furnished to Purchaser for use in connection with the
transactions contemplated hereby (collectively the
"Disclosure Documents").

Section 9.11.    Environmental.    To the knowledge of the
Seller, the Real Property and the Leased Real Prope rty has
not been used by the Company to generate, manufacture,
refine, transport, treat, store, handle or dispose of "Toxic
Material," "Hazardous Substances," or "Hazardous Waste",
other than in the ordinary course of business which
activities have been in compliance with all applicable laws
and regulations relating thereto.  For the purposes of this
Stock Purchase Agreement, "Toxic Material," "Hazardous
Substances," and "Hazardous Waste" means and includes any
hazardous, toxic, or dangerous wastes, substan      ce, or
material defined as such by (or for purposes of) the
Comprehensive Environmental Response, Compensation and
Liability Act, any so-called "Superfund" or "Superlien" law,
or any other federal, state, or local statute, law,
ordinance, code, rule, regul      ation, order or decree
regulating, relating to, or imposing liability or standards
of conduct concerning any hazardous, toxic, or dangerous
wastes, substance, or material as now in effect (each an
"Environmental Law").   To the knowledge of the Seller,
there are no pollutants, contaminants, or other substances,

15

whether hazardous or not, on or beneath the surface of the
Leased Real Property, which Seller, the Company, or any
other person or entity has placed, caused or allowed to be
placed upon the Leased Re al Property, and which may cause
any investigation by any agency or instrumentality of
Government which are or may be on the Leased Real Property
in violation of any law or regulation or which are, or may
be a nuisance or health threat to occupants of the      Leased
Real Property or other residents of the area.

Section 9.12.    Labor Matters .    To the knowledge of the
Seller, the Company is not bound by any collective
bargaining agreement or agreement of any kind with any union
or labor organization. The Company has not been the subject
of any union activity or labor dispute, nor has there been
any strike of any kind called or threatened to be called
against it, and, to the knowledge of the Seller, the Company
has not violated any material applicable federal or      state
law or regulation relating to labor or labor practices,
which could reasonably be expected to have a material
adverse effect.

Section 9.13.         Financial Statements .    The Company's
unaudited statements of assets, liabilities and equity, and
the Company's unaudited statements of revenue and expenses
(the "Financial Statements"), attached hereto as required by
Sections 6.1 and 6.2 herein, are in accordance with the
Company's books and records in all material respects, and
fairly present the Company's fi nancial condition as of the
respective dates and the Company's result of operations for
the years then ended. The Company does not have material
liability or obligation (whether accrued, absolute,
contingent, or otherwise) which could be reasonably expected
to have a material adverse effect on the Company and which
is not set forth on the Financial Statements, except for
liabilities incurred or accrued in the ordinary course of
business since the date of the Financial Statements or
liabilities which are no  t required to be disclosed by
generally accepted accounting principles ("GAAP") or under
the basis of accounting currently in use by the Company.
The Company is not in default with respect to any material
liabilities or obligations, which default could    reasonably
be expected to have a material adverse effect on the
business and operation of the Company, and all such
liabilities and obligations reflected in the Financial
Statements have been or are being paid and discharged as
they become due in the ordin       ary course of business
operations of the Company taken as a whole which could
reasonably be expected to have a material adverse effect
since the time that the Company supplied its books, records,

16

statements of financial condition and other documents to Purchaser.

Section 9.14.    Undisclosed Liabilities.    Except as and to the extent specifically reflected in the Financial Statements or not required to be disclosed by GAAP or under the basis of accounting currently in use by the Company, and except for trade payables and similar liabilities arising in the ordinary course of business, as of the date of the Financial Statements, the Company has no other material liabilities of any nature (whether accrued, absolute, contingent, known or unknown, determinable      or not or otherwise) which could have a material adverse effect on the Company.

Section 9.15    Taxes.    The Company has timely and properly completed and filed in correct form all United States federal, state, local, foreign, and other tax returns and estimates of every nature required to be filed by the Company and paid all taxes due as shown on such returns and all assessments of which notice has been received.    There are no agreements by the Company for the extension of time for the assessment of any t ax.    There are no claims pending or, to the knowledge of Seller, overtly threatened against the Company for past due taxes.    The Company has paid all taxes which do not require the filing of returns and which are required to have been paid by the Company.

Section 9.16    Condition of Company Assets.    With respect to the equipment owned, leased or used by the Company: (i) the Company is and has at all times been in compliance with all applicable material law relating to land use; and (ii) there are no ou tstanding requirements or recommendations by fire underwriters or rating boards, insurance companies or holders of mortgages or other security interests requiring or recommending any material repairs or work to be done with reference to any such properties, and in any case only where any failure relating thereto would be reasonably likely to have a material adverse effect on the Company.

Section 9.17.    Compliance with Contracts and Leases.    A List of all written leases of the Company and all written contracts (collectively the "Service Contracts"), is attached hereto as required by Sections 2.2, and 6.9 herein, and all such Service Contracts are in full force and effect, to the knowledge of Seller, are valid and binding upon each of the parties thereto, and to the knowledge of the Seller, are fully enforceable by the Company against the other party thereto in accordance with its terms.    Neither the Company nor the Seller has any notice of, or any justifiable reason

17

to believe that there is or has been, any actual, threatened
or contemplated termination or material modification of any
of the Service Contracts.    The Company is not in material
breach or in default of any Service Contracts, nor to the
knowledge of the Seller is any other party to any Service
Contracts in material breach or in default thereunder, nor
has any event occurred, to the knowledge of the Seller,
which, with the lapse of time, notice or election, may
become a material breach or material default by the Company
under any of the Service Contracts.   The execution, delivery
and performance of this Stock Purchase Agreement by the
Company and the consummation of the transactions
contemplated by this Stock Purchase Agreement (i) will not
result in the material breach or termination of or
constitute a default under any Service Contract, (ii) does
not require the consent of any party to a Service Contract,
or any other person  for whose benefit a Service Contract
was executed, and (iii) will not give any such party or
person the right to terminate a ny Service Contract.   All
payments required to be made pursuant to the Service
Contracts by parties to the Service Contracts, and other
persons for whose benefit Service Contracts were executed
which are now due, have been paid in full.   The Company has
not accepted payment under the Service Contracts for work
which it has not yet performed, other than in the ordinary
course of business.    The Service Contracts are in
compliance with all applicable material laws of all
Governmental Agencies.

Section 9 .18.   Liens.   Other than as disclosed in the
Financial Statements, to the knowledge of the Seller, there
are no judgments, bankruptcies, executions, liens,
encumbrances of any kind, or unpaid bills of any nature,
pending against the Seller or the Company.

Section 9.19.   Employment Contracts .   The Company is not
bound by any employment agreements, either written or oral,
with any employees or independent contractors of the Company
which is not terminable at will, except as may be prohibited
by any law, rule or regulation.

Section 9.20   Employment Practices .  To the knowledge of
Seller, the Company is in compliance with all federal and
state laws and regulations respecting employment and
employment practices, including, without limitation, payment
of payr oll, withholding and unemployment taxes.    The
premiums with respect to all workmen's compensation
insurance required to be carried by the Company on the
employees of the Company shall have been fully paid through
the Closing Date by the Company, and all r    eturns timely

18

filed by the Company except any failure to pay or file which could not be reasonably be expected to have a' material adverse effect.

Section 9.21. Employee Plans. Except as listed on Exhibit 9.21 attached hereto and incorporated herein by r eference, neither the Company nor any ERISA Affiliate (as hereinafter defined) maintains any of the following plans (the "Employee Plans"): (1) any employee pension benefit plan (as such term is defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), including any person, profit sharing, retirement, thrift, or stock purchase plan; (2) any employee welfare benefit (as such term is defined in ERISA): (3) any other compensation, stock option, restrictive stock, fringe benefit or r etirement plan of any kind whatsoever, formal or informal, not included in the foregoing or providing for benefits for, or the welfare of, any or all of the current or former employees or agents of the Company or any ERISA Affiliate or any of their benefic        iaries or dependents, including any group health, life insurance, retiree medical, bonus, incentive or severance plan; (4) any "multi-employer" plan as such term is defined in ERISA or the Internal Revenue Code of 1986, as amended (the "IRC"); or (5) any " multi-employer welfare arrangement " as defined in ERISA.   For purposes of this section, the term "ERISA Affiliate" shall mean any entity that is under common control with the Company within the meaning of ERISA or is any member of a group that includes t he Company and that is treated as a single employer under the IRC. To Seller's knowledge, there is not any liability of any kind arising out of, or attributable to, or affecting the Company for which Purchaser will have any liability for payment or otherwise relating to persons who are former employees or retirees of the Company as of the Closing Date. To Seller's knowledge, there does not exist and will not exist by virtue of the transactions contemplated by this Stock Purchase Agreement any liability wh ich may be asserted against the Company and no lien or other encumbrances has attached or will attach to the Company relating to former employees or retirees of the Company.

Section 9.22 Insurance. Attached hereto and incorporated herein by reference as  Exhibit 9.22, is a list of each insurance policy currently held by the Company, setting forth with respect to each policy the name and the insurer, a description of the policy, the dollar amount of the coverages, the amount of the premium, the amount of premiums which have been paid as of the Closing Date, and the expiration date.   Each insurance policy currently held by the Company is in full force and effect and the Company is

19

not in material beach of or in default under any such
policy, except where any such breach or default could not be
reasonably be expected to have a material adverse effect.
Neither the Seller nor the Company has any notice of or any
reason to believe that there is or has been any actual,
threatened, or contemplated termination or   cancellation of
any insurance policy.  To Seller's knowledge, the Company
has not failed to give any notice or to present any claim
under any insurance policy in a due and timely fashion.

Section 9.23. [Intentionally omitted]

Section 9.24.   Bank Accounts and Safe Deposit Arrangements.
Attached hereto and incorporated herein by reference as
Exhibit 9.24, which represents a true, correct, complete
list of each checking account, savings account and other
bank account and safe deposit box maintained by the Company,
and the names of all persons authorized to withdraw funds or
other property from, or otherwise deal with, such accounts
and safe deposit boxes.

Section 9.25.             Condition of Personal Property
Representation.  Exhibit 2.1 is a true and complete l ist of
all tangible personal property owned by the Company or used
by the Company in the Business as of the date reflected
thereon.   The Company has sole and exclusive, good and
merchantable title to all of the Tangible Personal Property
owned by it, free and clear of all pledges, claims, liens,
restrictions, security interests, charges and other
encumbrances, except as contained in Article Four herein.
Except as set forth on Exhibit 2.1, all of the tangible
personal property is in operating condition, maintenance and
repair consistent with past practices, and is adequate for
the continuation of the Company's business as presently
conducted, normal wear and tear excluded.

Section 9.26.   Intangible Personal Property Representation.
Exhibit 2.3 is a true  and  complete list of all intangible
personal property owned by the Company or used by the
Company in the Business as of the date reflected thereon,
including all patents, technology, trademarks, service
marks, trade names, business names, copyrights, othe          r
intellectual property rights, trade secrets, assumed names,
and other intangible assets and all applications therefore
which are owned or licensed to the Company.

Section 9.27.   Accounts Receivable Representation.  Exhibit
2.5 is a true and complete li st of all accounts receivable
owned by the Company as of the date reflected thereon,
representing work completed and invoiced to a third   -party

unrelated customer of the Company, not yet paid, and which
· to the knowledge of the Seller, will be paid to the Co mpany
in the ordinary course of business.

Section 9.28. Accounts Payable Representation. Exhibit 4.1
is a true and complete list of accounts payable owed by the
Company as of the date reflected thereon, representing
products and services providing t o the Company by a third -
party unrelated entity vendor. To the knowledge of Seller,
there exist no existing or prior vendor that refuses to ship
products to the Company as a result of pre -closing issues,
including but not limited to late payment, invoice c redits,
and distribution territory disagreements.

Section 9.29. Work in Progress Representation. Exhibit 2.9
is a true and complete list of work in progress of the
Company as of the date reflected thereon, all of which will
be completed in the due course of business and invoiced to a
third-party unrelated customer.

## ARTICLE TEN - PURCHASER'S REPRESENTATIONS AND WARRANTIES

Purchaser hereby represents and warrants to Seller as
follows:

Section 10.1.    Investment. Purchaser is acquiring the
Purchased Stock for the Purchaser's own account, to hold for
investment, and with no present intention of dividing his
participation with others or reselling or otherwise
participating, directly or indirectly, in a distribution of
shares, and the Purchaser will not mak e any sale, transfer,
or other disposition of the Purchased Stock in violation
with any state securities laws or in violation of the
Securities Act of 1933, as amended.

Section 10.2.    Authority.    Purchaser is a corporation
duly organized, validly exist   ing and in good standing.
Purchaser has full power and authority to purchase the
Company's Shares and to enter into and execute, deliver and
otherwise perform this Stock Purchase Agreement and the
Ancillary Documents in accordance with its terms.    This
Stock Purchase Agreement and the Ancillary Documents will be
duly executed and delivered by Purchaser, and each
constitutes the legal, valid and binding obligation of the
Purchaser, enforceable in accordance with its terms, except
as enforceability may be  limited by applicable bankruptcy,
insolvency and other laws and equitable principles affecting
creditor's rights.

21

Section 10.3.    No Conflicts .    The consummation of the
transactions hereby contemplated and the performance of the
obligations of Purchaser under and by virtue of this Stock
Purchase Agreement or the Ancillary Documents will not
result in any breach of, or constitute a default under, any
material mortgage, security deed or agreement, deed of
trust, lease, bank loan or credit agreement, corpora          te
charter or bylaws, agreement or certificate of limited
partnership, partnership agreement, license, franchise or
any other instrument or agreement to which the Purchaser is
a party or by which the Purchaser or its properties may be
bound or affected or to which the Purchaser has not obtained
an effective waiver.

Section 10.4    Sale or Transfer of Shares; Legend .    Each
certificate representing the Purchased Stock shall bear a
legend substantially in the following form:

> THE SHARES REPRESENTED BY THIS C ERTIFICATE HAVE
> NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF
> 1933, AS AMENDED AND MAY NOT BE OFFERED, SOLD,
> OR OTHERWISE TRANSFERRED, PLEDGED, OR
> HYPOTHECATED, UNLESS AND UNTIL SUCH SHARES ARE
> REGISTERED UNDER SUCH ACT OR AN OPINION OF
> COUNSEL SATISFACTORY TO THE COMPANY IS OBTAINED
> TO THE EFFECT THAT SUCH REGISTRATION IS NOT
> REQUIRED.

## ARTICLE ELEVEN - POST CLOSING COVENANTS AND AGREEMENTS.

Section 11.1    Continued Operation of the Company.    The
purpose of this transaction is for the continuation of t  he
Company.    Similarly, so long as Purchaser is not in Default
of the Deferred Payments, Seller shall not move for the
appointment of a receiver over the Company or its
responsibilities, and all parties herein irrevocably waive
the right to request a receiver.

Section 11.2.    Tangible Personal Property .    Purchaser and
the Company shall not sell or move the Tangible Personal
Property without the written consent of Seller, and shall
keep the Tangible Personal Property in the same condition as
on the Closi ng Date, wear and tear excepted, until the
Deferred Payments are fully paid.

Section 11.3    Access to Books and Records . Seller shall be
allowed full and complete access to the books and records of
the Company during business hours, and shall receive monthly

operating statements on the Company until the Deferred
Payments are fully paid.

Section 11.4.    Insurance.    After the Closing Date,
Purchaser shall cause the Company Assets to be fully insured
consistent with its insurance level pre      -Closing of this
transaction until the Deferred Payments are fully paid.
Proof of insurance will be provided to Sellers by the
Company, along with immediate notice of any cancellation
thereof.

Section 11.5    Performance of Obligations: Maintenance of
Representations and Warranties.    The parties shall in good
faith undertake to (i) to perform their covenants and
agreements, and satisfy all conditions, in this Stock
Purchase Agreement and (ii) to cause the transactions
contemplated in this Stock Purchase Agreement to be  carried
out promptly in accordance with the terms of this Stock
Purchase Agreement.

Section 11.6.    Expenses.    The Seller and Purchaser shall
pay their own expenses and costs incurred in connection with
the negotiation and consummation of this Stock Purc      hase
Agreement and the transactions contemplated by this Stock
Purchase Agreement, except if any party breaches this Stock
Purchase Agreement, such party will be responsible for the
other party's expenses and costs of entering into and
enforcing this Stock Purchase Agreement.

Section 11.7    Seller's Further Assurances.    If, at any time
after the Closing Date, Purchaser and/or the Company shall
reasonably consider or be advised that any further deeds,
assignments, other documents, assurances at law, or any
other acts are necessary, desirable, or proper to (a)
maintain ownership of the Assets to the Company, (b) confirm
such ownership or facilitate effective recordation thereof,
(c) put the Company in actual possession and control of the
Assets of the Company,   or (d) otherwise carry out the
purposes of this Stock Purchase Agreement, Seller shall
execute and deliver such further assurances to the Company
or Purchaser or cause them to be executed and delivered to
the Company without any charge to Purchaser and in   proper
form for any required recording, filing, or registration.


ARTICLE TWELVE - INDEMNIFICATION

Section  12.1    Indemnification of Seller  .  Except as
otherwise limited by this Article Twelve, Seller shall
indemnify, hold harmless and reimburse Purchas   er from and

23

for and all Loss (as hereinafter defined) suffered or
incurred by Purchaser as a direct result of, or with respect
to:

> (i) any material breach or inaccuracy of any
> representation or warranty of Seller set forth
> in this Stock Purchase Agreement       or other
> document delivered pursuant hereto or in
> connection herewith:

> (ii) any material breach of or noncompliance by
> Seller with any covenant or agreement of Seller
> contained in this Stock Purchase Agreement;

> (iii) any litigation against the Company   and/or
> Seller existing prior to the Closing Date and
> not disclosed herein;

> (iv) any liability or claim by the Internal
> Revenue Service based on the pre          -closing
> operation of the Company;

> (v) any liability of the Company not identified
> in Section 4.1 thr   ough 4.5, or not paid as
> required in Section 4.6 through 4.8;

> (vi) any and all actions, suits, proceedings,
> demands, assessments, judgments and expenses
> (including reasonable attorney's fees) incident
> to the foregoing.

Section 12.2    Limitations on Sel ler's and the Company's
Indemnification.  All representations and warranties of the
Seller contained herein, and the indemnification with
respect to the matters described in Section 12.1 hereof (the
"Seller's and the Company's Indemnification") shall exten  d
for a period of one (1) year following the Closing Date;
provided, however, that the foregoing limitation shall not
apply to claims of which Purchaser has given Seller and the
Company specific written notice within said period. The
indemnification provid ed for in Section 12.1 hereof is
inclusive of and not in addition to any other
indemnification provided by Seller or the Company in this
Stock Purchase Agreement and shall be Purchaser's exclusive
remedy for all claims against Seller and the Company.
Further, Purchaser will not be entitled to the Seller's and
the Company's Indemnification until the aggregate of all
Losses incurred by Purchaser exceeds in the aggregate the
amount of $15,000 (the "Threshold Amount"), and then
Purchaser shall only be entitled       to indemnification

hereunder to the extent of the excess of such Losses over the Threshold Amount. In no event shall Purchaser's recoverable Losses hereunder exceed the Purchase Price.

Section 12.3    Purchaser's Indemnification.    The Purchaser (and the C ompany, after Closing) shall indemnify and hold harmless Seller against and in respect of:

      (i)      any material breach or inaccuracy of any representation or warranty of any Purchaser set forth in this Stock Purchase Agreement or in any certificate or other docum ent delivered pursuant or in any certificate or other document delivered pursuant hereto or in connection herewith:

      (ii)     any material breach of or noncompliance by Purchaser with any covenant or agreement of Purchaser contained in this Stock Purchase Agreement;

      (iii)    any liability of Seller not being removed from personal liability from the copier leases of the Company.

      (iv)    all liabilities and obligations of, or claims against, the Company which arise from or relate to the ownership or operation of the Business after t     he Closing Date, or relating to the Company Liabilities that remain with the Company after Closing.

      (v)     any and all actions, suits, proceedings, demands, assessments, judgments, costs, and expenses (including reasonable attorneys' fees) incident to the foregoing.

Section 12.4    Duration of Purchaser's Indemnification.    The indemnification with respect to the matters described in Section 12.3 hereof (the "Purchaser's Indemnification") shall extend for a period of one (1) year following the Closing Date; provide    d, however, that the foregoing limitation shall not apply to claims of which Seller has given Purchaser specific written notice within said period. The indemnification provided for in Section 12.3 hereof is inclusive of and not in addition to any other indemnification provided by Purchaser in this Stock Purchase

Agreement and shall be Seller's and the Company's exclusive
remedy for all claims against Purchaser and Purchaser's
partners, and officers.

Section 12.5.    Indemnification Definitions .    Any party
entitled to indemnity under this Section 12 shall sometimes
hereinafter be referred to as an "Indemnified Party", and
the party from whom such indemnity is sought shall sometimes
hereinafter be referred to as the "Indemnifying Party".
"Loss" or "losses"  shall mean any and all out of pocket
losses, liabilities, damages, costs (including court costs)
and expenses (including reasonable attorney's fees and
reasonable accountant's fees) incurred by an Indemnified
Party.   Provided, however, that an Indemnified  Party under
this Section 12 shall not be entitled to indemnification
hereunder relating to: (i) the loss of any tax attribute or
benefit; (ii) any tax liability or related obligation
resulting from the receipt of any payment (including those
of indemnific ation) made under this Stock Purchase
Agreement; (iii) any Loss incurred after the Closing
associated with or resulting from any change in or
continuation of any practice, policy or procedure of the
Company, or the institution of any new practice, policy o  r
procedure, in each case regardless of the reasons therefore
(iv) any lost profits, reduction in value or special,
punitive, consequential or similar damages; or (v) any
matter for which an accrual of liability or a specific
reserve is shown on the Financial Statements.

Section 12.6.  Notice of Claim.   An Indemnified Party shall
notify the Indemnifying Party, in writing, of any claim for
indemnification, specifying in reasonable detail the nature
of the Loss, and, if known, the amount, or an estimate of
the amount, of the liability arising therefrom.    The
Indemnified Party shall provide to the Indemnifying Party as
promptly as practicable thereafter such information and
documentation as may be reasonably necessary requested by
the Indemnifying Party to s   upport and verify the claim
asserted.   The Indemnifying Party shall have the right to
assume and control the defense of any asserted claim,
provided that it does so diligently, and provided that the
Indemnified Party shall be entitled to participate in suc  h
defense at its own cost and expense.


## ARTICLE THIRTEEN - ARBITRATION

Section 13.1.    Arbitration.   Any controversy or claim
arising from or relating to this Stock Purchase Agreement,
or the breach thereof (other than for either party's refusal

26

to clos e) shall be settled by binding arbitration,
administered by the American Arbitration Association in
Washington DC, under its rules and judgment and the award
rendered by the arbitrator may be entered in any court
having jurisdiction thereof.    Any party sh    all have the
absolute right to remove any litigation between the parties
hereto to binding arbitration.    The winning party in
arbitration shall be entitled to reasonable arbitration
attorney fees from the losing party.    Where a decision is
split, each pa    rty shall be responsible for their own
attorney fees.

## ARTICLE FOURTEEN    - REMEDIES IN THE EVENT OF DEFAULT BY PURCHASER

Section 14.1    Legal Default . As long as Purchaser is in
compliance with this Stock Purchase Agreement, Seller and/or
the Company cannot and will not declare a default or breach
hereunder. In the event of an alleged default by Purchaser
other than Purchaser's failure to close, no legal default
will exist until first (a) Seller notify Purchaser in
writing, declaring a default and clearly the reason for the
default, and (b) Purchaser will not have cured such default
after a period of thirty (30) days (Non-Monetary Default) or
five (5) days (Monetary Default) from the date that
Purchaser has received such a default notice ("Default").

Section 14.2    Non-Monetary Breach . In the event of any
alleged breach by Purchaser for anything other than an
alleged breach of the payment of the Deferred Payments or
Purchaser's failure to close, then:

> (a) Purchaser shall attempt to remedy the breach
> within a thirty (30) day cure period.
>
> (b) If Purchaser disagrees that a non    -monetary
> breach has occurred, or if Purchaser is unable to
> remedy the breach to Seller's satisfaction, then:

the dispute shall be submitted to arbitration with the
American Ar bitration Association in Washington DC, and
administered by the American Arbitration Association under
its Commercial Arbitration Rules.    In the event the
arbitration then finds there is a non    -monetary breach,
Purchaser will be provided in the arbitration with at least
thirty (30) days to remedy the breach, or longer, if the
arbitration so finds.    Seller acknowledges that he will be
unable to take any action in the event of a claimed non    -
monetary breach until after the American Arbitration

27

Association rul es in his favor, and the cure period has
expired.

Section 14.3  Monetary Breach In the event that Purchaser is
in default of payment of the Deferred Payments, and in the
event that Seller has submitted and Purchaser has received a
written notice of Default, and the five (5) day cure period
has expired, then Seller may foreclose on the Purchased
Stock and/or the Company's assets pursuant to the Security
Agreement.

Section 14.4    Purchaser Right of Contestment of Default  .
In the event that Purchaser conte sts that it is in default
of payment of the Deferred Payments because of a set    -off
claimed in good faith, Purchaser may notify the escrow agent
to hold the amount of the claimed set -off in escrow pending
final resolution of the claim, and the dispute shall      be
submitted to arbitration with the American Arbitration
Association in Washington DC, and administered by the
American Arbitration Association under its Commercial
Arbitration Rules, and in the event that such arbitration
panel rules in favor of the Sel   ler, then Purchaser shall
immediately notify the Escrow Agent to release the claimed
amount to Seller and Purchaser shall pay Seller's costs of
enforcing Purchaser's payment obligation.

## ARTICLE FIFTEEN - MISCELLANEOUS

Section 15.1    Survival of Represent ations and Warranties  .
Except as provided in Sections 12.2 and 12.4 hereof, all of
the representations, warranties, covenants, promises and
agreements of the parties contained in this Stock Purchase
Agreement and the Ancillary Documents (and in any docum  ent
delivered or to be delivered pursuant to this Stock Purchase
Agreement or in connection with the Closing) shall survive
the execution and delivery of this Stock Purchase Agreement
and the consummation of the transactions contemplated
hereby.

Section 1 5.2.    Good Faith Efforts; Further Assurances:
Cooperation.    The parties shall in good faith undertake to
perform their obligations in this Stock Purchase Agreement,
to satisfy all conditions and to cause the transactions
contemplated in this Stock Purchas e Agreement to be carried
out promptly in accordance with the terms of this Stock
Purchase Agreement.    Upon the execution of this Stock
Purchase Agreement and thereafter, each party shall do such
things as may be reasonably requested by the other party
hereto in order to more effectively consummate or document

the transactions contemplated by this Stock Purchase
Agreement.

Section 15.3    Successors and Assigns: Binding Effect.
Whenever in this Stock Purchase Agreement one of the parties
hereto is named o    r referred to, the heirs, legal
representatives, successors, successors-in-title and assigns
of such parties shall be included, and all covenants and
agreements contained in this Stock Purchase Agreement by or
on behalf of the Seller or the Company or by or on behalf of
Purchaser shall bind and inure to the benefit of their
respective heirs, legal representatives, successors-in-title
and assigns, whether expressed or not.

Section 15.4.    Assignment.    This Stock Purchase Agreement
shall not be assignabl    e by any party hereto without the
prior written consent of the other parties hereto, except
that Purchaser may assign the Purchased Stock to a wholly
owned subsidiary provided that Purchaser and assignee are
both liable under the terms of this Stock Purcha        se
Agreement.

Section 15.5    Time of the Essence  .    Time is of the
essence with respect to each and every covenant, agreement
and obligation of the Company, the Seller and the Purchaser
hereunder and under all of the Ancillary Documents.

Section 15.6    Severability.    If any provision of this
Stock Purchase Agreement or the application thereof to any
person or circumstance shall be invalid or unenforceable to
any extent, the remainder of this Stock Purchase Agreement
and the application of such prov isions to other persons or
circumstances shall not be affected thereby and shall be
enforced to the greatest extent permitted by law.

Section 15.7    Venue and Governing Law.    Any dispute or
controversy arising out of or in connection with the
interpretation or performance of this Stock Purchase
Agreement or any of the other documents delivered by any
other person pursuant to this Stock Purchase Agreement shall
be adjudicated by, and the parties hereto hereby submit to
the venue and jurisdiction of the Amer        ican Arbitration
Association and, if applicable, the courts, in Washington
DC, said mechanism shall have exclusive venue and
jurisdiction with respect to any such dispute or
controversy.

Section 15.8    Counterparts. This Stock Purchase Agreement
may be exe cuted in one or more counterparts, each of which

29

shall be deemed an original but all of which together shall
constitute one and the same agreement.

Section 15.9   Notices.   All notices, consents, requests,
instructions, approvals, and other communications   provided
for herein shall be validly given, made, or served if in
writing and (a) delivered personally, (b) sent by certified
mail, return receipt requested, postage prepaid, with a copy
sent by U.S. Mail or (c)   sent by overnight courier delivery
service, receipt acknowledged, fees prepaid,  and addressed
to:

If to Purchaser:

WILLIAMS FUND PRIVATE EQUITY GROUP, INC.
140 HIGHWAY ONE
LEWES, ~~DELAWARE~~ DE 19958

with a copy to:

1700 W LAKE MEAD, unit 9, Apt 340
LAS VEGAS, NEVADA 89112

If to Company:

Engel Corporation
11507 Sunset Hills Rd
Reston VA 20190

with a copy to:

If to Seller:

David Engel
1102 Oak Knoll terrace
Rockville, MD 20850

with a copy to:

or such other address or facsimile telephone number as
shall be designated in writing by like notice given by any
party hereto to all other parties hereto.    Notice will be
deemed given when personally delivered, mail, or shipped,
except in reference to notice required by Article 14 where
notices of default will be   deemed given when received by
Purchaser if sent by methods (a) or (c)   [?].    Any notice

sent by either party not in compliance with these methods is automatically null and void.

Section 15.10 Modification. This Stock Purchase Agreement may not be amende d, modified, or supplemented except by a written instrument executed by duly authorized officers of the Company and Purchaser, and individually by Seller.

Section 15.11 Waiver. Seller, Company and Purchaser, may, by written instrument signed by their re spective authorized officers or representatives, at any time extend the time for the performance of any of the obligations or other acts of any other party hereto and may waive, with respect to such other party, (a) any inaccuracies in the representations and warranties contained in this Stock Purchase Agreement or in any document delivered pursuant hereto, (b) compliance with any of the covenants, undertakings, or agreements, or satisfaction of any of the conditions to its obligations, contained in this St ock Purchase Agreement, or (c) the performance (including performance to the satisfaction of a party) of any obligations set out herein. Any waiver by any party of a condition to its obligation to perform this Stock Purchase Agreement shall be without pre judice to the rights or remedies it may have arising out of any subsequent breach of any representation, warranty, covenant, or other agreement hereunder. The remedies of a party provided in this Stock Purchase Agreement are cumulative and shall not exclude any other remedies to which any party may be lawfully entitled under this Stock Purchase Agreement or applicable law, and the exercise of a remedy shall not be deemed an election excluding any other remedy.

Section 15.12 Pro-Rations. On the Closing Date, Purchaser and Seller will pro -rate the rent, real property utilities, and real property taxes.

Section 15.13. Article and Section Headings . Numbered and titled article and section headings are for convenience only and shall not be construed as amp lifying or limited any of the provisions of this Stock Purchase Agreement.

Section 15.14 Entire Stock Purchase Agreement. This Stock Purchase Agreement, together with the schedules and exhibits which are referred to herein and are incorporated herein by reference, contains absolutely the entire agreement between the parties hereto with respect to the transactions contemplated herein.

Section 15.15. Previous Drafts, Verbal Statements Non - Admissible. This Stock Purchase Agreement herein

supersedes all   previous written or oral negotiations,
commitments, letters of intent, and writings, which by
mutual agreement shall be non -admissible in a court of law
or equity.

Section 15.16   Finder's Fee of Broker.   Each party hereto
represents and warrants that it  'has not used a broker in
this transaction, except for Prime Investments, LLC, care of
Bill Blumberg, nor have any incurred any obligation or
liability, contingent or otherwise, for brokerage fees,
agent's commissions or the like in connection with this
Stock Purchase Agreement or the transactions contemplated
hereby.   The Seller has incurred a finder's fee of
_____  ($ 31,000 ᵒᵒ      ) Dollars in this
transaction to Prime Investments, LLC, care of Bill
Blumberg, pursuant to Finder's Fee Agr     eement, attached
hereto and incorporated herein by reference as Exhibit
15.16.   Seller represents that it is not selling the
Purchased Stock to Purchaser based upon any representation,
oral or written by the Prime Investments, Inc., or by Bill
Blumberg, and that Seller is solely responsible to do any
and all due diligence on Purchaser, and Purchaser, likewise,
represents that it is not acquiring the Purchased Stock
based upon any representation, oral or written, by Prime
Investments, LLC, or by Bill Blumbe      rg but rather by
independent examination and judgment as to the prospects of
the Business.   .Further, the Purchased Stock was not offered
to the undersigned by means of publicly disseminated
advertisements or sales literature, nor is the undersigned
aware of any offers made to other persons by such means.
The Seller specifically agrees to take such further action
as may be necessary to ensure that the payment of such
finder's fee is in accordance with all applicable laws.
Seller hereby authorizes Purchas er to pay this Finder's Fee
directly to Prime Investments, LLC, care of Bill Blumberg,
and deduct same from the Closing Payment.

Section 15.17    Parties-in-Interest.  Nothing herein is
intended nor should be construed as granting any third party
beneficiary rights in or through this Stock Purchase
Agreement.

Section 15.18.   Definitions .   The following terms shall
have the indicated meaning for purposes of this Stock
Purchase Agreement and the Ancillary Documents:

(a)    Ancillary Documents .  As used herein,
Ancillary Documents refer to all
exhibits, attachments, schedules,
certificates and other memorandum which

32

are attached to the Stock Purchase
Agreement and incorporated therein by
reference.

(b)    To the Knowledge of the Company .  As used
herein, the term "to  the knowledge of the
Company" and similar terms with respect to
the Company shall mean the actual
knowledge of David Engel without any duty
of inquiry thereto.

(c)    To the Knowledge of Seller   .   As used
herein, the term "to the knowledge of
Seller" and similar terms with respect to
the Seller shall mean the actual knowledge
of David Engel without any duty of inquiry
thereto.

(d)    To the Knowledge of Purchaser  .  As used
herein, the term "to the Knowledge of
Purchaser" and similar terms with respect
to the Purchaser    shall mean the actual
knowledge of any officer, director or
shareholder of Williams Fund Private
Equity Group, Inc. with a reasonable duty
of inquiry thereto.

(e)    Material Adverse Effect .   As used herein,
the term "Material Adverse Effect" or
similar terms w ith respect to a particular
or multiple party herein, a material
adverse effect on the business, assets,
financial condition, and results of
operations, determined on a consolidated
basis, and when used with respect to
representations, warranties, covenant     s,
agreements or conditions, means the
aggregate effect of all similar situations
unless the context indicates otherwise.
If it cannot be mutually agreed that a
material adverse effect has occurred, the
parties shall resolve it through
arbitration.

Section 15.19  Tax Returns .  The parties hereby elect,
pursuant to Section 1377(a)(2) of the Internal Revenue
Code, to treat the Company's current taxable year as if
it consisted of two (2) taxable years, the first of
which ended on the Closing Date.

IN WITNES S WHEREOF, the parties hereto have caused this
Stock Purchase Agreement to be executed as of the date first
above written by their duly authorized officers.

_____

Engel Corporation t/a Budget
Communications, Inc.
     By:
       Its: President

Dated: __9/2/05___

_____

David Engel

Dated: _____

_____

Williams Fund Private Equity Group,
Inc.

    By:

       Its:

Dated: _____

**ENGEL CORPORATION**
**CLOSING STATEMENT**
9/13/05

**PURCHASE PRICE**

| | |
|---|---|
| BASE PURCHASE PRICE | $310,000.00 |
| | |
| CASH DOWN PAYMENT DUE SELLER | $155,000.00 |
| - INVENTORY CREDIT ($30,000.00 - $29,343.44) | $656.56 |
| - ACCOUNTS RECEIVABLE over 90 days | $7,268.80* |
| - CUSTOMER DEPOSITS | $223.73 |
| + SECTION 1.5 CREDIT | $21,382.35 |
| - TAXES OWING | $19,079.91 |
| + RENT Pro-RATE | $5,082.77 |
| - PAYROLL PRO-RATA | $5,692.00 |
| - CREDIT CARD S DUE ** | 0 |
| TOTAL CASH DOWN PAYMENT | $148,544.12 |
| - COMMISSION TO PRIME INVESTMENTS | $31,000.00 |
| - GENERAL ELECTRIC PAYOFF | $55,829.59 |
| DUE SELLER AT CLOSE | $61,714.53 |
| | |
| FROM PURCHASER AT CLOSE | $61,714.53 |
| - CHECKING ACCOUNT BALANCE | $24,484.00 |
| TO SELLER | $37,230.53 |
| TO PRIME INVESTMENTS | $31,000.00 |
| TO GENERAL ELECTRIC | $55,829.59 |

DEFERRED PAYMENTS DUE

| | |
|---|---|
| ON OCTOBER 3 | $40,000.00 |
| ON OCTOBER 24 | $40,000.00 |
| ON NOVEMBER 14 | $35,000.00 |
| ON DECEMBER 13 | $40,000.00 |

\* Amount represents the following invoices/accounts, which are hereby assigned to Seller:
84144, 84462, 84983, 84771, 85317, 84585, 85395, 85059, 84818, 84967, 93906 and entire Cheska's account

\*\* Purchaser to pay off MBNA credit card account ($22,434.12 within 30 days of closing.

Engel Corporation

By: _____ (SEAL)
Name: David Engel
Title: President

_____ (SEAL)
David Engel

Williams Fund Private Equity Group, Inc.

By: _____ (SEAL)
Name: Tom Daly
Title: Dir - M

## DISCLOSURE SCHEDULE

For convenient reference, this Disclosure Schedule is
arranged in paragraphs corresponding to the numbered
Sections contained in the attached Agreement.  H owever, any
disclosure in any paragraph of the Disclosure Schedule shall
relate to the entire Agreement and not solely to the
corresponding Section of the Agreement.

Section 9.3      Change of control consents required from
                 landlords/lessors in the Company's p  remises
                 lease and equipment leases.

Section 9.6      See disclosures referenced above with respect
                 to Section 9.3.

Section 9.8      See disclosures referenced above with respect
                 to Section 9.3.

Section 9.17     See disclosures referenced above with respect
                 to Section 9.3.

Section 9.19     The Company has an independent contractor
                 arrangement with an outside salesperson.

Section 9.21     The Company maintains a simple IRA plan and a
                 Section 125 plan.

35



GE Commercial Finance
**Business Property**

Small Business Market

August 26, 2005

Engel Corporation
11507 Sunset Hills Road
Reston, VA 20190

Re:    Engel Corporation
       A/S # 6302854-001

Dear Borrower:

Per your request, following is the payoff on the above captioned loan:

Interest Due from August 1, 2005 to **September 15, 2005** *

| | |
|---|---|
| 30 days at 8.25% | $407.61 |
| 14 days at 8.50% | $195.98 |
| Principal Balance | $59,288.45 — 3700 = 55,588.45 |
| Processing Fee | $75.00 |
| Late Charges | $0.00 |
| Returned Item Charges | $0.00 |
| Other Charges | $50.00 |
| Prepayment Premium | $0.00 |
| Total | $60,017.04 |
| | |
| Per Diem Rate | $13.99 |

* It is written in your Note that a three-week notification of payoff is required. You may pay the loan in full prior to the three weeks, however, the total amount shown above, which includes three weeks of interest, is due in full. Please note, the above notification is only valid through October 21, 2005. If GE Capital Small Business Finance Corporation has not received the funds within this (60) day period, a new three-week advance written notification must be provided by the borrower. Fees are added to date. The above payoff quote is based upon the current applicable rate plus spread on your loan. Regardless of any payoff efforts underway, you are required to make scheduled monthly payments per the terms of your note. Failure to do so could result in additional late charge assessments. **Due to possible prime rate changes and any monthly payments being applied, please confirm amount prior to actual payoff to insure that the above payoff amount will satisfy your loan in full.** You are responsible for any fees that may occur after this quote. Your payoff must include interest at the per diem rate to the date GE Capital Small Business Finance Corporation receives the proceeds.

Funds for payoff of your loan must either be in the form of: (1) a wire transfer to our bank (see wire instructions below); or (2) a check drawn on a U.S. Bank from the borrower's personal or business account via next day delivery (see mailing instructions below). **We will not accept money orders, third party checks or any other form of payoff funds.**

GE Commercial Finance Business Property Corporation

Engel Corporation
August 26, 2005

Page 2

If you choose to wire the payoff, please wire your funds (and include your A/S# shown above) to:

    Deutsche Bank
    60 Wall Street
    New York, NY
    Phone #212-250-2500
    ABA #021001033
    For Credit to: GE Capital Small Business Finance Corporation
    Account #50-256-717

If you choose to submit your payoff via check, please overnight your check (and include your A/S# shown above) to my attention at the following address:

    GE Capital Small Business Finance Corporation
    635 Maryville Centre Drive, Suite 120
    St. Louis, MO 63141-9025
    ATTENTION: Serena Pettyjohn

If your payoff date falls on a Monday through Thursday, the payoff must be received and identified by 2:00 pm CST. If the payoff is not received by 2:00 pm CST, you must include an extra day of interest. If your payoff date falls on a Friday, your payoff must be received and identified by 10:00 am CST. If the payoff is not received by 10:00 am CST, you must include three extra days of interest (Friday, Saturday and Sunday). If a holiday falls on Monday, you must include three days of interest (Saturday, Sunday and Monday). It is important that you include your A/S # listed above to assist us in identifying your loan payoff.

Should the payoff be made via check, GE Capital Small Business Finance Corporation will hold release of the collateral documents until said check clears.

Again, prior to actual payoff please confirm the amount due, as it may vary from the amount stated on this letter due to payments applied or rate changes that occurred after this letter was issued.

Should you have questions, feel free to contact us.

Sincerely,

GE Capital Small Business Finance Corporation,
    a Delaware corporation

By:
Name Printed:  Serena Pettyjohn
Title: Sr. Par

**ENCLOSED ARE DOCUMENTATION RELEASE INSTRUCTIONS:**

**DOCUMENTATION RELEASE INSTRUCTIONS:**

When your loan is satisfied in full and the quoted processing fee is paid, GE Capital Small Business Finance Corporation will release the collateral which secured the loan, including any life insurance assignments. IT IS OUR POLICY NOT TO SEND ANY RELEASES OR DOCUMENTS TO PARTIES OTHER THAN THE BORROWER. GE Capital Small Business Finance Corporation WILL NOT ASSIGN LOAN COLLATERAL DOCUMENTS TO OTHER LENDERS.

Please forward these instructions to all parties involved in your payoff, including title companies and attorneys.

Please allow 90 days for all the documents to be filed and returned to our office. Additional time is required in some geographical regions due to their jurisdictional recording backlog. Your final package will be mailed to your invoice address unless you instruct us otherwise in writing.

After your loan has paid off, please contact your insurance carriers and instruct them to delete GE Capital Small Business Finance Corporation as Mortgagee or Loss Payee, as the case may be.

Mail correspondence about documentation to:
GE Capital Small Business Finance Corporation
635 Maryville Centre Drive, Suite 120
St. Louis, MO 63141
Attn: Release Dept.

# Any questions pertaining to the payoff figures should be directed to Customer Service at 1-800-286-8676.

GE Commercial Finance Business Property Corporation

**EXHIBIT 5.1 (a)**

**CLOSING CERTIFICATE**

This certificate evidences on this 13th day of September, 2005, one hundred and 00/100 (100.0%) percent of the outstanding and issued shares of Engel Corporation were both sold to Williams Fund Private Equity Group, Inc., pursuant to a Stock Purchase Agreement dated September 2, 2005.

Williams Fund Private Equity Group, Inc.
     By:
     Its:

David Engel

Engel Corporation

EXHIBIT 7.1 (a)

## RESOLUTION OF THE BOARD OF DIRECTORS OF ENGEL CORPORATION

RESOLVED, that the Directors of ENGEL CORPORATION, hereby authorizes David Engel acting on behalf of ENGEL CORPORATION to enter into a Stock Purchase Agreement with WILLIAMS FUND PRIVATE EQUITY GROUP, INC. ("WILLPEG") whereby WILLPEG will acquire one hundred percent (100%) of the shares of common stock of ENGEL CORPORATION.   The Directors hereby approve the terms and provisions of the Stock Purchase Agreement dated September 2, 2005, with WILLPEG.

RESOLVED, that   Frank Mitan   is elected as Chief Executive Officer of ENGEL CORPORATION effective immediately.

RESOLVED, that the current signatories ENGEL CORPORATION's checking accounts shall be removed, AND replaced by _____ or his designee.

Dated:  September 13, 2005

_____
ENGEL CORPORATION
    By: David Engel
    Its: Former         PRESIDENT


_____
ENGEL CORPORATION
    By:
    Its: New        PRESIDENT

**EXHIBIT 7.3**

**RESIGNATION OF OFFICERS**

Whereas, as of this day of September 13, 2005, David Engel hereby and irrevocably resigns as an officer of Engel Corporation.

_____
David Engel

_____
Engel Corporation

SHARES *1,000*

NUMBER 2

INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF VIRGINIA

# ENGEL CORPORATION

The Corporation is authorized to issue 5,000 Common Shares Par Value $1.00 each

The Shares represented by this certificate are transferable only on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this certificate properly endorsed. This certificate and the shares represented hereby are issued and shall be held subject to all of the provisions of the Articles of Incorporation and the By-laws of the Corporation and any amendments thereto, to all of which the holder by acceptance hereof assents. The Corporation will furnish without charge to each shareholder who so requests a Statement of the designations, relative rights, preferences and limitations applicable to each class of shares and the variations in relative rights, preferences and limitations determined for each series, and the authority of the Board of Directors to establish series and to determine the variations in the relative rights, preferences and limitations as between series.

**This Certifies that** *David B. Engel*

*One Thousand* is the owner of

non-assessable Shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated As of January 1, 2005



The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written
ut in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

| TEN COM | — as tenants in common | UNIF GIFT MIN ACT — .................Custodian................(Minor) |
| TEN ENT | — as tenants by the entireties | under Uniform Gifts to Minors Act................................(State) |
| JT TEN | — as joint tenants with right of survivorship and not as tenants in common | |

*or value received, the undersigned hereby sells, assigns and transfers unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

WILLIAMS  GOOD  MOUNTR  EQUITY  GROUP.  INC.

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

...........................................................................................................................................................................................................................

.................................................................................................................................................................................*Shares*

*presented by the within Certificate, and hereby irrevocably constitutes and appoints.................................................*

.............................................................................................................................*Attorney to transfer the said*

*ares on the books of the within-named Corporation with full power of substitution in the premises.*

*ated,....9/13/05.............*

*In presence of*

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular without alteration or enlargement, or any change whatever.

## SECURITY AGREEMENT

This Security Agreement is made between and entered into the 13th day of September, 2005, by and among WILLIAMS FUND PRIVATE EQUITY GROUP, INC. (the "Borrower"), DAVID ENGEL (the "Holder") and ENGEL CORPORATION t/a Budget Communications (the "Company").

FOR VALUE RECEIVED, and in order to secure payment of any and all indebtedness of the Borrower to Holder, now existing or hereafter incurred, matured or unmatured, direct or contingent, including any extensions, renewals and substitutions thereof, pursuant to the Stock Purchase Agreement among Borrower, Holder and the Company dated September 2, 2005 (the "Stock Purchase Agreement"), the Borrower hereby grants to the Holder a security interest in (i) the Purchased Stock of the Company as defined in the Stock Purchase Agreement, and (ii) all assets of the Company and proceeds thereof (collectively, the "Collateral").   All capitalized terms used herein that are not defined herein shall have the meaning ascribed to them in the Stock Purchase Agreement.

This Security Agreement secures the indebtedness of the Borrower to Holder for the Deferred Payments, as defined in the Stock Purchase Agreement.

1.   UCC FINANCING STATEMENT.   A UCC Financing Statement covering the Collateral herein secured shall be filed for record with the appropriate filing office in the Commonwealth of Virginia.   In addition, the certificates representing the Purchased Stock shall be held in escrow by the escrow agent referred to in the Stock Purchase Agreement.

2. Default

In the event of any alleged breach by Borrower for anything other than an alleged breach of the payment of the Deferred Payments or Borrower's failure to close, then:

> (a) Borrower shall attempt to remedy the breach within a thirty (30) day cure period.

> (b) If Borrower disagrees that a non-monetary breach has occurred, or if Borrower is unable to remedy the breach to Holder's satisfaction, then:

the dispute shall be submitted to arbitration with the American Arbitration Association in Washington DC, and administered by the American Arbitration Association under its Commercial Arbitration Rules.   In the event the arbitration then finds there is a non-monetary breach, Borrower will be provided in the arbitration with at least thirty (30) days to remedy the breach, or longer, if the arbitration so finds.   Holder acknowledges that he will be unable to take any action in the event of a claimed non-monetary breach until after the American Arbitration Association rules in his favor, and the cure period has expired.

Monetary Breach In the event that Borrower is in default of payment of the Deferred Payments, and in the event that Holder has submitted and Borrower has received a written notice of Default, and the five (5) day cure period has expired, then Holder may foreclose on the Collateral in accordance with the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

Borrower Right of Contestment of Default.   In the event that Borrower contests that it is in default of payment of the Deferred Payments because of a set-off claimed in good faith, Borrower may notify the escrow agent to hold the amount of the claimed set-off in escrow pending final resolution of the claim, and the dispute shall be submitted to arbitration with the American Arbitration Association in Washington DC, and administered by the American Arbitration Association under its Commercial Arbitration Rules, and in the event that such arbitration panel rules in favor of the Holder, then Borrower shall immediately notify the Escrow Agent to release the claimed amount to Holder and Borrower shall pay Holder's costs of enforcing Borrower's payment obligation.

Stock Pledge.   In the event of an uncured default, Holder assumes the control of the Purchased Stock pending foreclosure, except if Borrower contests the default, and has filed for arbitration regarding said default, and continues making timely payments to the escrow for the Deferred Payments, then Borrower will retain control of the Purchased Stock pending decision by the American Arbitration Association.

3.   ATTORNEY'S FEES.   In the event the Holder is required to take legal action to enforce any of the provisions of the Security Agreement, then in addition to such relief as shall be granted the Holder, the Holder shall also be entitled to reasonable attorney's fees.

2

4.   NOTICES.        All  notices,  consents,  requests,
instructions, approvals, and other communications provided
for herein shall be validly given, made, or served if in
writing and (a) delivered personally, (b) sent by certified
mail, return receipt requested, postage prepaid, with a copy
sent by U.S. Mail or (c) sent by overnight courier delivery
service, receipt acknowledged, fees prepaid, and addressed
to:

| | |
|---|---|
| If to Borrower: | Williams Fund Private Equity Group, Inc. |
| | 140 Highway One |
| | Lewes, DE 19958 |
| with a copy to: | 7500 W. Lake Mead, Suite 9, Dept. 340 |
| | Las Vegas, Nevada 89128 |
| If to the Company: | Engel Corporation |
| | 11507 Sunset Hills Road |
| | Reston, VA 20190 |
| If to Holder: | David Engel |
| | 1102 Oak Knoll Terrace |
| | Rockville, MD 20850 |

or such other address or facsimile telephone number as shall
be designated in writing by like notice given by any party
hereto to all other parties hereto.    Notice will be deemed
given when personally delivered, mail, or shipped, except in
reference to notice required by Article 14 where notices of
default will be deemed given when received by Borrower.

5.   TIME OF PERFORMANCE AND WAIVER:  The Holder's failure
to enforce the time periods pursuant to the Schedule,
assuming performance of the Promissory Note shall not
operate as a waiver of the right of the Holder thereafter to
require that the terms hereof or the terms of such other
documents be strictly performed.

6.   GOVERNING  LAW  AND  SEVERABILITY.        This  Security
Agreement shall be governed by the law of the state of
Virginia.   In the event that any provision of this Security
Agreement conflicts with applicable law, such conflict shall
not affect other provisions of the Security Agreement which
can be given effect without the conflicting provision.   To

3

this end the provisions of the Security Agreement are declared to be severable.

7.    SURVIVAL.    The provisions contained in this Security Agreement shall survive the Closing.

8.    BINDING EFFECT.    This Security Agreement shall inure to the benefit of and be binding upon the Holder and the Borrower and their respective heirs, executors, administrators, successors and assigns and legal representatives.

9.    HEADINGS.    Numbered and titled article and section headings are for convenience only and shall not be construed as amplifying or limited any of the provisions of this Security Agreement

_____

Williams Fund Private Equity Group, Inc.
    By: _____
    Its: _____

_____

Engel Corporation t/a Budget Communications
    By: David Engel
    Its: President

_____

David Engel

4

## AMERICAN ARBITRATION ASSOCIATION
### Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 16 168 00185 06
    Williams Fund Private Equity Group, Inc. (Claimant)
    and
    David Engel  (Respondent)

### AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Stock Purchase Agreement entered into between the above-named parties and dated September 02, 2005 (herein "Stock Purchase Agreement")[1], and having been duly sworn and having heard the proofs and allegations of the parties, and Respondent having made a motion to amend its counterclaim and the arbitrator having considered the same, hereby **FIND**, as follows.

    A.     Respondent David Engel's Motion to admit into evidence the complaints and other materials in three proceedings not before the Arbitrator is denied and the documents submitted in support thereof are not admitted into evidence. Specifically, the pleading styled "Respondent David Engel's Submission Concerning Related Proceedings" and the accompanying exhibits marked as "L8", "L9" and "L11" are not admitted into the record.

    B.     Respondent's initial response to the Claim included a counter-claim estimated at seventy-five thousand ($75,000.00). In subsequent pleadings, Respondent increased its claim substantially. The increased claim has been permitted by the Arbitrator. Any administrative matters that might arise because of this increase in claim amount are to be handled between the Respondent and the Case Administrator.

I hereby **AWARD** as follows:

1.    The Stock Purchase Agreement is void and unenforceable by the Claimant under Virginia law, the Respondent having been induced to enter the agreement by a pattern of intentional, fraudulent misrepresentations by Claimant and its principals, upon which the Respondent justifiably relied to his detriment. The misrepresentations continued after execution of the agreement.

2.    The Respondent is entitled to the remedy of rescission.

3.    The Respondent is awarded sole ownership of all corporate shares of Engel Corporation (herein the "Corporation").

4.    The single, current Stock Certificate representing the entirety of the corporate shares of the Corporation is null and void. The Corporation may re-issue a certificate, as it deems appropriate.

---

[1] Article 13 thereof provides for binding arbitration to be administered by the American Arbitration Association

5.   Further, the Claimant shall pay to Respondent the sum of TWO HUNDRED
     FOUR THOUSAND, SEVEN HUNDRED FIFTY-EIGHT DOLLARS AND
     FORTY-TWO CENTS ($204,758.42.)  This figure is inclusive of entitlement to
     attorneys fees and is ordered after due consideration of the evidence and case law
     submitted by the parties.  This Award is not a "split decision" as such
     nomenclature is utilized in Article 13 of the Stock Purchase Agreement, but is a
     decision in favor of Respondent.

6.   Claimant's claim is denied in its entirety.

7.   The administrative fees and expenses of the American Arbitration Association
     (the "Association") totaling SIX THOUSAND FIVE HUNDRED FIFTY
     DOLLARS AND NO CENTS ($6,550.00) shall be borne by the Claimant and the
     compensation and expenses of the arbitrator totaling FOUR THOUSAND
     SEVEN HUNDRED SIXTY-SIX DOLLARS AND FORTY-FOUR CENTS
     ($4,766.44) shall be borne by the Claimant.  Therefore Claimant shall reimburse
     the Respondent the sum of SIX THOUSAND THREE HUNDRED EIGHTY-
     THREE DOLLARS AND TWENTY-TWO CENTS ($6,383.22) representing that
     portion of said fees and expenses in excess of the apportioned costs previously
     incurred by Respondent, **upon demonstration that these incurred costs have
     been paid.**

8.   The above sums are to be paid within thirty (30) days.

       This Award is in full settlement of all claims and counterclaims submitted to this
Arbitration[2].  All claims not expressly granted herein are hereby, **DENIED.**

Dated: September 27, 2006

                                                Roy L. Kaufmann
                                                Arbitrator

I, Roy L. Kaufmann, do hereby affirm upon my oath as Arbitrator that I am the individual
described in and who executed this instrument which is my Award.

September 27, 2006

                                                Roy L. Kaufmann

---

[2] Testimony at the Hearings included matters related to a lien asserted by a third party.  The arbitrator declines to
rule on any matters related to the third party's claim or resulting therefrom, because the third party is not a party to
this Arbitration.

**I (a) PLAINTIFFS**

Williams Fund Private Equity Group, Inc.

**DEFENDANTS**

David Engel

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
**(EXCEPT IN U.S. PLAINTIFF CASES)**

88888

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** 88888
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Joseph A. Artabane
Artabane & Belden, P.C.
818 18th Street, NW, Suite 410
Washington, Dc 20006

**ATTORNEYS (IF KNOWN)**

Jeremy W. Schulman
Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
11921 Rockville Pike, Third Floor
Rockville, MD 20852

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

◉ 4 Diversity
(Indicate Citizenship of
Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ◉ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

◉ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☒ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
28 USC sec. 1332 - diversity of citizenship; 28 USC sec. 1391 - venue; 9 USCS §10(a)(4) - application to vacate arbitration award.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 263,544.12    Check YES only if demanded in complaint
JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE Dec. 29, 2006    SIGNATURE OF ATTORNEY OF RECORD _____

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.