# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAMS FUND PRIVATE EQUITY GROUP, INC. | Case No. 1:06cv02266 |
| Petitioner, | Hon. Henry H. Kennedy |
| v. | |
| DAVID ENGEL | |
| Respondent. | |

## RESPONDENT DAVID ENGEL'S OPPOSITION TO PETITIONER'S APPLICATION TO VACATE ARBITRATION AWARD AND CROSS-APPLICATION TO CONFIRM ARBITRATION AWARD AND FOR IMPOSITION OF SANCTIONS

Respondent David Engel ("Engel") respectfully submits this (i) Opposition to Petitioner Williams Fund Private Equity Group, Inc.'s ("Williams Fund") Application to Vacate Arbitration Award ("Motion to Vacate") and (ii) Cross-Application to Confirm Arbitration Award and for Imposition of Sanctions.

## INTRODUCTION

The arbitration proceeding at issue arises out of Williams Fund's fraudulent inducement of Engel to enter and close upon a Stock Purchase Agreement pursuant to which Engel sold Williams Fund all of his stock in Engel Corporation d/b/a Budget Communications (the "Company"). (*See* Exhibit A, Stock Purchase Agreement, dated September 2, 2005.) Under the Stock Purchase Agreement, Engel was induced to extend credit to Williams Fund by agreeing to accept deferred payments of much of the $310,000 purchase price for his stock in the Company. Williams Fund accomplished its fraud by, among other things, submitting materially false financial statements with the intent of misrepresenting its capacity and willingness to follow through on its deferred payment obligations under the Stock Purchase Agreement.

Williams Fund also deliberately concealed the true identity of its principal – Kenneth Mitan – by falsely representing that his name was "John Adams," a name that is essentially untraceable in a background check. "John Adams" has since been discovered to be an alias for Kenneth Mitan, who has long been accused of perpetrating schemes to acquire businesses with little or no money down, deplete company assets, and then leave the victim with no recourse other than to re-possess a company that is mired in debt. (Mitan's "rap sheet" specifically includes a criminal conviction, as well as a record of having been a debtor in bankruptcy and a defendant or counter-defendant in a multitude of civil lawsuits. Mitan was the subject of the website www.mitanalert.com, which was maintained by a small business owner who claimed to have been defrauded by Mitan and would have been seen by Mr. Engel prior to signing the Stock Purchase Agreement had Mitan not used the alias "John Adams.")[1] Had Engel been aware of the severe risks of doing business with Mitan/Williams Fund – including Mitan's history of seeking to purchase companies under a deferred payment arrangement, looting the companies of their assets, and then defaulting on his payment obligations – Engel never would have entered into the Stock Purchase Agreement.

Engel ultimately attempted to foreclose on the stock and assets of the Company (which were pledged as collateral under a separate Security Agreement executed at closing) after Williams Fund failed to cure its several defaults under the Stock Purchase Agreement. (*See*

---

[1] A printed copy of portions of the website was admitted into evidence at the arbitration hearing. Williams Fund has attempted to designate all exhibits admitted into evidence at the hearing as confidential pursuant to a Stipulated Protective/Confidentiality Order entered in the arbitration proceedings. (*See* Exhibit B, Stipulated Protective/Confidentiality Order, dated July 26, 2006 (the "Confidentiality Order").) However, paragraph 1 of the Confidentiality Order provides that "this Confidentiality Order does not affect the rights of the producing or disclosing party with respect to the use or other disclosure of any Discovery Information." Because the printout of the website was produced and offered into evidence by Engel, Williams Fund may not properly designate it as confidential and thereby prevent Engel from its use or disclosure. Moreover, the website is available in the public domain by accessing http://web.archive.org/web/20051124032931/http://www.mitanalert.com/. Nonetheless, because Williams Fund has attempted to designate all hearing exhibits as confidential, Engel respectfully requests that this Court order that Engel may submit the website materials to the Court in connection with this judicial proceeding.

Exhibit C, Security Agreement, dated September 13, 2005.)  Engel scheduled a foreclosure sale for March 3, 2006.  However, Williams Fund filed a Demand for Arbitration a few days before the scheduled foreclosure sale, claiming that Engel breached the Stock Purchase Agreement and Security Agreement by allegedly improperly seizing the purchased stock, trespassing upon the premises of the Company, and improperly seeking to foreclose on the stock and assets of the Company.  In the arbitration proceeding, Engel counterclaimed against Williams Fund for fraud and breach of the Stock Purchase Agreement.

Pursuant to his fraud counterclaim, Engel sought to rescind the Stock Purchase Agreement and recover direct and consequential damages, attorney's fees and costs in the amount of $560,309.56.  (*See* Exhibit D, Respondent David Engel's Statement of Remedies Sought and Calculation of Damages, dated August 25, 2006, at 1-8 ("Engel's Damages Calculation").)  Engel further sought punitive damages amounting to three times the total compensatory damages awarded to Engel as a result of Williams Fund's fraudulent and illegal scheme.  (*Id.,* at 6-8.)  In seeking to rescind the Stock Purchase Agreement, Engel specifically argued that Williams Fund should not be entitled to offset any portion of the damages suffered by Engel to account for the $263,544.12 allegedly "paid" to Engel by Williams Fund in connection with the Stock Purchase Agreement.  (*Id.,* at 6-7.)  This is because Engel had established that none of the funds received by Engel were actually paid by Williams Fund, but rather were paid from the Company's own checking account, or other victims of Williams Fund's fraudulent schemes.  (*Id.*)

Williams Fund and Engel participated in a two-day arbitration hearing on August 14-15, 2006 in Washington, D.C. before a single arbitrator:  Roy Kaufmann of Jackson & Campbell, P.C. (the "Arbitrator").  At a preliminary hearing, both parties agreed to a standard

3

award by the Arbitrator. (*See* Exhibit G, Preliminary Hearing Scheduling Order #1, dated June

20, 2006.) During the hearing, more than 100 exhibits were admitted into the record by the

parties in support of their claims and counterclaims. On the second day of the proceedings,

Engel attempted to introduce into the record complaints and other materials relating to three

separate legal proceedings in which Williams Fund and Kenneth Mitan were previously

involved. (*See* Transcript of August 15, 2006 hearing before Roy L. Kaufmann, at 43:16-58:7

("Day 2 Transcript").[2]) Engel argued that the three proceedings, combined with the other

evidence adduced by Engel, tend to show that Williams Fund and Kenneth Mitan have engaged

in a common scheme to defraud small business owners of substantial sums of money (the

"Related Proceedings"). (*Id.,* at 49:1-50:1.) Counsel to Williams Fund objected to the

introduction of the Related Proceedings into the record, arguing principally that the evidence was

cumulative and that a proper foundation had not been laid. (*Id.,* at 45:12-47:18.) In order to save

time during the hearing, the Arbitrator deferred ruling on Engel's motion and proposed, and the

parties agreed, to leave the record open at the close of the hearing for the submission by Engel of

a chart indicating the similarities between the present action and the Related Proceedings, and

giving Williams Fund the opportunity to respond. (*Id.,* at 57:2-17.) Engel submitted a chart

concerning the Related Proceedings on August 25, 2006, to which Williams Fund responded on

September 5, 2006. (*See* Exhibit E, Respondent David Engel's Submission Concerning Related

---

[2] The transcripts of the arbitration hearing, consisting of one transcript for each day of the hearing, were designated as "confidential" by Williams Fund pursuant to the terms of the parties' Confidentiality Order, and are thus not attached hereto as exhibits. However, because Williams Fund has challenged the integrity of the proceedings and the reasonableness of the Award, Williams Fund has waived any objection as to the confidentiality of the hearing transcripts. Nonetheless, for the avoidance of any doubt, Engel respectfully requests that this Court enter an order modifying the Confidentiality Order to allow the parties to submit the transcripts in connection with this judicial proceeding. This is necessary so that the Court has an adequate record of the arbitration proceedings, which have been placed in issue by Williams Fund's Motion to Vacate.

Proceedings, dated August 25, 2006.)  Both parties also submitted post-hearing briefs and reply

briefs outlining their statement of remedies sought and calculation of damages.

On September 27, 2006, the Arbitrator issued his award.  (*See* Exhibit F, Award

of Arbitrator, dated September 27, 2006 (the "Award").)  The Arbitrator first addressed Engel's

submission concerning the Related Proceedings, and denied Engel's request to admit the

complaints and other materials respecting those proceedings into the record.  The Arbitrator went

on to award in favor of Engel, stating in pertinent part:

> The Stock Purchase Agreement is void and unenforceable . . .
> [Engel] having been induced to enter the agreement by a pattern of
> intentional, fraudulent misrepresentations by [Williams Fund] and
> its principals, upon which [Engel] justifiably relied to his
> detriment.  The misrepresentations continued after execution of the
> agreement.

(*Id.*)  The Arbitrator found that Engel is entitled to the remedy of rescission, and ordered

Williams Fund to pay Engel damages in the amount of $204,758.42, inclusive of attorney's fees,

with Williams Fund also to pay the administrative fees and expenses of the arbitration.

On December 29, 2006, Williams Fund commenced the instant proceedings to

vacate the Award, claiming that the Arbitrator issued the Award in manifest disregard of law

because the Arbitrator did not specifically order Engel to "return the $263,544.12 [Williams

Fund] had paid into the Company."  (Motion to Vacate, at ¶ 12.)  Williams Fund further

contends that the Award should be vacated because of the alleged partiality of the Arbitrator

because counsel to Engel allegedly "threatened" the Arbitrator and because Engel's post-hearing

submission respecting the Related Proceedings "were false and highly and unfairly prejudicial."

(*Id.,* at ¶¶ 14-17.)  For the reasons set forth herein, Williams Fund's arguments are entirely

without merit, the Motion to Vacate should be denied, and the Award should be confirmed.

Further, sanctions should be imposed against Williams Fund and its counsel for commencing this frivolous judicial proceeding.

## ARGUMENT

Courts have long recognized that judicial review of an arbitration award is extremely limited. *See Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37-38 (1987) (refusing to vacate arbitration award and holding that "[t]he Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator"); *Kurkei v. Oscar Gruss and Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006); *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998) (calling judicial review of arbitration awards "severely circumscribed"). The Federal Arbitration Act ("FAA") empowers a federal court to vacate an arbitration award only in four enumerated circumstances, one of which is "where there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10. Courts have also recognized a very limited non-statutory ground for vacating an arbitration award where the arbitrator has acted in "manifest disregard of the law." *See Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996); *Matter of Baird,* 939 F.Supp. 15 (D.D.C. 1996). There is no basis whatsoever under the FAA or otherwise to vacate the Award in this case, as there is no support for Williams Fund's contention that there was "evident partiality or corruption" in the Arbitrator, or that the Arbitrator acted in manifest disregard of the law.

### A.    The Arbitrator Did Not Act In Manifest Disregard Of The Law.

William's Fund's argument that this Court should vacate the arbitration Award on the ground that the Arbitrator demonstrated manifest disregard of the applicable law is entirely

6

without merit.[3]  Manifest disregard of the law may be found if the arbitrator understands and

correctly states the law but proceeds to ignore it.  *See Kanuth v. Prescott, Ball, & Turben, Inc.,*

949 F.2d 1175, 11769 (D.C. Cir. 1991); *Johnston Lemon & Co., Inc. v.* Smith, 886 F.Supp. 54,

56 (D.D.C. 1995).  Williams Fund contends that the Arbitrator acted in manifest disregard of law

because the Arbitrator allegedly "failed to itemize or otherwise explain how he arrived at the

Award figure of $204,758.42" and that, in granting rescission, the Arbitrator "failed to make

[Williams Fund] whole by restoring to [Williams Fund] the $263,544.12 it has paid to Engel

under the [Stock Purchase Agreement] – or any part thereof – or to even take such payments into

account whatsoever in the Award."  (Motion to Vacate, at ¶¶ 9, 11.)  Such broad and conclusory

contentions are not only incorrect, but, without more, they also suggest that Williams Fund

misunderstands its burden before this Court.  Williams Fund fails to allege that the Arbitrator

undertook to correctly state the law and then proceeded to disregard it.

        First, the Arbitrator had absolutely no obligation to "itemize or otherwise explain"

how he arrived at the Award.  Indeed, Rule R-42 of the Commercial Arbitration Rules of the

American Arbitration Association ("AAA Rules") provides that "[t]he arbitrator need not render

a reasoned award unless the parties request such an award in writing prior to appointment of the

arbitrator or unless the arbitrator determines that a reasoned award is appropriate."  In this case,

at the preliminary hearing in the arbitration, both parties affirmatively agreed to a standard award

that did not contemplate an explanation by the Arbitrator.  (*See* Exhibit G (noting that the

scheduling order, which provides for a standard award, was issued "[b]y [a]greement of the

---

[3] The document heading under which Williams Fund argues that the Arbitrator demonstrated manifest disregard of applicable law is titled "The Arbitrator Exceeded His Powers."  One of the four enumerated circumstances for vacatur under the FAA is "where the arbitrators exceeded their powers;" however, Williams Fund goes on to argue for vacatur pursuant to the non-statutory ground of "manifest disregard of applicable law."  Williams Fund incorrectly states that the FAA authorizes the vacatur of an arbitral award for "manifest disregard of applicable law." (Motion to Vacate, at ¶ 13.)

parties").)  In any event, it is well-settled that "Arbitrators do not have to give reasons." *Baird,* 939 F.Supp. at 15 (*citing Montana Power Company v. Federal Power Commission*, 445 F.2d 739, 755 (D.C. Cir. 1970)); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598 (1960)); *accord Sargent v. Paine Webber Jackson & Curtis, Inc.*, 882 F.2d 529, 530 (D.C. 1989).  In *Sargent,* the Court rejected the idea that the FAA authorizes a lump-sum arbitral award to be remanded to the arbitrator for explanation.  The Court held that "the Supreme Court has observed that arbitral awards may be made without explanation" and that "the absence of a duty to explain is presumably one of the reasons why arbitration should be faster and cheaper than an ordinary lawsuit." *Id.* at 532.  Further, when the arbitrators give no explanation for their decision, as commonly occurs in arbitration, the award must be confirmed if any justification can be gleaned from the record.  *See Kurke,* 454 F.3d at 354 ("In light of this severely limited standard of review, it should come as no surprise that obtaining judicial relief for arbitrators' manifest disregard of the law is rare.") (Internal citations omitted.).

   The Arbitrator could have plausibly fashioned any number of awards consistent with the arguments presented by the parties and supported by the record in the arbitration.  Rule R-43 of the AAA Rules provides that the arbitrator may "grant any remedy or relief that the arbitrator deems just and equitable."  The Arbitrator was not confined to the exact dollar amounts claimed by each party in issuing the Award.  It is thus possible that the Arbitrator *did* offset the damages award to Engel by precisely the $263,544.12 claimed by Williams Fund, given that Engel sought $560,309.56 in compensatory damages (plus punitive damages), whereas the Arbitrator awarded only $204,758.42.  Alternatively, it is possible that the Arbitrator accepted Engel's argument that Williams Fund should not be entitled to offset any portion of the damages suffered by Engel because none of the funds paid to Engel were actually paid by Williams Fund,

but rather were paid from the Company's own checking account, or other victims of Williams Fund's fraudulent schemes. (Engel's Damages Calculation, at 6-7 (citing *Webb v. Webb*, 16 Va.App. 486, 495 (Va. App. 1993) (holding that "[t]he general rule of restoration is not strictly applied in the case of fraud, because it would become a loophole to escape the consequences of a fraudulent act" and that equity "does not permit the rule of restoration to become a shield for wrongdoing.")).) Moreover, the Arbitrator's finding in the Award that "[t]he misrepresentations continued after execution of the agreement" suggest that the Arbitrator awarded additional damages for the continued fraudulent behavior of Williams Fund after Engel was induced into the Stock Purchase Agreement. Simply put, the Arbitrator's possible rejection of Williams Fund's claim for damages does not amount to a manifest disregard of the law because, even if the Arbitrator did indeed reject that claim, there would be ample support in the record to do so.

Williams Fund only offers arguments as to why the Arbitrator *should* have agreed with its view of the law, rather than presenting credible evidence that the Arbitrator actually acted in manifest disregard of the law. Because there is ample evidence in the record to support the Award issued by the Arbitrator, Williams Fund's Motion to Vacate should be denied, and the Award should be confirmed.

### B.    Williams Fund Has Not Demonstrated Any Evident Partiality On The Part Of The Arbitrator.

The D.C. Circuit Court has stated that "the burden on a claimant for vacation of an arbitration award due to evident partiality is heavy, and the claimant must establish specific facts that indicate improper motives on the part of an arbitrator." *See Al-Harbi,* 85 F.3d 680 at 683; *Alston v. UBS Financial Services, Inc.*, No. Civ.A. 04-01798, 2006 WL 20516, at *3 (Jan. 2, 2006) ("The alleged partiality must be direct, definite, and capable of demonstration rather than remote, uncertain or speculative.") (Internal citations omitted.) Thus, evident partiality is

9

not supported by a "conclusory statement of the appearance of possible bias." *See M.R.S. Enterprises, Inc. v. Sheet Metal Workers' International Association, Local 40*, 429 F.Supp.2d 72, 81 (D.D.C. 2006). Williams Fund's five-sentence argument in support of its claim that there was evident partiality on the part of the Arbitrator hardly overcomes the substantial burden on Williams Fund for vacatur of the Award.

Williams Fund claims that counsel to Engel "inappropriately threatened the arbitrator during the arbitration hearing," and in support thereof merely excerpts a portion of the transcript containing the closing argument of Engel's counsel. The portion of the closing argument cited by Williams Fund states:

> Mr. Arbitrator, David Engel is asking you principally to unwind this transaction because of the fraud and the inducement and because of the criminality and illegality that went along with the scheme. And essentially if you find for the claimant in this case, there's really no other conclusion but that you and AAA, the legal process, would be aiding and abetting this fraud, this criminality. And we ask that you don't become a participant in that, and you do not allow this fraud to be – to reach its conclusion.

(Day 2 Transcript, at 422:9-21.) Williams Fund provides no explanation as to how the excerpt is considered a "threat" to the Arbitrator, nor does it demonstrate how the alleged "threat" resulted in the evident partiality of the Arbitrator. Williams Fund merely contends that the above excerpt "compromises beyond doubt the impartiality of the arbitrator and cries out for the court to vacate the award." Without more, Williams Fund has not even come close to meeting its heavy burden of demonstrating partiality in a direct and definite manner.

Importantly, Williams Fund had more than ample opportunity to object to the partiality of the Arbitrator after the above statements were made to the Arbitrator, but elected not to do so. Williams Fund could have noted an objection on the record during the hearing or in one of its several post-hearing briefs, but it did not. Pursuant to Rule 17 of the AAA Rules,

Williams Fund could have raised an objection with the AAA to the continued service of the Arbitrator, but it did not. Williams Fund thus did not preserve its argument for vacatur of the Award on the basis of evident partiality. Williams Fund should now be deemed to have waived any such objection. *See M.R.S. Enterprises,* 429 F.Supp.2d at 80 (holding that a challenge to the partiality of the neutral arbitrator is deemed waived unless the objecting party timely raised the issue); *accord Atlantic Rayon Corp. v. Harold Goldsmith,* 277 A.D. 554, 556 (1st Dept. 1950) ("Courts are loath to sustain belated claims of disqualification after an adverse award."); *Fort Hill Builders, Inc. v. National Grange Mut. Ins. Co.,* 866 F.2d 11, 13 (1st Cir. 1989) ("[A]bsent exceptional circumstances, we will not entertain a claim of personal bias where it could have been raised at the arbitration proceedings but was not.")

Additionally, Williams Fund argues that Engel's post-hearing submission respecting the Related Proceedings contained "matters which were false and highly and unfairly prejudicial." Again, Williams Fund's contention is far too broad and conclusory to meet its heavy burden of demonstrating evident partiality on the part of the Arbitrator. Williams Fund does not demonstrate how the submission was in any way "false" or how it was "highly and unfairly prejudicial." Williams Fund's claim that the Arbitrator's mere review of Engel's submission respecting the Related Proceedings resulted in the evident partiality of the Arbitrator is speculative at best. *See, e.g., Mantle v. Upper Deck Company,* 956 F.Supp. 719, 729 (N.D.Tex.1997).

The court in *Mantle* stated that "[a]rbitrators must review documents to make rulings on discovery and privilege issues" and held that a reasonable person could not conclude that an arbitrator was partial to one party merely because he read certain documents. *Id.* The Court in *Mantle* further stated: "The court rejects as meritless defendants' argument that all a

11

party need show to vacate an award is that an arbitrator viewed a potentially prejudicial document. It is not widely held that arbitrators are so impressionable that exposure to prejudicial documents inexorably leads to partiality." *Id.* at 730. As in *Mantle*, this Court should reject Williams Fund's argument that the Arbitrator's mere review of Engel's post-hearing submission respecting the Related Proceedings somehow resulted in the evident partiality of the Arbitrator. The Arbitrator in fact rejected Engel's submission and indicated that he would not consider it. Williams Fund has failed to meet its heavy burden of establishing that the documents were so inherently prejudicial as to dim the prospect of an impartial award. Williams Fund's Motion to Vacate should thus be denied, and the Award should be confirmed.

### C.    Williams Fund Should Be Sanctioned For Instituting A Frivolous Proceeding.

Rule 11 of the Federal Rules of Civil Procedure allows federal courts to impose monetary sanctions to deter repetition of misconduct by a party, their counsel, or both when frivolous judicial proceedings are brought for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. *See, e.g., Saltany v. Reagan*, 886 F.2d 438, 439 (D.C. Cir. 1986) (commencing an action when counsel "surely knew" that the action had "no hope whatsoever of success" violated Rule 11 and warranted imposition of sanctions). Federal courts have awarded sanctions where a party challenges an arbitration award without substantial justification. *See, e.g., United Food and Commercial Workers Local 400 v. Marval Poultry Co.*, 876 F.2d 346 (4th Cir. 1989); *International Association of Machinists and Aerospace Workers District 776 v. Texas Steel Co.*, 538 F.2d 1116, 1121-22 (5th Cir. 1976); *Flexible Mfg. Systems Pty. Ltd. v. Super Products Corp.*, 86 F.3d 96, 101 (7th Cir. 1996) (challenge of arbitral award had absolutely no chance of success and only taxed the resources of the court). The court in *Flexible* held that the petitioner's argument was so insufficient to

12

overcome an arbitral award's presumption of validity that the imposition of sanctions for a frivolous appeal was warranted. *Id.*

As shown herein, Williams Fund's Motion to Vacate is entirely unsupported by the arbitral record, and completely devoid of any colorable argument for vacatur of the Award. Significantly, Williams Fund's belated arguments concerning the alleged evident partiality of the Arbitrator suggest that Williams Fund is simply seeking to subvert the arbitral process through unnecessary delay and needlessly increasing Engel's costs. Federal courts may impose sanctions when objectionable issues are only belatedly raised in a petition for vacatur, even though such issues were known at the time of the arbitral proceedings. *See, e.g., Capitol Cement Corp. v. Cement, Lime, Gypsum, and Allied Workers Div.,* 17 F.Supp.2d 564, 567 (N.D.W.Va. 1998) (awarding sanctions where party did not raise objectionable issue until after award of arbitrator). During the arbitration proceeding, Williams Fund sat idly by in the hope of obtaining a favorable result. Only after the unfavorable Award was issued did Williams Fund conjure up an objection to the Arbitrator's partiality.

Indeed, this frivolous judicial proceeding is just the latest in a series of unsustainable positions taken and/or contemptuous behavior exhibited by Kenneth Mitan, who controls Williams Fund[4] and, as indicated in the Award, fraudulently induced Engel to enter into the Stock Purchase Agreement. *See, e.g., In re Contempt of Keith Mitan and Kenneth Mitan,* Nos. 222230 and 222231 (Mich. Ct. App. September 17, 2002) (upholding criminal contempt conviction against Kenneth Mitan for, *inter alia*, demonstrating a "blatant disregard of the

---

[4] Frank Mitan, the purported sole shareholder and director of Williams Fund, testified at the arbitration hearing that his son, Kenneth Mitan, was involved in every aspect of Williams Fund's business, was the sole representative of Williams Fund in dealings with Engel, had full access to company bank accounts, used company funds for personal expenses, and otherwise controlled Williams Fund. (Day 2 Transcript, at 366:9-367:8, 381:1-382:17, 387:13-389:1.) Furthermore, the Arbitrator found that "[Williams Fund] and its *principals*" defrauded Engel, and the evidence provided at the hearing was that the only "principals" of Williams Fund were Kenneth Mitan and Frank Mitan. (*See* Transcript of August 14, 2006 hearing before Roy L. Kaufmann, at 290-291, 314.)

authority of the Court"); *Mitan v. New World Television, Inc.*, No. 225530, 2003 WL 22871415, at *2 (Mich. App. Dec. 4, 2003) (upholding imposition of sanctions against Kenneth Mitan for his repeated noncompliance with court orders); *Mitan v. International Fidelity Ins. Co.*, 23 Fed.Appx. 292, 298 (6th Cir. 2001) (upholding the district court's award of sanctions "after painstakingly documenting Mitan's history of forum shopping and abusing the legal process"); *In re Polemar Construction Limited Partnership*, 19 Fed.Appx. 267, 268 (6th Cir. 2001) (upholding award of sanctions against Kenneth Mitan where his court submission was "so out of compliance with the local rules that sanctions are warranted"). Given Kenneth Mitan's propensity to abuse the legal process, an award of sanctions is more than appropriate in this instance in an effort to "deter repetition of misconduct." *See Saltany*, 886 F.2d at 439. Thus, this Court should impose sanctions upon Williams Fund and its counsel, and award Engel his reasonable costs and expenses incurred in opposing Williams Fund's Motion to Vacate.

## **CONCLUSION**

For the foregoing reasons, Engel respectfully requests that the Court enter the attached proposed Order denying Williams Fund's Motion to Vacate, confirming the Award, and awarding Engel his reasonable costs and expenses incurred in opposing Williams Fund's Motion to Vacate.

Dated: January 17, 2007                          Respectfully submitted,


                                                 _____/s/_____
                                                 Jeremy W. Schulman
                                                 SHULMAN, ROGERS, GANDAL,
                                                     PORDY & ECKER, P.A.
                                                 11921 Rockville Pike, Third Floor
                                                 Rockville, Maryland 20852
                                                 (301) 230-5200

                                                 Attorneys for Respondent David Engel
                                                 14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| WILLIAMS FUND PRIVATE EQUITY GROUP, INC. | ) ) ) | Case No. 1:06cv02266 |
| Petitioner, | ) ) | Hon. Henry H. Kennedy |
| v. | ) ) ) | |
| DAVID ENGEL | ) ) | |
| Respondent. | ) ) | |

### ORDER

Upon consideration of Petitioner's Application to Vacate Arbitration Award, Respondents Opposition to Application to Vacate Arbitration Award, and Respondent's Cross-Application to Confirm Arbitration Award and for Imposition of Sanctions, and for other good cause shown, it is hereby this ___ day of _____, 2007:

ORDERED that the Application to Vacate Arbitration Award is DENIED; and it is further

ORDERED that the Cross-Application to Confirm Arbitration Award and for Imposition of Sanctions is GRANTED; and it is further

ORDERED that Petitioner and its counsel, jointly and severally, reimburse Respondent for the costs and attorney's fees he has incurred in connection with preparing his Opposition to Petitioner's Application to Vacate Arbitration Award. Respondent shall submit an affidavit detailing his costs and attorney's fees no later than 14 days after entry of this Order.

_____
The Honorable Henry H. Kennedy

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAMS FUND PRIVATE<br>EQUITY GROUP, INC.<br><br>Petitioner,<br><br>v.<br><br>DAVID ENGEL<br><br>Respondent. | Case No. 1:06cv02266<br><br>Hon. Henry H. Kennedy |

### ORDER REGARDING SUBMISSION OF DOCUMENTS

Upon consideration of Respondent's motion to file the transcripts of the August 14-15, 2006 arbitration hearing and Exhibit 62 admitted into evidence therein, and for other good cause shown, it is hereby this ____ day of _____, 2007:

ORDERED that the motion is GRANTED; and it is further

ORDERED that Respondent may file with the Court the transcripts of the August 14-15, 2006 arbitration hearing and Exhibit 62 admitted into evidence therein.


_____

The Honorable Henry H. Kennedy

## **Certificate of Service**

I HEREBY CERTIFY that on this 17th day of January 2007, a copy of the foregoing was served first-class mail, postage pre-paid on:

Joseph A. Artabane, Esq.
ARTABANE & BELDEN, P.C.
818 18th Street, N.W.
Washington, DC 20006

_____/s/_____
Jeremy W. Schulman

STOCK PURCHASE AGREEMENT


AMONG



ENGEL CORPORATION t/a BUDGET COMMUNICATIONS
DAVID ENGEL

And

WILLIAMS FUND PRIVATE EQUITY GROUP, INC.


SEPTEMBER 2, 2005




## STOCK PURCHASE AGREEEMNT

AGREEMENT made and entered into as of the 2nd        day of
SEPTEMBER, 2005, by and among WILLIAMS FUND PRIVATE EQUITY
GROUP, INC., ("Purchaser"), DAVID ENGEL (the "Seller") and
ENGEL CORPORATION t/a BUDGET COMMUNICATIONS (the "Company").

WITNESSETH:

WHEREAS, the Company is engaged in the sal    e of printing, design, and copying and related products thereto (the "Business"); and

WHEREAS, the Seller owns of record one thousand (1,000) shares of common stock in the Company, which constitutes one-hundred and 00/100 (100.0%) percent of the issued an    d outstanding stock of the Company.

WHEREAS, the Seller agrees to sell, assign, transfer and deliver to the Purchaser, and the Purchaser agrees to purchase from the Seller, one thousand (1,000) shares of the Company, to be purchased by Purchaser on the C    losing Date, upon the terms and conditions contained in this Agreement, together with all schedules and exhibits delivered in connection herewith, all of which are incorporated herein by reference (collectively the "Stock Purchase Agreement").

NOW, THEREFORE, in consideration of the mutual covenants and agreements, representations and warranties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending legally t    o be bound hereby, agree as follows:

## ARTICLE ONE - PURCHASE OF STOCK AND REAL PROPERTY

Section 1.1.    <u>Purchased Stock</u>.    Upon the terms and subject to the conditions contained in this Agreement, on the Closing Date (as defined below), the Seller shall    sell, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase from Seller one thousand (1,000) of the Company's common stock, which constitutes one hundred (100%) percent of the issued and outstanding shares of stock of the Company (the "Purchased Stock") as of the Closing Date.

Section 1.2    <u>Purchase Price.</u>    The purchase price for the Purchased Stock shall be the sum of Three Hundred Ten Thousand and 00/100 ($310,000.00) Dollars plus or minus the Section 1.5 Credits (the "Purchase Price").

Section 1.3    <u>Closing Payment.</u>    On the Closing Date, Purchaser shall pay to the Seller the amount of One Hundred Fifty Five Thousand and 00/100 ($155,000.00) Dollars plus or minus the Section 1.5 Credits (the "Closing Payment"), payable in immediately available funds.

2

Section 1.4.   <u>Deferred Payments</u>.   The remaining $155,000 of the Purchase Price (the "Deferred Payments") shall be payable as follows.   Within twenty (20) days of the Closing Date, the Purchaser shall pay to the Seller Forty Th ousand and 00/100 ($40,000.00) Dollars. Within forty (40) days of the Closing Date, the Purchaser shall pay to the Seller Forty Thousand and 00/100 ($40,000.00) Dollars.   Within sixty (60) days of the Closing Date, the Purchaser shall pay to the Seller For   ty Thousand and 00/100 ($40,000.00) Dollars. Within ninety (90) days of the Closing Date, the Purchaser shall pay to the Seller Thirty Five Thousand and 00/100 ($35,000.00) Dollars. At Closing, an amount equal to the next ensuing Deferred Payment, Forty Thousand and 00/100 ($40,000.00) Dollars, shall be deposited in escrow in immediately available funds with an escrow agent of Purchaser's choice and released by the escrow agent on the appropriate date, and upon such release of payment, the next ensuing Defe rred Payment will be placed into escrow. Payment of the Deferred Payments shall be secured by a pledge of Purchased Stock to Seller, and a blanket lien on the Company's assets, pursuant to a form of Security Agreement reasonably acceptable to the parties          (the "Security Agreement"), which shall be governed by the Uniform Commercial Code as adopted by the Commonwealth of Virginia.

Section 1.5.   <u>Credits</u>.   The Cash Down Payment and Purchase Price will be adjusted on the Closing Date, dollar for dollar downward, to the extent that the Section 2.5 Accounts Receivable plus the Section 2.10 Checking Account Balance minus the Section 4.1 Accounts Payable is less than Zero. The Purchase Price will be adjusted, dollar for dollar upward, to the extent that the Sect        ion 2.5 Accounts Receivable plus the Section 2.10 Checking Account Balance minus the Section 4.1 Accounts Payable is more than Zero. Any such adjustments shall first be applied to the Closing Payment of the Purchase Price, and then to the Deferred Payments, if applicable.

<u>ARTICLE TWO - ASSETS AS OF CLOSING DATE</u>

On the Closing Date, the Assets of the Company (the "Company Assets") shall be as is detailed in Sections 2.1        - 2.11 herein in all material respects, subject to the operation of the Business   through the Closing Date in the ordinary

course; with no expenditures, except in the ordinary course of business, or pledging of collateral or purchase of capitalized equipment between execution hereof and the Closing Date.  However, the Company shall be e ntitled to make distributions or other payments to the Seller and other expenditures of cash, subject to the Purchase Price adjustment provisions of Section 1.5 above.

Section 2.1.   <u>Tangible Personal Property.</u>   All of the machinery, equipment, furniture, fixtures, supplies, rolling stock and other vehicles, computers tools, dies, spare parts, and other similar items which are owned by the Company, or which will be owned by the Company as of the Closing Date, or which are owned by the Seller as of the Closing Date and are related to the Business, all of which are listed in Exhibit 2.1, attached hereto and incorporated herein by reference (collectively the Tangible Personal Property").

Section 2.2   <u>Operating Leases.</u>  All of the operating leases with regard  to items of personal property in which the Company has any interest as a lessee or a sublessee set forth on Exhibit 2.2 attached hereto and incorporated herein by reference, or any additional operating leases in which the Company will have any interest as      a lessee or a sublessee as of the Closing Date (collectively the "Operating Leases").

Section 2.3   <u>Intangible Personal Property.</u>   All of the patents, technology, industry or technological innovations and/or know -how, trademarks, servicemarks, trade names business names, copyrights, other intellectual property rights, trade secrets, corporate names, including but not limited to the exclusive right to use the name Budget Communications, and all derivatives thereof, and other intangible Assets and all appli cations therefore which are owned by or licensed to the Company, or which will be owned by or licensed to the Company as of the Closing Date, or which will be owned by the Seller as of the Closing Date and related to the Business, all of which are listed i n Exhibit 2.3 attached hereto and incorporated herein by reference (collectively the "Intangible Personal Property").

Section 2.4   <u>Inventory</u>.  Inventory items which are owned by the Company, or which will be owned by the Company as of the Closing Date, or which will be owned by the Seller as of the Closing Date and related to the Business (collectively the "Inventory").   Seller hereby authorizes Purchaser, or Purchaser's agent to conduct such Inventory Report as necessary pursuant to this Section 2.4 on t he Closing Date.

To the extent that the Inventory is less than Thirty Thousand and 00/100 ($30,000.00) Dollars, Purchaser will be entitled to a dollar for dollar credit against the Purchase Price to be applied against the Deferred Payments.  The Inventory on the Closing Date shall be identified in Exhibit 2.4, attached hereto and incorporated herein by reference.

Section  2.5    Accounts and Notes Receivable.   All of the accounts and notes receivable which are owned by the Company, or which will be owned    by the Company as of the Closing Date (collectively the "Accounts and Notes Receivable"), all of which are listed in Exhibit 2.5 attached hereto and incorporated herein by reference. Purchaser has the right to reject any receivables over ninety (90) days by assigning same to Seller on the Closing Date, and receiving a dollar for dollar credit against the Cash Down Payment and Purchase Price.  If any unrejected accounts receivable on Exhibit 2.5 are not collected by the Company prior to the date that the final Deferred Payment is due to Seller, Purchaser shall have the right to assign such receivables to Seller, and notify Seller and the escrow agent that the amount of such uncollected receivables shall be deducted from the final Deferred Payment.

Section 2.6    Commercial Data.   All of the books, records, files, customer lists, invoices, accounts, surveys, plans, specifications, blueprints, chemical formulas, engineering data, computer software programs and all data files related thereto, permits, and other    similar documents, and information which are owned by or licensed to the Company, or which will be owned by or licensed to the Company as of the Closing Date (collectively the "Commercial Data").

Section 2.7    Contracts.  All of the contracts to which the Seller is a party, or will be a party as of the Closing Date, attached hereto and incorporated herein as Exhibit 2.7 (collectively the "Contracts").

Section 2.8    Customer Deposits .  All of the customer deposits to which the Company is a party as of  the Closing Date (collectively the "Customer Deposits").  To the extent that the Company shall have received any deposits or pre   - payments for shipment for work that has not commenced, or for which inventory or supplies have not been purchased as of the Clo sing Date, these amounts shall be deducted from the Closing Payment.

Section 2.9.    Work in Progress.  All work in progress by the Company in the ordinary course of conducting the

Company, all of which is listed in Exhibit 2.9 attached hereto and incorporated herein by reference.

Section 2.10.  Cash or Checking Accounts . The cash and sums in the Business checking accounts as of the Closing Date, which at a minimum will be One Hundred ($100.00) Dollars (the "Minimum Balance").  Seller warrants and covenants that there be sufficient moneys in the Company checking account on the Closing Date to cover any checks that have been written but not yet cleared.

Section 2.11    Other Assets.  All of the (a) insurance policies which are currently in force or which wil  1 be in force as of the Closing Date, naming the Company or the Seller as an insured (to the extent that the same are assignable or transferable to Purchaser), (b) prepaid expenses shown on the books of the Company as of the Closing Date which are incurred in the ordinary and usual course of its business, including but not limited to security deposits (c) deposits with and refunds or rebates due from any landlord, insurance company, utilities, payroll companies, customs, or suppliers to the Company, or any other person or entity shown on the Closing Date,  (d) post office boxes and telephone numbers utilized by the Company, and (e)  other miscellaneous Assets which are owned by the Company, or owned by the Company as of the Closing Date and relate to the Business (collectively the "Other Assets").

## ARTICLE THREE - EXCLUDED ASSETS.

Notwithstanding anything contained herein to the contrary, there are no excluded Assets of the Company.  All Assets of the Company as of the Closing Date are intended to be retained by the Company pursuant to this Stock Purchase Agreement, whether or not any specific Asset is listed in Sections 2.1 to 2.12 herein.

## ARTICLE FOUR - LIABILITIES AS OF CLOSING DATE

On the Closing Date, the Liabilities of the Company (the "Company Liabilities") shall include and be limited to:

Section 4.1.   Current Unsecured Debt and Accounts Payable. All of the accounts payable and accrued expenses to which the Company is responsible (including credit card) listed in Exhibit 4.1 attached hereto an    d incorporated herein by reference, and such additional amounts as are incurred in the ordinary course of business through the Closing Date.

Section 4.2. <u>Purchase Orders.</u>    All purchase orders for the purchase of inventory issued by the Company in the o rdinary course of conducting the Company.

Section 4.3. <u>Employee Fringe Benefits and Accrued Vacation</u>. Outstanding fringe benefits and accrued vacation of the Company employees, excepting those to be released, including to Seller, all of which are listed  in Exhibit 4.3, attached hereto and incorporated by reference.

Section 4.4    <u>Credit Card Debt</u>.    All credit card debt of the Company will be retained by the Company.  Copies of the latest credit card statements will be attached hereto and incorporated he reto by reference as Exhibit 4.4.  At such time as Seller is removed from liability with respect to such credit card debt, Purchaser will be solely responsible for decisions related to use of Company credit cards post - closing.

Section 4.5. <u>Leases</u>.  The Company will retain certain copier and postage meter leases, as well as the lease for its premises, attached hereto and incorporated herein by Seller, as Exhibit 4.5.  To the extent applicable, Seller will be removed from liability from these leases no later        than ninety (90) days after the Closing Date, or these leases will be paid off.

*The following liabilities in Section 4.6 through 4.8 shall be paid off by Seller on the Closing Date.*

Section 4.6    <u>Secured Debt</u>.  On the Closing Date, out of the Closing Payment proceeds to Seller, Purchaser to pay off the Company's secured debt loan with *GE Capital*            . Seller to obtain a payoff letter as directed by Purchaser immediately prior to the Closing Date.

Section 4.7.    <u>Released Liabilities</u>.  On the Closing  Date, the Company shall receive a release from Seller as to any outstanding shareholder or member, or outstanding payroll or fringe benefit to any shareholder or member, attached hereto and incorporated herein as Exhibit 4.7.

Section 4.8. <u>Outstanding Payroll and Taxes</u>.  Seller shall pay out of the Closing Payment all outstanding payroll and commissions, and all outstanding workmen's compensation, payroll taxes, sales tax and income taxes that are accrued and outstanding as of the Closing Date.

**ARTICLE FIVE - CLOSING.**

Subject to the terms and conditions of this Stock Purchase Agreement, the consummation of the transaction provided for herein (the "Closing") shall take place at the offices of the Company or the Seller's attorney on September 8, 2005. The Closing shall be effective as of 7:00 A.M., eastern time, on the Closing Date.    Purchaser has the right to delay Closing Date up to twenty (20) days for logistical conflicts.   At the Closing, Seller and Purchaser shall execute a certificate evidencing  the fact that the Closing has occurred and is effective, said certificate attached hereto and incorporated herein by reference as Exhibit 5.1 (a).   The Closing shall be effective once said certificate has been signed, the Closing Payment has been delivered   to Seller, and the Deferred Payment has been delivered to the escrow agent as provided in Section 1.4, notwithstanding the fact that certain of the documents and other instruments to be delivered at Closing shall not have been delivered and the fact revis ions to certain of the schedules referred to in this Stock Purchase Agreement are intended to be made after the Closing Date to properly reflect the matters referenced therein as of the Closing Date.   The Closing will occur on the Closing Date pursuant to        certain Escrow Instructions, attached hereto and incorporated herein by reference as Exhibit 5.1. (b).

**ARTICLE SIX  -   DOCUMENTS TO BE DELIVERED BY SELLER TO THE PURCHASER WITHIN THREE (3) DAYS OF EXECUTION OF THIS STOCK PURCHASE AGREEMENT**

The following   documents will be delivered by Seller to Purchaser within three (3) business days of executed Stock Purchase Agreement, and updated at Purchaser's reasonable request between then and the Closing Date.

Section 6.1.    Balance Sheets .   Year end 2002 balance sheets, 2003, and 2004 balance sheet, and 2005 year to date, which will be Exhibit 6.1.

Section 6.2.   Income and Expense Statements.   Year end 2002, 2003 and 2004 and 2005 year to date Income and Expense Statements, which will be Exhibit 6.2.

Section 6.3 .    Tax Returns .   A copy of the last three filed Federal annual tax returns, which will be Exhibit 6.3.

Section 6.4.   Insurance Policies.   A copy of all insurance policies in effect with respect to the Company, which will be Exhibit 6.4.

Section 6.5.   List of Employees.  A list of all present and past employees, since the year 2002, their starting date, annual salary, home addresses, phone numbers, and job descriptions, which will be Exhibit 6.5.

Section 6.6.   Licenses and Permits.  A copy of all licenses and permits maintained by the Company or used in the Business, which will be Exhibit 6.6.

Section 6.7.   Customer List.  A master customer list of all customers who have ordered services or products from the Company within two years of the Closing Date     , including contact names, telephone numbers and addresses (the "Master Customer List"), which will be Exhibit 6.7.

Section 6.8.   Accounts Receivable Report.   A list of all outstanding account and notes receivable due the Company, complete with address    and phone numbers, which will be Exhibit 6.8.

Section 6.9.    Written License, Distribution and Sales Agency Contracts .   A copy of all written license, distribution and sales agency contracts, which will be Exhibit 6.9.

Section 6.10.   Employment Manual.  A copy of the Company employment manual, if any, which will be Exhibit 6.10.

Section 6.11  Real Property Lease.  A copy of the Real Property Lease where the Business is located in Reston, Virginia.

Section 6.12   Certificate of Non  -Contamination.   A certificate from Seller certifying that to the knowledge of the Seller, there is no asbestos, hazardous and/or toxic wastes on or about the Leased Real Property, which will be Exhibit 6.12.


ARTICLE SEVEN  -   DOCUMENTS TO BE EXECUTED ON THE CLOSING DATE


Section 7.1    Certified Resolutions    Company, and the Purchaser shall have received a copy of each other's Company's resolutions, having been duly adopted approving the consummation of the transaction contemplated hereby,

attached hereto and incorporated herein as Exhibits 7.1 (a), and 7.1 (b).

Section 7.2.  <u>Removal of Signatory</u>.  Seller shall deliver to Purchaser a copy of all letters removing Seller and Seller's designees as a signatory from the Company checking accounts.  The Removal of Signatory is attached hereto and incorporated herein by reference as Exhibit 7.2.

Section 7.3.  <u>Resignation of Officers</u>.  On the Closing Date, Seller irrevocably resigns as an officer and employee of the Company, as evidenced by Exhibit 7.3, attached hereto and incorporated herein by reference.

Section 7.4. <u>Covenant Not to Compete.</u>  In consideration of this transaction, Seller agrees for a period during and for five (5) years after the Closing Date, not to directly or indirectly, as an owner, partner, joint venturer, e mployee, independent contractor, consultant, distributor, or shareholder (of more than one (1%) percent of the outstanding voting stock of a company), engage in, establish, invest in, have an interest in, or associate in any fashion with, or perform any pr ofessional services on behalf of, a company which maintains a place of commerce within 100 miles of Reston, Virginia,  or actively solicits commerce from persons or entities located within 100 miles of Reston, Virginia organized in whatever form, and directly or significantly indirectly engaged in the Business. The Covenant Not to Compete is attached hereto and incorporated herein by reference as Exhibit 7.4.

Section 7.5  <u>Covenant Not to Contact or Solicit Customers</u>.  In consideration of this transaction, S eller agrees for a period during and five (5) years after the Closing Date, not to directly or indirectly, as an owner, partner, joint venturer, employee, independent contractor, consultant, distributor, or shareholder (of more than one (1%) percent of the outstanding voting stock of a company), (a) contact on behalf of a competing company or on Seller's own behalf, any customer the Company as of the Closing Date, and (b) attempt to solicit on behalf of a competing company or on Seller's own behalf, any cus tomer of the Company as of the Closing Date to provide goods or services provided by the Business.  The Covenant Not to Contact or Solicit Customers is attached hereto and incorporated herein by reference as Exhibit 7.5.

Section 7.6.  <u>Covenant Not to S    olicit Employees</u>. In consideration of this transaction, Seller agrees for a period during and for five (5) years after the Closing Date,

not to directly or indirectly, as an owner, partner, joint venturer, employee, independent contractor, consultant, distributor, or shareholder (of more than one (1%) percent of the outstanding voting stock of a company), solicit, divert, hire or attempt to solicit, divert, or hire any employee of the Company. The Covenant Not to Solicit Employees is attached hereto and in  corporated herein by reference as Exhibit 7.6.

Section 7.7.   Employment Agreement .  On the Closing Date, Company will execute an Employment Agreement as contained in Exhibits 7.7, attached hereto and incorporated herein by reference, with Seller for a term    of ninety (90) days ("Training Period") at $19.11 an hour, so that Seller may train his replacement.   Purchaser may extend the ninety (90) days at $35.00 per hour.  Seller acknowledges that upon the Closing Date, he will be employee of the Company, and his obligations to the Company and right to be involved in the operation of the Company after closing are at the exclusive direction of Purchaser

## ARTICLE EIGHT - CONDITIONS PRECEDENT

Section 8.1.    Due Diligence .  Purchaser to have ten (10) business d ays from the execution date hereof (the "Due Diligence Period") to review the books and records of the Company.   If Purchaser's due diligence team determines any irregularities in the Company's financial records during said due diligence, or notices a rec      ent decline in performance of the Company, then Purchaser may declare this Stock Purchase Agreement null and void at any time prior to the expiration of the Due Diligence Period.

Section 8.2    Key Employees to Stay with Company     .  At Purchaser's sole discre tion, Purchaser may terminate this Agreement prior to Closing if Purchaser is advised in writing by any key employee of the Company that such key employee will resign from the Company prior to or post    - Closing and the Company has not made arrangements prior    to Closing to replace such key employee with a reasonably acceptable replacement.  These employees include Chris Radford, Christine Andreoni, Bryan Russell, Christine Morse, David Lewis, Diane Falk, Vinh Nguyen, and Tamara Gawthrop.

Section 8.3.   Seller B ound upon Signature .  Once the Stock Purchase Agreement is fully executed, Seller must proceed to

closing, and in the event that Seller refuses to close, Purchaser is authorized to take all steps to effectuate closing, and Seller consents to such authority.

## ARTICLE NINE - SELLER'S AND THE COMPANY'S REPRESENTATIONS AND WARRANTIES

The Seller, and Company hereby represent and warrant to Purchaser as follows, subject to the exceptions and qualifications set forth on the Disclosure Schedule attached hereto and made a part hereof:

Section 9.1    Corporate Status.  Company is a corporation duly organized, validly existing and in good standing under the laws of the state of Virginia and have the corporate power and authority to own and operate its properties and to carry on it business as now being conducted, and to enter into and to perform its obligations under this Stock Purchase Agreement and the and Ancillary Documents (as hereinafter defined) to which it is a party.  Company is duly qualified to do busin ess and is in good standing in each state in which failure to be so qualified would have a material adverse effect on Company's financial position or its ability to conduct its business in the manner now conducted.

Section 9.2    Ownership of Shares, Power  and Authority to Sell.  The Seller owns all rights, title and interest in and to the Purchased Stock being sold and the Purchased Stock will be, on the Closing Date, free and clear of any liens, encumbrances, adverse rights and claims of any kind whatsoever.   The Seller has the power and authority to sell the Purchased Stock being sold hereunder to Purchaser pursuant to this Stock Purchase Agreement free and clear and to execute, deliver and otherwise perform this Stock Purchase Agreement and the Ancillar y Documents to which it is a party.

Section 9.3.   Authorization.  The Company has full legal right, power and authority to conduct its business and affairs.  The Company has full legal right, power and authority to enter into and perform its obligations hereunder, without the consent or approval of any other person, firm, governmental agency or any other legal entity. The execution and delivery of this Stock Purchase Agreement, the execution and delivery of each Ancillary Document to which the Company  is a party, and the performance by the Company of its obligations thereunder, are within the corporate powers of the Company, and have been authorized by

all necessary corporate action properly taken, have
received all necessary governmental approvals, if any were
required, and to the knowledge of the Seller, do not
contravene or conflict with any current provision of any
material law, any applicable judgment, ordinance, regulation
or order of any court or governmental agency, the Articles
of Incorporation or Bylaws of the Company or any agreement
binding upon the Seller or the Company or its properties.
The officer of the Company executing this Stock Purchase
Agreement, and all the documents relating to the
transactions contemplated hereby to which the C ompany is a
party (the "Ancillary Documents") is duly authorized to act
on behalf of the Company.  Spousal consent forms are
attached hereto and incorporated herein by reference.

Section 9.4    <u>Validity and Binding Effect</u> .  The Stock
Purchase Agreement an d the Ancillary Documents are the
legal, valid and binding obligations of the Seller and the
Company, as appropriate, enforceable in accordance with
their respective terms, subject to (i) limitations imposed
by bankruptcy, insolvency, moratorium or other s imilar laws
affecting the rights of creditors, and (ii) the exercise of
judicial discretion in accordance with general principles of
equity.

Section 9.5.    <u>Capitalization</u>.   Company issued and
outstanding capital stock consists solely of one thousand
(1,000) shares of common stock (or securities or rights
convertible into such shares) represent one  -hundred (100%)
percent of the shares that are issued and outstanding. At
the Closing Date, the Seller will transfer one thousand
(1,000) shares in the Company t  o Purchaser and Purchaser
will be the owner of one hundred (100%) percent of the
issued and outstanding shares the Company.

Section 9.6    <u>No Conflicts</u> .  To the knowledge of the
Seller, the consummation of the transactions hereby
contemplated and the perf ormance of the obligations of the
Seller and the Company under and by virtue of this Stock
Purchase Agreement or the Ancillary Documents will not
result in any breach of, or constitute a default under, any
material mortgage, security deed or agreement, dee     d of
trust, lease, bank loan or credit agreement, corporate
charter or bylaws, agreement or certificate of limited
partnership, license, franchise or any other instrument or
agreement to which the Seller or the Company is a party or
by which the Seller or      the Company or its respective
properties may be bound or affected or to which the Seller
or the Company have not obtained an effective waiver which
could reasonably be expected to have a material adverse

effect on the Company or its future operations taken    as a whole.

Section 9.7    <u>Litigation</u>.    There are no actions, suits, or proceedings pending or, to the knowledge of the Seller, overtly threatened against or affecting the Seller, Company or the Company Assets, at law or in equity, before any court, fede ral, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, and, to the best of Seller's and the Company's knowledge, no basis exists for any such action, suit, or proceeding.

Section 9.8    <u>Other Agreements; No Defaults</u>.    The Seller and the Company are not parties to any indenture, loan or credit agreement, lease or other agreement or instrument, or subject to any charter or corporate restriction that could, by virtue of containing terms and conditions    other than usual and customary for the circumstances, reasonably be expected to have a material adverse effect other than arising as a result of a default thereunder) on the business, properties, assets, operations or conditions, financial or otherwise, o f the Company, or the ability of the Seller or the Company to carry out its obligations under this Stock Purchase Agreement and the Ancillary Documents to which it is a party.    To the knowledge of the Seller, the Company is not in default in any respect in the performance, observance or fulfillment of any of the material obligations, covenants or conditions contained in any agreement or instrument material to its business to which it is a party, and no other default by Company or event has occurred and is continuing that with notice or the passage of time or both would reasonably be expected to constitute a material default by Company or event of material default by Company or event of material default by Company under any of same.

Section 9.9    <u>Compliance with Law</u>.    To the knowledge of Seller, the Company has obtained, or in the ordinary course of business will obtain, all necessary material licenses, permits and approvals and authorizations necessary or required in order to conduct its business and affai    rs as heretofore conducted and as hereafter intended to be conducted.    To the knowledge of the Seller, the Company is in compliance with all material laws, regulations, decrees and orders known to be applicable to it (including but not limited to laws, re gulations, decrees and orders relating environmental, occupational and health standards and controls, antitrust, monopoly, restraint of trade or unfair competition), to the extent that noncompliance, in the

aggregate, cannot reasonably be expected to have                          a
materially adverse effect on its respective business,
operations, property or financial condition and will not
materially adverse affect the Company's ability to perform
its obligations under this Stock Purchase Agreement and the
Ancillary Documents.

Section 9.10.    <u>Statements Not False or Misleading</u>.  To the
knowledge of Seller, no representation or warranty given as
of this date hereof by the Seller or the Company contained
in this Stock Purchase Agreement or any exhibit attached
hereto or any statement   in any document, certificate or
other instrument required by the terms hereof furnished to
Purchaser, to the knowledge of the Seller, contains or will
contain any material untrue statement, or omits or will omit
to state any material fact which is necessa   ry in order to
make the statements contained therein not misleading.
There is no fact known to the Seller which materially
adversely affects, or in the future could reasonably be
expected to materially adversely affect, the business,
operations, cash flo ws, affairs, prospects, properties or
assets or the condition, financial or otherwise, of the
Company which has not been disclosed in this Stock Purchase
Agreement, the exhibits, the Ancillary Documents, or in any
documents, certificates, information or wr itten statements
furnished to Purchaser for use in connection with the
transactions contemplated hereby (collectively the
"Disclosure Documents").

Section 9.11.    <u>Environmental</u>.  To the knowledge of the
Seller, the Real Property and the Leased Real Prope  rty has
not been used by the Company to generate, manufacture,
refine, transport, treat, store, handle or dispose of "Toxic
Material," "Hazardous Substances," or "Hazardous Waste",
other than in the ordinary course of business which
activities have been in compliance with all applicable laws
and regulations relating thereto.  For the purposes of this
Stock Purchase Agreement, "Toxic Material," "Hazardous
Substances," and "Hazardous Waste" means and includes any
hazardous, toxic, or dangerous wastes, substan      ce, or
material defined as such by (or for purposes of) the
Comprehensive Environmental Response, Compensation and
Liability Act, any so-called "Superfund" or "Superlien" law,
or any other federal, state, or local statute, law,
ordinance, code, rule, regul      ation, order or decree
regulating, relating to, or imposing liability or standards
of conduct concerning any hazardous, toxic, or dangerous
wastes, substance, or material as now in effect (each an
"Environmental Law").  To the knowledge of the Seller,
there are no pollutants, contaminants, or other substances,

whether hazardous or not, on or beneath the surface of the Leased Real Property, which Seller, the Company, or any other person or entity has placed, caused or allowed to be placed upon the Leased Re al Property, and which may cause any investigation by any agency or instrumentality of Government which are or may be on the Leased Real Property in violation of any law or regulation or which are, or may be a nuisance or health threat to occupants of the     Leased Real Property or other residents of the area.

Section 9.12.    <u>Labor Matters</u>.   To the knowledge of the Seller, the Company is not bound by any collective bargaining agreement or agreement of any kind with any union or labor organization.  The Company has not been the subject of any union activity or labor dispute, nor has there been any strike of any kind called or threatened to be called against it, and, to the knowledge of the Seller, the Company has not violated any material applicable federal or    state law or regulation relating to labor or labor practices, which could reasonably be expected to have a material adverse effect.

Section 9.13.      <u>Financial Statements</u>.  The Company's unaudited statements of assets, liabilities and equity, and the Company's unaudited statements of revenue and expenses (the "Financial Statements"), attached hereto as required by Sections 6.1 and 6.2 herein, are in accordance with the Company's books and records in all material respects, and fairly present the Company's fi nancial condition as of the respective dates and the Company's result of operations for the years then ended.  The Company does not have material liability or obligation (whether accrued, absolute, contingent, or otherwise) which could be reasonably expected to have a material adverse effect on the Company and which is not set forth on the Financial Statements, except for liabilities incurred or accrued in the ordinary course of business since the date of the Financial Statements or liabilities which are no  t required to be disclosed by generally accepted accounting principles ("GAAP") or under the basis of accounting currently in use by the Company. The Company is not in default with respect to any material liabilities or obligations, which default could   reasonably be expected to have a material adverse effect on the business and operation of the Company, and all such liabilities and obligations reflected in the Financial Statements have been or are being paid and discharged as they become due in the ordin      ary course of business operations of the Company taken as a whole which could reasonably be expected to have a material adverse effect since the time that the Company supplied its books, records,

statements of financial condition and other documents to
Purchaser.

Section 9.14.   Underlined Liabilities.   Except as and to
the extent specifically reflected in the Financial
Statements or not required to be disclosed by GAAP or under
the basis of accounting currently in use by the Company, and
except for trade payables and similar liabilities arising in
the ordinary course of business, as of the date of the
Financial Statements, the Company has no other material
liabilities of any nature (whether accrued, absolute,
contingent, known or unknown, determinable      or not or
otherwise) which could have a material adverse effect on the
Company.

Section 9.15   Taxes.   The Company has timely and properly
completed and filed in correct form all United States
federal, state, local, foreign, and other tax returns and
estimates of every nature required to be filed by the
Company and paid all taxes due as shown on such returns and
all assessments of which notice has been received.   There
are no agreements by the Company for the extension of time
for the assessment of any t ax.   There are no claims pending
or, to the knowledge of Seller, overtly threatened against
the Company for past due taxes.   The Company has paid all
taxes which do not require the filing of returns and which
are required to have been paid by the Company.

Section 9.16   Condition of Company Assets.   With respect
to the equipment owned, leased or used by the Company: (i)
the Company is and has at all times been in compliance with
all applicable material law relating to land use; and (ii)
there are no ou tstanding requirements or recommendations by
fire underwriters or rating boards, insurance companies or
holders of mortgages or other security interests requiring
or recommending any material repairs or work to be done with
reference to any such properties, and in any case only where
any failure relating thereto would be reasonably likely to
have a material adverse effect on the Company.

Section 9.17.   Compliance with Contracts and Leases.   A List
of all written leases of the Company and all written
contracts (collectively the "Service Contracts"), is
attached hereto as required by Sections 2.2, and 6.9 herein,
and all such Service Contracts are in full force and effect,
to the knowledge of Seller, are valid and binding upon each
of the parties thereto, and to the knowledge of the Seller,
are fully enforceable by the Company against the other party
thereto in accordance with its terms.   Neither the Company
nor the Seller has any notice of, or any justifiable reason

to believe that there is or has been, any actual, threatened or contemplated termination or material modification of any of the Service Contracts.  The Company is not in material breach or in default of any Service Contracts, nor to the knowledge of the Seller is any other party to any Service Contracts in material breach or in default thereunder, nor has any event occurred, to the knowledge of the Seller, which, with the lapse of time, notice or election, may become a material breach or material default by the Company under any of the Service Contracts.  The execution, delivery and performance of this Stock Purchase Agreement by the Company and the consummation of the transactions contemplated by this Stock Purchase Agreement (i) will not result in the material breach or termination of or constitute a default under any Service Contract, (ii) does not require the consent of any party to a Service Contract, or any other person  for whose benefit a Service Contract was executed, and (iii) will not give any such party or person the right to terminate a ny Service Contract.   All payments required to be made pursuant to the Service Contracts by parties to the Service Contracts, and other persons for whose benefit Service Contracts were executed which are now due, have been paid in full.   The Company has not accepted payment under the Service Contracts for work which it has not yet performed, other than in the ordinary course of business.   The Service Contracts are in compliance with all applicable material laws of all Governmental Agencies.

Section 9 .18.   <u>Liens</u>.   Other than as disclosed in the Financial Statements, to the knowledge of the Seller, there are no judgments, bankruptcies, executions, liens, encumbrances of any kind, or unpaid bills of any nature, pending against the Seller or the Company.

Section 9.19.   <u>Employment Contracts</u>.   The Company is not bound by any employment agreements, either written or oral, with any employees or independent contractors of the Company which is not terminable at will, except as may be prohibited by any law, rule or regulation.

Section 9.20   <u>Employment Practices</u>.   To the knowledge of Seller, the Company is in compliance with all federal and state laws and regulations respecting employment and employment practices, including, without limitation, payment of payr oll, withholding and unemployment taxes.   The premiums with respect to all workmen's compensation insurance required to be carried by the Company on the employees of the Company shall have been fully paid through the Closing Date by the Company, and all r     eturns timely

18

filed by the Company except any failure to pay or file which
could not be reasonably be expected to have a material
adverse effect.

Section 9.21.   Employee Plans.   Except as listed on Exhibit
9.21 attached hereto and incorporated herein by r eference,
neither the Company nor any ERISA Affiliate (as hereinafter
defined) maintains any of the following plans (the "Employee
Plans"): (1) any employee pension benefit plan (as such term
is defined in the Employee Retirement Income Security Act of
1974, as amended ("ERISA"), including any person, profit
sharing, retirement, thrift, or stock purchase plan; (2) any
employee welfare benefit (as such term is defined in ERISA):
(3) any other compensation, stock option, restrictive stock,
fringe benefit or r etirement plan of any kind whatsoever,
formal or informal, not included in the foregoing or
providing for benefits for, or the welfare of, any or all of
the current or former employees or agents of the Company or
any ERISA Affiliate or any of their benefic    iaries or
dependents, including any group health, life insurance,
retiree medical, bonus, incentive or severance plan; (4) any
"multi-employer" plan as such term is defined in ERISA or
the Internal Revenue Code of 1986, as amended (the "IRC");
or (5) any " multi-employer welfare arrangement " as defined
in ERISA.   For purposes of this section, the term "ERISA
Affiliate" shall mean any entity that is under common
control with the Company within the meaning of ERISA or is
any member of a group that includes t he Company and that is
treated as a single employer under the IRC.   To Seller's
knowledge, there is not any liability of any kind arising
out of, or attributable to, or affecting the Company for
which Purchaser will have any liability for payment or
otherwise relating to persons who are former employees or
retirees of the Company as of the Closing Date.   To Seller's
knowledge, there does not exist and will not exist by virtue
of the transactions contemplated by this Stock Purchase
Agreement any liability wh ich may be asserted against the
Company and no lien or other encumbrances has attached or
will attach to the Company relating to former employees or
retirees of the Company.

Section 9.22   Insurance.   Attached hereto and incorporated
herein by reference as   Exhibit 9.22, is a list of each
insurance policy currently held by the Company, setting
forth with respect to each policy the name and the insurer,
a description of the policy, the dollar amount of the
coverages, the amount of the premium, the amount of premiums
which have been paid as of the Closing Date, and the
expiration date.   Each insurance policy currently held by
the Company is in full force and effect and the Company is

not in material beach of or in default under any such
policy, except where any such breach or default could not be
reasonably be expected to have a material adverse effect.
Neither the Seller nor the Company has any notice of or any
reason to believe that there is or has been any actual,
threatened, or contemplated termination or cancellation of
any insurance policy. To Seller's knowledge, the Company
has not failed to give any notice or to present any claim
under any insurance policy in a due and timely fashion.

Section 9.23. [Intentionally omitted]

Section 9.24. <u>Bank Accounts and Safe Deposit Arrangements</u>.
Attached hereto and incorporated herein by reference as
Exhibit 9.24, which represents a true, correct, complete
list of each checking account, savings account and other
bank account and safe deposit box maintained by the Company,
and the names of all persons authorized to withdraw funds or
other property from, or otherwise deal with, such accounts
and safe deposit boxes.

Section 9.25. <u>Condition of Personal Property</u>
<u>Representation</u>. Exhibit 2.1 is a true and complete l ist of
all tangible personal property owned by the Company or used
by the Company in the Business as of the date reflected
thereon. The Company has sole and exclusive, good and
merchantable title to all of the Tangible Personal Property
owned by it, free and clear of all pledges, claims, liens,
restrictions, security interests, charges and other
encumbrances, except as contained in Article Four herein.
Except as set forth on Exhibit 2.1, all of the tangible
personal property is in operating condition, maintenance and
repair consistent with past practices, and is adequate for
the continuation of the Company's business as presently
conducted, normal wear and tear excluded.

Section 9.26. <u>Intangible Personal Property Representation</u>.
Exhibit 2.3 is a true and complete list of all intangible
personal property owned by the Company or used by the
Company in the Business as of the date reflected thereon,
including all patents, technology, trademarks, service
marks, trade names, business names, copyrights, othe      r
intellectual property rights, trade secrets, assumed names,
and other intangible assets and all applications therefore
which are owned or licensed to the Company.

Section 9.27. <u>Accounts Receivable Representation</u>. Exhibit
2.5 is a true and complete li st of all accounts receivable
owned by the Company as of the date reflected thereon,
representing work completed and invoiced to a third     -party

unrelated customer of the Company, not yet paid, and which
to the knowledge of the Seller, will be paid to the Co mpany
in the ordinary course of business.

Section 9.28.  Accounts Payable Representation.  Exhibit 4.1
is a true and complete list of accounts payable owed by the
Company as of the date reflected thereon, representing
products and services providing t o the Company by a third -
party unrelated entity vendor. To the knowledge of Seller,
there exist no existing or prior vendor that refuses to ship
products to the Company as a result of pre -closing issues,
including but not limited to late payment, invoice c redits,
and distribution territory disagreements.

Section 9.29.  Work in Progress Representation.  Exhibit 2.9
is a true and complete list of work in progress of the
Company as of the date reflected thereon, all of which will
be completed in the due course of business and invoiced to a
third-party unrelated customer.

## ARTICLE TEN - PURCHASER'S REPRESENTATIONS AND WARRANTIES

Purchaser hereby represents and warrants to Seller as
follows:

Section 10.1.   Investment.  Purchaser is acquiring the
Purchased Stock for the Purchaser's own account, to hold for
investment, and with no present intention of dividing his
participation with others or reselling or otherwise
participating, directly or indirectly, in a distribution of
shares, and the Purchaser will not mak e any sale, transfer,
or other disposition of the Purchased Stock in violation
with any state securities laws or in violation of the
Securities Act of 1933, as amended.

Section 10.2.   Authority.  Purchaser is a corporation
duly organized, validly exist  ing and in good standing.
Purchaser has full power and authority to purchase the
Company's Shares and to enter into and execute, deliver and
otherwise perform this Stock Purchase Agreement and the
Ancillary Documents in accordance with its terms.   This
Stock Purchase Agreement and the Ancillary Documents will be
duly executed and delivered by Purchaser, and each
constitutes the legal, valid and binding obligation of the
Purchaser, enforceable in accordance with its terms, except
as enforceability may be  limited by applicable bankruptcy,
insolvency and other laws and equitable principles affecting
creditor's rights.

Section 10.3.    No Conflicts .    The consummation of the transactions hereby contemplated and the performance of the obligations of Purchaser  under and by virtue of this Stock Purchase Agreement or the Ancillary Documents will not result in any breach of, or constitute a default under, any material mortgage, security deed or agreement, deed of trust, lease, bank loan or credit agreement, corpora      te charter or bylaws, agreement or certificate of limited partnership, partnership agreement, license, franchise or any other instrument or agreement to which the Purchaser is a party or by which the Purchaser or its properties may be bound or affected or to which the Purchaser has not obtained an effective waiver.

Section 10.4    Sale or Transfer of Shares; Legend .    Each certificate representing the Purchased Stock shall bear a legend substantially in the following form:

>THE SHARES REPRESENTED BY THIS C ERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED AND MAY NOT BE OFFERED, SOLD, OR OTHERWISE TRANSFERRED, PLEDGED, OR HYPOTHECATED, UNLESS AND UNTIL SUCH SHARES ARE REGISTERED UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY IS OBTAINED TO THE EFFECT THAT SUCH REGISTRATION IS NOT REQUIRED.

## ARTICLE ELEVEN -  POST CLOSING COVENANTS AND AGREEMENTS.

Section 11.1    Continued Operation of the Company.    The purpose of this transaction is for the continuation of t  he Company.    Similarly, so long as Purchaser is not in Default of the Deferred Payments, Seller shall not move for the appointment of a receiver over the Company or its responsibilities, and all parties herein irrevocably waive the right to request a receiver.

Section 11.2.    Tangible Personal Property .    Purchaser and the Company shall not sell or move the Tangible Personal Property without the written consent of Seller, and shall keep the Tangible Personal Property in the same condition as on the Closi ng Date, wear and tear excepted, until the Deferred Payments are fully paid.

Section 11.3    Access to Books and Records . Seller shall be allowed full and complete access to the books and records of the Company during business hours, and shall receive monthly

operating statements on the Company until the Deferred
Payments are fully paid.

Section 11.4.    <u>Insurance</u>.    After the Closing Date,
Purchaser shall cause the Company Assets to be fully insured
consistent with its insurance level pre    -Closing of this
transaction until the Deferred Payments are fully paid.
Proof of insurance will be provided to Sellers by the
Company, along with immediate notice of any cancellation
thereof.

Section 11.5    <u>Performance of Obligations: Maintenance of
Representations and Warranties</u>.    The parties shall in good
faith undertake to (i) to perform their covenants and
agreements, and satisfy all conditions, in this Stock
Purchase Agreement and (ii) to cause the transactions
contemplated in this Stock Purchase Agreement to be carried
out promptly in accordance with the terms of this Stock
Purchase Agreement.

Section 11.6.    <u>Expenses</u>.    The Seller and Purchaser shall
pay their own expenses and costs incurred in connection with
the negotiation and consummation of this Stock Purc    hase
Agreement and the transactions contemplated by this Stock
Purchase Agreement, except if any party breaches this Stock
Purchase Agreement, such party will be responsible for the
other party's expenses and costs of entering into and
enforcing this Stock Purchase Agreement.

Section 11.7    <u>Seller's Further Assurances.</u>    If, at any time
after the Closing Date, Purchaser and/or the Company shall
reasonably consider or be advised that any further deeds,
assignments, other documents, assurances at law, or any
other acts are necessary, desirable, or proper to (a)
maintain ownership of the Assets to the Company, (b) confirm
such ownership or facilitate effective recordation thereof,
(c) put the Company in actual possession and control of the
Assets of the Company,    or (d) otherwise carry out the
purposes of this Stock Purchase Agreement, Seller shall
execute and deliver such further assurances to the Company
or Purchaser or cause them to be executed and delivered to
the Company without any charge to Purchaser and in    proper
form for any required recording, filing, or registration.


**ARTICLE TWELVE - INDEMNIFICATION**

Section   12.1    <u>Indemnification of Seller  </u>.    Except as
otherwise limited by this Article Twelve, Seller shall
indemnify, hold harmless and reimburse Purchas    er from and

for and all Loss (as hereinafter defined) suffered or
incurred by Purchaser as a direct result of, or with respect
to:

> (i) any material breach or inaccuracy of any
> representation or warranty of Seller set forth
> in this Stock Purchase Agreement      or other
> document delivered pursuant hereto or in
> connection herewith:

> (ii) any material breach of or noncompliance by
> Seller with any covenant or agreement of Seller
> contained in this Stock Purchase Agreement;

> (iii) any litigation against the Company  and/or
> Seller existing prior to the Closing Date and
> not disclosed herein;

> (iv) any liability or claim by the Internal
> Revenue Service based on the pre        -closing
> operation of the Company;

> (v) any liability of the Company not identified
> in Section 4.1 thr  ough 4.5, or not paid as
> required in Section 4.6 through 4.8;

> (vi) any and all actions, suits, proceedings,
> demands, assessments, judgments and expenses
> (including reasonable attorney's fees) incident
> to the foregoing.

Section 12.2     Limitations on Sel ler's and the Company's
Indemnification.  All representations and warranties of the
Seller contained herein, and the indemnification with
respect to the matters described in Section 12.1 hereof (the
"Seller's and the Company's Indemnification") shall exten  d
for a period of one (1) year following the Closing Date;
provided, however, that the foregoing limitation shall not
apply to claims of which Purchaser has given Seller and the
Company specific written notice within said period. The
indemnification provid ed for in Section 12.1 hereof is
inclusive of and not in addition to any other
indemnification provided by Seller or the Company in this
Stock Purchase Agreement and shall be Purchaser's exclusive
remedy for all claims against Seller and the Company.
Further, Purchaser will not be entitled to the Seller's and
the Company's Indemnification until the aggregate of all
Losses incurred by Purchaser exceeds in the aggregate the
amount of $15,000 (the "Threshold Amount"), and then
Purchaser shall only be entitled       to indemnification

hereunder to the extent of the excess of such Losses over the Threshold Amount. In no event shall Purchaser's recoverable Losses hereunder exceed the Purchase Price.

Section 12.3    Purchaser's Indemnification.    The Purchaser (and the C ompany, after Closing) shall indemnify and hold harmless Seller against and in respect of:

    (i)    any material breach or inaccuracy of any representation or warranty of any Purchaser set forth in this Stock Purchase Agreement or in any certificate or other docum ent delivered pursuant or in any certificate or other document delivered pursuant hereto or in connection herewith:

    (ii)    any material breach of or noncompliance by Purchaser with any covenant or agreement of Purchaser contained in this Stock Purchase Agreement;

    (iii)    any liability of Seller not being removed from personal liability from the copier leases of the Company.

    (iv)    all liabilities and obligations of, or claims against, the Company which arise from or relate to the ownership or operation of the Business after t        he Closing Date, or relating to the Company Liabilities that remain with the Company after Closing.

    (v)    any and all actions, suits, proceedings, demands, assessments, judgments, costs, and expenses (including reasonable attorneys' fees) incident to the foregoing.

Section 12.4    Duration of Purchaser's Indemnification.    The indemnification with respect to the matters described in Section 12.3 hereof (the "Purchaser's Indemnification") shall extend for a period of one (1) year following the Closing Date; provide    d, however, that the foregoing limitation shall not apply to claims of which Seller has given Purchaser specific written notice within said period. The indemnification provided for in Section 12.3 hereof is inclusive of and not in addition to any other indemnification provided by Purchaser in this Stock Purchase

Agreement and shall be Seller's and the Company's exclusive
remedy for all claims against Purchaser and Purchaser's
partners, and officers.

Section 12.5.    Indemnification Definitions .    Any party
entitled to indemnity under this Section 12 shall sometimes
hereinafter be referred to as an "Indemnified Party", and
the party from whom such indemnity is sought shall sometimes
hereinafter be referred to as the "Indemnifying Party".
"Loss" or "losses"  shall mean any and all out of pocket
losses, liabilities, damages, costs (including court costs)
and expenses (including reasonable attorney's fees and
reasonable accountant's fees) incurred by an Indemnified
Party.  Provided, however, that an Indemnified  Party under
this Section 12 shall not be entitled to indemnification
hereunder relating to: (i) the loss of any tax attribute or
benefit; (ii) any tax liability or related obligation
resulting from the receipt of any payment (including those
of indemnific ation) made under this Stock Purchase
Agreement; (iii) any Loss incurred after the Closing
associated with or resulting from any change in or
continuation of any practice, policy or procedure of the
Company, or the institution of any new practice, policy o r
procedure, in each case regardless of the reasons therefore
(iv) any lost profits, reduction in value or special,
punitive, consequential or similar damages; or (v) any
matter for which an accrual of liability or a specific
reserve is shown on the Financial Statements.

Section 12.6. Notice of Claim.  An Indemnified Party shall
notify the Indemnifying Party, in writing, of any claim for
indemnification, specifying in reasonable detail the nature
of the Loss, and, if known, the amount, or an estimate of
the amount, of the liability arising therefrom.   The
Indemnified Party shall provide to the Indemnifying Party as
promptly as practicable thereafter such information and
documentation as may be reasonably necessary requested by
the Indemnifying Party to s  upport and verify the claim
asserted.   The Indemnifying Party shall have the right to
assume and control the defense of any asserted claim,
provided that it does so diligently, and provided that the
Indemnified Party shall be entitled to participate in suc  h
defense at its own cost and expense.


**ARTICLE THIRTEEN - ARBITRATION**

Section 13.1.    Arbitration.   Any controversy or claim
arising from or relating to this Stock Purchase Agreement,
or the breach thereof (other than for either party's refusal

to clos e) shall be settled by binding arbitration,
administered by the American Arbitration Association in
Washington DC, under its rules and judgment and the award
rendered by the arbitrator may be entered in any court
having jurisdiction thereof.    Any party sh    all have the
absolute right to remove any litigation between the parties
hereto to binding arbitration.    The winning party in
arbitration shall be entitled to reasonable arbitration
attorney fees from the losing party.    Where a decision is
split, each pa    rty shall be responsible for their own
attorney fees.

## ARTICLE FOURTEEN    - REMEDIES IN THE EVENT OF DEFAULT BY PURCHASER

Section 14.1    Legal Default .   As long as Purchaser is in
compliance with this Stock Purchase Agreement, Seller and/or
the Company cannot and will not declare a default or breach
hereunder. In the event of an alleged default by Purchaser
other than Purchaser's failure to close, no legal default
will exist until first (a) Seller notify Purchaser in
writing, declaring a default and clearly  the reason for the
default, and (b) Purchaser will not have cured such default
after a period of thirty (30) days (Non-Monetary Default) or
five (5) days (Monetary Default) from the date that
Purchaser has received such a default notice ("Default").

Section 14.2    Non-Monetary Breach .   In the event of any
alleged breach by Purchaser for anything other than an
alleged breach of the payment of the Deferred Payments or
Purchaser's failure to close, then:

> (a) Purchaser shall attempt to remedy the breach
> within a thirty (30) day cure period.

> (b) If Purchaser disagrees that a non    -monetary
> breach has occurred, or if Purchaser is unable to
> remedy the breach to Seller's satisfaction, then:

the dispute shall be submitted to arbitration with the
American Ar bitration Association in Washington DC, and
administered by the American Arbitration Association under
its Commercial Arbitration Rules.   In the event the
arbitration then finds there is a non    -monetary breach,
Purchaser will be provided in the arbitration  with at least
thirty (30) days to remedy the breach, or longer, if the
arbitration so finds.   Seller acknowledges that he will be
unable to take any action in the event of a claimed non    -
monetary breach until after the American Arbitration

Association rul es in his favor, and the cure period has
expired.

Section 14.3    <u>Monetary Breach</u> In the event that Purchaser is
in default of payment of the Deferred Payments, and in the
event that Seller has submitted and Purchaser has received a
written notice of Defaul t, and the five (5) ·day cure period
has expired, then Seller may foreclose on the Purchased
Stock and/or the Company's assets pursuant to the Security
Agreement.

Section 14.4    <u>Purchaser Right of Contestment of Default</u>  .
In the event that Purchaser conte sts that it is in default
of payment of the Deferred Payments because of a set    -off
claimed in good faith, Purchaser may notify the escrow agent
to hold the amount of the claimed set -off in escrow pending
final resolution of the claim, and the dispute shall    be
submitted to arbitration with the American Arbitration
Association in Washington DC, and administered by the
American Arbitration Association under its Commercial
Arbitration Rules, and in the event that such arbitration
panel rules in favor of the Sel    ler, then Purchaser shall
immediately notify the Escrow Agent to release the claimed
amount to Seller and Purchaser shall pay Seller's costs of
enforcing Purchaser's payment obligation.


**ARTICLE FIFTEEN - MISCELLANEOUS**

Section 15.1    <u>Survival of Represent ations and Warranties</u> .
Except as provided in Sections 12.2 and 12.4 hereof, all of
the representations, warranties, covenants, promises and
agreements of the parties contained in this Stock Purchase
Agreement and the Ancillary Documents (and in any docum  ent
delivered or to be delivered pursuant to this Stock Purchase
Agreement or in connection with the Closing) shall survive
the execution and delivery of this Stock Purchase Agreement
and the consummation of the transactions contemplated
hereby.

Section 1 5.2.    <u>Good Faith Efforts; Further Assurances:</u>
<u>Cooperation</u>.    The parties shall in good faith undertake to
perform their obligations in this Stock Purchase Agreement,
to satisfy all conditions and to cause the transactions
contemplated in this Stock Purchas e Agreement to be carried
out promptly in accordance with the terms of this Stock
Purchase Agreement.    Upon the execution of this Stock
Purchase Agreement and thereafter, each party shall do such
things as may be reasonably requested by the other party
hereto in order to more effectively consummate or document

the transactions contemplated by this Stock Purchase Agreement.

Section 15.3     <u>Successors and Assigns: Binding Effect.</u>
Whenever in this Stock Purchase Agreement one of the parties hereto is named o     r referred to, the heirs, legal representatives, successors, successors-in-title and assigns of such parties shall be included, and all covenants and agreements contained in this Stock Purchase Agreement by or on behalf of the Seller or the Company or by or on behalf of Purchaser shall bind and inure to the benefit of their respective heirs, legal representatives, successors-in-title and assigns, whether expressed or not.

Section 15.4.     <u>Assignment</u>.   This Stock Purchase Agreement shall not be assignabl  e by any party hereto without the prior written consent of the other parties hereto, except that Purchaser may assign the Purchased Stock to a wholly owned subsidiary provided that Purchaser and assignee are both liable under the terms of this Stock Purcha          se Agreement.

Section 15.5     <u>Time of the Essence</u>  .   Time is of the essence with respect to each and every covenant, agreement and obligation of the Company, the Seller and the Purchaser hereunder and under all of the Ancillary Documents.

Section 15.6     <u>Severability</u>.   If any provision of this Stock Purchase Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Stock Purchase Agreement and the application of such prov isions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law.

Section 15.7     <u>Venue and Governing Law.</u>   Any dispute or controversy arising out of or in connection with the interpretation or performance of this Stock Purchase Agreement or any of the other documents delivered by any other person pursuant to this Stock Purchase Agreement shall be adjudicated by, and the parties hereto hereby submit to the venue and jurisdiction of the Amer     ican Arbitration Association and, if applicable, the courts, in Washington DC, said mechanism shall have exclusive venue and jurisdiction with respect to any such dispute or controversy.

Section 15.8     <u>Counterparts.</u> This Stock Purchase Agreement may be exe cuted in one or more counterparts, each of which

shall be deemed an original but all of which together shall constitute one and the same agreement.

Section 15.9   Notices.   All notices, consents, requests, instructions, approvals, and other communications   provided for herein shall be validly given, made, or served if in writing and (a) delivered personally, (b) sent by certified mail, return receipt requested, postage prepaid, with a copy sent by U.S. Mail or (c)   sent by overnight courier delivery service, receipt acknowledged, fees prepaid,   and addressed to:

If to Purchaser:    WILLIAMS FUND PRIVATE EQUITY GROUP, INC.
                    140 HIGHWAY ONE
with a copy to:     LEWES, ~~MARYLAND~~ DE 19958

                    7500 W LAKE MEAD, UNIT 9, Apt 340
                    LAS VEGAS, NEVADA 89128

If to Company:      Engel Corporation
                    11507 Sunset Hills Rd
                    Reston VA 20190

with a copy to:


If to Seller:       David Engel
                    1102 Oak Knoll terrace
                    Rockville, MD 20850

with a copy to:


     or such other address or facsimile telephone number as shall be designated in writing by like notice given by any party hereto to all other parties hereto.   Notice will be deemed given when personally delivered, mail, or shipped, except in reference to notice required by Article 14 where notices of default will be   deemed given when received by Purchaser if sent by methods (a) or (c)   [?].   Any notice

sent by either party not in compliance with these methods is automatically null and void.

Section 15.10   Modification.   This Stock Purchase Agreement may not be amende d, modified, or supplemented except by a written instrument executed by duly authorized officers of the Company and Purchaser, and individually by Seller.

Section 15.11   Waiver.   Seller, Company and Purchaser, may, by written instrument signed by their re spective authorized officers or representatives, at any time extend the time for the performance of any of the obligations or other acts of any other party hereto and may waive, with respect to such other party, (a) any inaccuracies in the representations and warranties contained in this Stock Purchase Agreement or in any document delivered pursuant hereto, (b) compliance with any of the covenants, undertakings, or agreements, or satisfaction of any of the conditions to its obligations, contained in this St ock Purchase Agreement, or (c) the performance (including performance to the satisfaction of a party) of any obligations set out herein.  Any waiver by any party to a condition to its obligation to perform this Stock Purchase Agreement shall be without pre judice to the rights or remedies it may have arising out of any subsequent breach of any representation, warranty, covenant, or other agreement hereunder.   The remedies of a party provided in this Stock Purchase Agreement are cumulative and shall not exclude any other remedies to which any party may be lawfully entitled under this Stock Purchase Agreement or applicable law, and the exercise of a remedy shall not be deemed an election excluding any other remedy.

Section 15.12   Pro-Rations.   On the Closing Date, Purchaser and Seller will pro -rate the rent, real property utilities, and real property taxes.

Section 15.13.   Article and Section Headings .   Numbered and titled article and section headings are for convenience only and shall not be construed as amp lifying or limited any of the provisions of this Stock Purchase Agreement.

Section 15.14   Entire Stock Purchase Agreement.   This Stock Purchase Agreement, together with the schedules and exhibits which are referred to herein  and are incorporated herein by reference, contains absolutely the entire agreement between the parties hereto with respect to the transactions contemplated herein.

Section 15.15.   Previous Drafts, Verbal Statements Non  - Admissible.   This Stock Purchase Agreement herein

supersedes all  previous written or oral negotiations, commitments, letters of intent, and writings, which by mutual agreement shall be non -admissible in a court of law or equity.

Section 15.16   <u>Finder's Fee of Broker.</u>   Each party hereto represents and warrants that it  has not used a broker in this transaction, except for Prime Investments, LLC, care of Bill Blumberg, nor have any incurred any obligation or liability, contingent or otherwise, for brokerage fees, agent's commissions or the like in connection with this Stock Purchase Agreement or the transactions contemplated hereby.   The Seller has incurred a finder's fee of _____ ($ 31,000 00 _____) Dollars in this transaction to Prime Investments, LLC, care of Bill Blumberg, pursuant to Finder's Fee Agr     eement, attached hereto and incorporated herein by reference as Exhibit 15.16.   Seller represents that it is not selling the Purchased Stock to Purchaser based upon any representation, oral or written by the Prime Investments, Inc., or by Bill Blumberg, a nd that Seller is solely responsible to do any and all due diligence on Purchaser, and Purchaser, likewise, represents that it is not acquiring the Purchased Stock based upon any representation, oral or written, by Prime Investments, LLC, or by Bill Blumbe     rg but rather by independent examination and judgment as to the prospects of the Business.   .Further, the Purchased Stock was not offered to the undersigned by means of publicly disseminated advertisements or sales literature, nor is the undersigned aware of any offers made to other persons by such means. The Seller specifically agrees to take such further action as may be necessary to ensure that the payment of such finder's fee is in accordance with all applicable laws. Seller hereby authorizes Purchas er to pay this Finder's Fee directly to Prime Investments, LLC, care of Bill Blumberg, and deduct same from the Closing Payment.

Section 15.17      <u>Parties-in-Interest</u>.  Nothing herein is intended nor should be construed as granting any third party beneficiary rights in or through this Stock Purchase Agreement.

Section 15.18.   <u>Definitions</u> .   The following terms shall have the indicated meaning for purposes of this Stock Purchase Agreement and the Ancillary Documents:

   (a)      <u>Ancillary Documents</u> . As used herein, Ancillary Documents refer to all exhibits, attachments, schedules, certificates and other memorandum which

are attached to the Stock Purchase Agreement and incorporated therein by reference.

(b)  <u>To the Knowledge of the Company</u> .  As used herein, the term "to the knowledge of the Company" and similar terms with respect to the Company shall mean the actual knowledge of David Engel without any duty of inquiry thereto.

(c)  <u>To the Knowledge of Seller</u>  .  As used herein, the term "to the knowledge of Seller" and similar terms with respect to the Seller shall mean the actual knowledge of David Engel without any duty of inquiry thereto.

(d)  <u>To the Knowledge of Purchaser</u>  .  As used herein, the term "to the Knowledge of Purchaser" and similar terms with respect to the Purchaser   shall mean the actual knowledge of any officer, director or shareholder of Williams Fund Private Equity Group, Inc. with a reasonable duty of inquiry thereto.

(e)  <u>Material Adverse Effect</u> .  As used herein, the term "Material Adverse Effect" or similar terms w ith respect to a particular or multiple party herein, a material adverse effect on the business, assets, financial condition, and results of operations, determined on a consolidated basis, and when used with respect to representations, warranties, covenant    s, agreements or conditions, means the aggregate effect of all similar situations unless the context indicates otherwise. If it cannot be mutually agreed that a material adverse effect has occurred, the parties shall resolve it through arbitration.

Section 15.19  <u>Tax Returns</u>.  The parties hereby elect, pursuant to Section 1377(a)(2) of the Internal Revenue Code, to treat the Company's current taxable year as if it consisted of two (2) taxable years, the first of which ended on the Closing Date.

IN WITNES S WHEREOF, the parties hereto have caused this
Stock Purchase Agreement to be executed as of the date first
above written by their duly authorized officers.

Engel Corporation t/a Budget
Communications, Inc.
        By:
            Its: President

Dated: __9/2/05___

David Engel

Dated: _____

Williams Fund Private Equity Group,
Inc.

        By:
            Its:

Dated: _____

**ENGEL CORPORATION**
**CLOSING STATEMENT**
9/13/05

**PURCHASE PRICE**

| | |
|---|---|
| BASE PURCHASE PRICE | $310,000.00 |
| | |
| CASH DOWN PAYMENT DUE SELLER | $155,000.00 |
| - INVENTORY CREDIT ($30,000.00 - $29,343.44) | $656.56 |
| - ACCOUNTS RECEIVABLE over 90 days | $7,268.80* |
| - CUSTOMER DEPOSITS | $223.73 |
| + SECTION 1.5 CREDIT | $21,382.35 |
| - TAXES OWING | $19,079.91 |
| + RENT Pro-RATE | $5,082.77 |
| - PAYROLL PRO-RATA | $5,692.00 |
| - CREDIT CARD S DUE ** | 0 |
| TOTAL CASH DOWN PAYMENT | $148,544.12 |
| - COMMISSION TO PRIME INVESTMENTS | $31,000.00 |
| - GENERAL ELECTRIC PAYOFF | $55,829.59 |
| DUE SELLER AT CLOSE | $61,714.53 |
| | |
| FROM PURCHASER AT CLOSE | $61,714.53 |
| - CHECKING ACCOUNT BALANCE | $24,484.00 |
| TO  SELLER | $37,230.53 |
| TO PRIME INVESTMENTS | $31,000.00 |
| TO GENERAL ELECTRIC | $55,829.59 |

DEFERRED  PAYMENTS DUE

| | |
|---|---|
| ON OCTOBER 3 | $40,000.00 |
| ON OCTOBER 24 | $40,000.00 |
| ON NOVEMBER 14 | $35,000.00 |
| ON DECEMBER 13 | $40,000.00 |

\* Amount represents the following invoices/accounts, which are hereby assigned to Seller:
   84144, 84462, 84983, 84771, 85317, 84585, 85395, 85059, 84818, 84967, 93906 and entire Cheska's
   account

\** Purchaser to pay off MBNA credit card account ($22,434.12 within 30 days of closing.

Engel Corporation                              Williams Fund Private Equity Group, Inc.

By:_____ (SEAL)      By:_____ (SEAL)
Name:_____David Engel_____              Name:_____
Title:_____President_____              Title:_____


_____ (SEAL)
David Engel

## DISCLOSURE SCHEDULE

For convenient reference, this Disclosure Schedule is arranged in paragraphs corresponding to the numbered Sections contained in the attached Agreement.  H owever, any disclosure in any paragraph of the Disclosure Schedule shall relate to the entire Agreement and not solely to the corresponding Section of the Agreement.

Section 9.3        Change of control consents required from landlords/lessors in the Company's p  remises lease and equipment leases.

Section 9.6        See disclosures referenced above with respect to Section 9.3.

Section 9.8        See disclosures referenced above with respect to Section 9.3.

Section 9.17       See disclosures referenced above with respect to Section 9.3.

Section 9.19       The Company has an independent contractor arrangement with an outside salesperson.

Section 9.21       The Company maintains a simple IRA plan and a Section 125 plan.



GE Commercial Finance
**Business Property**

Small Business Market

August 26, 2005

Engel Corporation
11507 Sunset Hills Road
Reston, VA 20190

Re:    Engel Corporation
       A/S # 6302854-001

Dear Borrower:

Per your request, following is the payoff on the above captioned loan:

Interest Due from August 1, 2005 to **September 15, 2005** *

| | |
|---|---|
| 30 days at 8.25% | $407.61 |
| 14 days at 8.50% | $195.98 |
| Principal Balance | $59,288.45  ‒ 37 0 0 = 55,588.45 |
| Processing Fee | $75.00 |
| Late Charges | $0.00 |
| Returned Item Charges | $0.00 |
| Other Charges | $50.00 |
| Prepayment Premium | $0.00 |
| Total | $60,017.04 |
| | |
| Per Diem Rate | $13.99 |

* It is written in your Note that a three-week notification of payoff is required.  You may pay the loan in full prior to the three weeks, however, the total amount shown above, which <u>includes three weeks of interest</u>, is due in full.  Please note, the above notification is only valid through October 21, 2005.  If GE Capital Small Business Finance Corporation has not received the funds within this (60) day period, a new three-week advance written notification must be provided by the borrower.  Fees are added to date.  The above payoff quote is based upon the current applicable rate plus spread on your loan.  Regardless of any payoff efforts underway, you are required to make scheduled monthly payments per the terms of your note.  Failure to do so could result in additional late charge assessments.  **Due to possible prime rate changes and any monthly payments being applied, please confirm amount prior to actual payoff to insure that the above payoff amount will satisfy your loan in full.** You are responsible for any fees that may occur after this quote.  Your payoff must include interest at the per diem rate to the date GE Capital Small Business Finance Corporation receives the proceeds.

Funds for payoff of your loan must either be in the form of: (1) a wire transfer to our bank (see wire instructions below); or (2) a check drawn on a U.S. Bank from the borrower's personal or business account via next day delivery (see mailing instructions below).  <u>We will not accept money orders, third party checks or any other form of payoff funds.</u>

GE Commercial Finance Business Property Corporation

Engel Corporation
August 26, 2005

Page 2

If you choose to wire the payoff, please wire your funds (and **include your A/S# shown above**) to:

> Deutsche Bank
> 60 Wall Street
> New York, NY
> Phone #212-250-2500
> ABA #021001033
> For Credit to:  GE Capital Small Business Finance Corporation
> Account #50-256-717

If you choose to submit your payoff via check, please overnight your check (and **include your A/S# shown above**) to my attention at the following address:

> GE Capital Small Business Finance Corporation
> 635 Maryville Centre Drive, Suite 120
> St. Louis, MO  63141-9025
> ATTENTION:  Serena Pettyjohn

If your payoff date falls on a Monday through Thursday, the payoff **must be received and identified by 2:00 pm CST.**  If the payoff is not received by 2:00 pm CST, you must include an extra day of interest. If your payoff date falls on a Friday, your payoff **must be received and identified by 10:00 am CST.** If the payoff is not received by 10:00 am CST, you must include three extra days of interest (Friday, Saturday and Sunday).  If a holiday falls on Monday, you must include three days of interest (Saturday, Sunday and Monday). It is important that you include your A/S # listed above to assist us in identifying your loan payoff.

Should the payoff be made via check, GE Capital Small Business Finance Corporation will hold release of the collateral documents until said check clears.

Again, prior to actual payoff please confirm the amount due, as it may vary from the amount stated on this letter due to payments applied or rate changes that occurred after this letter was issued.

Should you have questions, feel free to contact us.

Sincerely,

GE Capital Small Business Finance Corporation,
        a Delaware corporation

By: _____
Name Printed:  Serena Pettyjohn
Title: Sr. Par

**For questions or updated quotes, please call Customer Service at 1-800-286-8676**

ENCLOSED ARE DOCUMENTATION RELEASE INSTRUCTIONS:

**DOCUMENTATION RELEASE INSTRUCTIONS:**

When your loan is satisfied in full and the quoted processing fee is paid, GE Capital Small Business Finance Corporation will release the collateral which secured the loan, including any life insurance assignments. **IT IS OUR POLICY NOT TO SEND ANY RELEASES OR DOCUMENTS TO PARTIES OTHER THAN THE BORROWER. GE Capital Small Business Finance Corporation WILL NOT ASSIGN LOAN COLLATERAL DOCUMENTS TO OTHER LENDERS.**

**Please forward these instructions to all parties involved in your payoff, including title companies and attorneys.**

Please allow 90 days for all the documents to be filed and returned to our office. Additional time is required in some geographical regions due to their jurisdictional recording backlog. Your final package will be mailed to your invoice address unless you instruct us otherwise in writing.

After your loan has paid off, please contact your insurance carriers and instruct them to delete GE Capital Small Business Finance Corporation as Mortgagee or Loss Payee, as the case may be.

Mail correspondence about documentation to:
  GE Capital Small Business Finance Corporation
  635 Maryville Centre Drive, Suite 120
  St. Louis, MO 63141
  Attn: Release Dept.

# Any questions pertaining to the payoff figures should be directed to Customer Service at 1-800-286-8676.

GE Commercial Finance Business Property Corporation

**EXHIBIT 5.1 (a)**

**CLOSING CERTIFICATE**

This certificate evidences on this 13th day of September, 2005, one hundred and 00/100 (100.0%) percent of the outstanding and issued shares of Engel Corporation were both sold to Williams Fund Private Equity Group, Inc., pursuant to a Stock Purchase Agreement dated September 2, 2005.

_____
Williams Fund Private Equity Group, Inc.

By:
Its:

_____
David Engel

_____
Engel Corporation

## EXHIBIT 7.1 (a)

## RESOLUTION OF THE BOARD OF DIRECTORS OF ENGEL CORPORATION

RESOLVED, that the Directors of ENGEL CORPORATION, hereby authorizes David Engel acting on behalf of ENGEL CORPORATION to enter into a Stock Purchase Agreement with WILLIAMS FUND PRIVATE EQUITY GROUP, INC. ("WILLPEG") whereby WILLPEG will acquire one hundred percent (100%) of the shares of common stock of ENGEL CORPORATION. The Directors hereby approve the terms and provisions of the Stock Purchase Agreement dated September 2, 2005, with WILLPEG.

RESOLVED, that Frank Mctaw ................is elected as Chief Executive Officer of ENGEL CORPORATION effective immediately.

RESOLVED, that the current signatories ENGEL CORPORATION's checking accounts shall be removed, AND replaced by _____ or his designee.

Dated:   September 13, 2005

_____
ENGEL CORPORATION
     By: David Engel
     Its: Former                 PRESIDENT


_____
ENGEL CORPORATION
     By:
     Its: New              PRESIDENT

**EXHIBIT 7.3**

**RESIGNATION OF OFFICERS**

Whereas, as of this day of September 13, 2005, David Engel hereby and irrevocably resigns as an officer of Engel Corporation.

_____
David Engel

_____
Engel Corporation



**ENGEL CORPORATION**

INCORPORATED UNDER THE LAWS OF THE COMMONWEALTH OF VIRGINIA

NUMBER 2

SHARES 1,000+

The Corporation is authorized to issue 5,000 Common Shares Par Value $1.00 each

*One Thousand*

*David B. Engel*

This Certifies that

is the owner of

fully paid and

non-assessable Shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated As of January 1, 2005

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations. Additional abbreviations may also be used though not in the list.

TEN COM — as tenants in common
TEN ENT — as tenants by the entireties
JT TEN — as joint tenants with right of survivorship and not as tenants in common

UNIF GIFT MIN ACT — .................Custodian................(Minor)
under Uniform Gifts to Minors Act...............................(State)

or value received, the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

WILLIAM TWD ACute EQUITY Goul, Inc

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF ASSIGNEE

_____Shares

presented by the within Certificate, and hereby irrevocably constitutes and appoints............................

a   on the books of the within-named Corporation with full power of substitution in the premises.

Dated   9/13/05

In presence of

NOTICE: The signature to this assignment must correspond with the name as written upon the face of the certificate in every particular, without alteration or enlargement, or any change whatever.

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration Between ) | Case No. 16 168 00185 06 |
| ) | |
| Williams Fund Private Equity Group, Inc., ) | Arbitrator: Roy L. Kauffman, Esq. |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| David Engel, ) | |
| ) | |
| Respondent. ) | |
| ) | |

## STIPULATED PROTECTIVE/CONFIDENTIALITY ORDER

It is hereby stipulated and agreed by and between the parties to the above-captioned arbitration, through their undersigned counsel, as follows:

1.      Until further order of the Arbitrator, all documents, testimony, interrogatory responses and other information disclosed in this arbitration by the parties to this arbitration (collectively, "Discovery Information"), shall be handled in accordance with this Stipulated Protective/Confidentiality Order (the "Confidentiality Order"), except that this Confidentiality Order does not affect the rights of the producing or disclosing party with respect to the use or other disclosure of any Discovery Information.

2.      For the purpose of this Confidentiality Order, Discovery Information designated as "Confidential" means any information of any type, kind, or character which is designated as confidential in the manner specified in this Confidentiality Order by the party supplying this information.  Discovery Information designated as "Confidential" may be contained in documents produced or made available, testimony taken in depositions, information derived

from entry onto land or other property, tangible things produced or made available, exhibits, interrogatory answers, responses to requests for admission, or otherwise.

3.      Any person or entity subject to discovery in this arbitration may designate any Discovery Information it produces or discloses as "Confidential" pursuant to paragraphs 4 or 5 hereof.

4.      Any Discovery Information produced in this arbitration may be designated "Confidential" by stamping each page of the document with such designation or by separate written notification that the Discovery Information, or portions thereof, is "Confidential" within seven (7) days of production.

5.      (a) Any oral testimony, including any transcript of such testimony, given by or on behalf of a party, may be designated "Confidential" by any party or the witness by so designating either (i) on the record at the time of the testimony or (ii) by separate written notification within (30) days after receipt by the party or witness of the transcript of the testimony.  All testimony and transcripts shall be treated as if designated "Confidential" until the expiration of that thirty (30) day period.

(b)  If testimony is designated "Confidential" on the record, the court reporter shall mark the face of the transcript and the designated portion thereof containing the designated testimony "Confidential."

6.      Any Discovery Information designated "Confidential" pursuant to paragraphs 4 or 5 herein shall be treated in a strictly confidential manner and shall be disclosed only pursuant to the terms of this Confidentiality Order.  In addition, any Discovery Information designated "Confidential" shall be used only for the purposes of this arbitration and for no other purpose whatsoever, and shall not be disclosed to anyone except in accordance with the terms of this

2

Confidentiality Order, including but not limited to Paragraph 14 below (relating to disclosure under compulsion of law).

7.      Each person to whom any Discovery Information designated "Confidential" is to be disclosed pursuant to paragraphs 8 through 10 hereof shall be provided with a copy of this Confidentiality Order prior to such disclosure.

8.      Discovery Information designated "Confidential" shall be provided only to the receiving party's counsel (including counsel's staff). Such Discovery Information may then be disclosed by the receiving party's counsel to "Qualified Recipients" as defined in paragraph 9 hereof, subject to the restrictions contained in this Confidentiality Order.

9.      The following are "Qualified Recipients" of Discovery Information designated "Confidential:"

(a)   the Arbitrator and employees of the Arbitrator;

(b)   named parties to this arbitration and their employees;

(c)   counsel of record employed by a party to this arbitration, other attorneys of the firm of such counsel, and employees assisting counsel in this arbitration;

(d)   any independent experts or consultants retained by an attorney of record in this arbitration solely for the purpose of assisting counsel in the arbitration or testifying at the hearing;

(e)   court reporters; and

(f)   federal, state and/or municipal regulatory authorities or law enforcement agencies.

3

No person having access to any "Confidential" Discovery Information shall disclose in any manner its contents to any person other than to those persons specifically identified in paragraphs 9(a) through 9(e) above, and no such disclosure shall be made for any purpose other than those specified in this Order.

10.    In addition to the "Qualified Recipients" listed in paragraph 9, if counsel of record determines that it is necessary to disclose "Confidential" Discovery Information to any other person, counsel wishing to make such disclosure shall first give written notice to the designating party specifically identifying the Discovery Information for which disclosure is sought and the name and affiliation of the person to whom the material is to be disclosed. Counsel for the designating party shall have five (5) days (excluding weekends and holidays) following receipt of such written notice to object in writing to the proposed disclosure. If, at the end of those five (5) days, the designating party has not objected, such Discovery Information may be disclosed, provided that such disclosure shall be limited to the person(s) stated in the notice of disclosure. If no agreement as to the propriety of disclosure is reached, the parties will jointly apply to the Arbitrator for determination of whether such disclosure shall be made. In any case, any disclosure to other persons pursuant to this paragraph shall be subject to the same restrictions applicable to disclosures to named parties to this litigation, and any person receiving "Confidential" Discovery Information shall be bound by the terms of this Confidentiality Order and by the penalties for violation thereof.

11.    At the conclusion of this arbitration, all Discovery Information designated "Confidential," as well as any copies, excerpts or summaries thereof, shall be returned to the producing or disclosing party. Counsel of record for any party receiving Discovery Information designated "Confidential" shall certify within 30 days of the conclusion of this arbitration to

4

counsel for the producing or disclosing party that the provisions of this paragraph have been complied with. The provisions of this Confidentiality Order shall not terminate with the disposition of this arbitration, but shall continue in effect until further order of the Arbitrator.

12.     If a receiving party contends that specific Discovery Information is not entitled to confidential treatment, such party may within ten (10) days give written notice challenging such designation to the producing or disclosing party. The parties shall make diligent good faith efforts to resolve any disagreement as to the confidentiality of any Discovery Information. If good faith negotiations fail to resolve a disagreement, the receiving party may apply to the Arbitrator for a ruling that specific documents or testimony designated as "Confidential" are not entitled to such status or protection.

13.     If a party in possession of Discovery Information designated "Confidential" is served with a subpoena, demand or request for production of such information from a court, administrative, legislative or other governmental body, or from any other person purporting to have authority to subpoena, demand or request such information (the "Requesting Party"), the recipient shall give immediate written notice of the subpoena, demand, or request (including the delivery of a copy thereof) to the attorneys for the producing or disclosing party. In the event that a subpoena, demand or request purports to require production of such Discovery Information on less than ten (10) days' notice, the party to whom the subpoena, demand or request is directed shall give prompt telephonic notice of the receipt of such subpoena, demand or request, and transmit a copy thereof by telecopier or for next-day delivery, to the attorneys for the producing or disclosing party.

14.     Nothing herein shall preclude any party from applying to the Arbitrator for an order modifying this Confidentiality Order, or shall preclude any modification of this Confidentiality Order by the Arbitrator with the consent of all parties hereto.

15.     The Arbitrator retains jurisdiction to enforce provisions of this Confidentiality Order and to make such modifications and additions to this Confidentiality Order as the Arbitrator may from time to time deem appropriate.

16.     This Confidentiality Order may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

DONE and ORDERED, this 26ᵗʰ day of _July_, 2006.

_____
Arbitrator

STIPULATED AND AGREED:

_____
Joseph A. Artabane
Artabane & Belden, P.C.
818 18ᵗʰ Street, NW, Suite 410
Washington, DC 20006-3523

_____
Jeremy W. Schulman
Shulman, Rogers, Gandal,
Pordy & Ecker, P.A.
11921 Rockville Pike, Suite 300
Rockville, MD 20852

6

# SECURITY AGREEMENT

This Security Agreement is made between and entered into the 13th day of September, 2005, by and among WILLIAMS FUND PRIVATE EQUITY GROUP, INC. (the "Borrower"), DAVID ENGEL (the "Holder") and ENGEL CORPORATION t/a Budget Communications (the "Company").

FOR VALUE RECEIVED, and in order to secure payment of any and all indebtedness of the Borrower to Holder, now existing or hereafter incurred, matured or unmatured, direct or contingent, including any extensions, renewals and substitutions thereof, pursuant to the Stock Purchase Agreement among Borrower, Holder and the Company dated September 2, 2005 (the "Stock Purchase Agreement"), the Borrower hereby grants to the Holder a security interest in (i) the Purchased Stock of the Company as defined in the Stock Purchase Agreement, and (ii) all assets of the Company and proceeds thereof (collectively, the "Collateral"). All capitalized terms used herein that are not defined herein shall have the meaning ascribed to them in the Stock Purchase Agreement.

This Security Agreement secures the indebtedness of the Borrower to Holder for the Deferred Payments, as defined in the Stock Purchase Agreement.

1.  UCC FINANCING STATEMENT.  A UCC Financing Statement covering the Collateral herein secured shall be filed for record with the appropriate filing office in the Commonwealth of Virginia.  In addition, the certificates representing the Purchased Stock shall be held in escrow by the escrow agent referred to in the Stock Purchase Agreement.

2.  Default

In the event of any alleged breach by Borrower for anything other than an alleged breach of the payment of the Deferred Payments or Borrower's failure to close, then:

> (a) Borrower shall attempt to remedy the breach within a thirty (30) day cure period.

> (b) If Borrower disagrees that a non-monetary breach has occurred, or if Borrower is unable to remedy the breach to Holder's satisfaction, then:

the dispute shall be submitted to arbitration with the American Arbitration Association in Washington DC, and administered by the American Arbitration Association under its Commercial Arbitration Rules.   In the event the arbitration then finds there is a non-monetary breach, Borrower will be provided in the arbitration with at least thirty (30) days to remedy the breach, or longer, if the arbitration so finds.   Holder acknowledges that he will be unable to take any action in the event of a claimed non-monetary breach until after the American Arbitration Association rules in his favor, and the cure period has expired.

Monetary Breach In the event that Borrower is in default of payment of the Deferred Payments, and in the event that Holder has submitted and Borrower has received a written notice of Default, and the five (5) day cure period has expired, then Holder may foreclose on the Collateral in accordance with the Uniform Commercial Code as adopted in the Commonwealth of Virginia.

Borrower Right of Contestment of Default.   In the event that Borrower contests that it is in default of payment of the Deferred Payments because of a set-off claimed in good faith, Borrower may notify the escrow agent to hold the amount of the claimed set-off in escrow pending final resolution of the claim, and the dispute shall be submitted to arbitration with the American Arbitration Association in Washington DC, and administered by the American Arbitration Association under its Commercial Arbitration Rules, and in the event that such arbitration panel rules in favor of the Holder, then Borrower shall immediately notify the Escrow Agent to release the claimed amount to Holder and Borrower shall pay Holder's costs of enforcing Borrower's payment obligation.

Stock Pledge.   In the event of an uncured default, Holder assumes the control of the Purchased Stock pending foreclosure, except if Borrower contests the default, and has filed for arbitration regarding said default, and continues making timely payments to the escrow for the Deferred Payments, then Borrower will retain control of the Purchased Stock pending decision by the American Arbitration Association.

3.  ATTORNEY'S FEES.  In the event the Holder is required to take legal action to enforce any of the provisions of the Security Agreement, then in addition to such relief as shall be granted the Holder, the Holder shall also be entitled to reasonable attorney's fees.

4.    NOTICES.        All  notices,  consents,  requests,
instructions,  approvals,  and  other  communications  provided
for  herein  shall  be  validly  given,  made,  or  served  if  in
writing  and  (a)  delivered  personally,  (b)  sent  by  certified
mail,  return  receipt  requested,  postage  prepaid,  with  a  copy
sent  by  U.S.  Mail  or  (c)  sent  by  overnight  courier  delivery
service,  receipt  acknowledged,  fees  prepaid,  and  addressed
to:

       If to Borrower:     Williams Fund Private Equity Group,
                               Inc.
                               140 Highway One
                               Lewes, DE 19958

       with a copy to:     7500 W. Lake Mead, Suite 9, Dept.
                               340
                               Las Vegas, Nevada 89128

       If to the Company:  Engel Corporation
                               11507 Sunset Hills Road
                               Reston, VA 20190

       If to Holder:       David Engel
                               1102 Oak Knoll Terrace
                               Rockville, MD 20850

or  such  other  address  or  facsimile  telephone  number  as  shall
be  designated  in  writing  by  like  notice  given  by  any  party
hereto  to  all  other  parties  hereto.    Notice  will  be  deemed
given  when  personally  delivered,  mail,  or  shipped,  except  in
reference  to  notice  required  by  Article  14  where  notices  of
default  will  be  deemed  given  when  received  by  Borrower.


5.    TIME OF PERFORMANCE AND WAIVER:  The  Holder's  failure
to  enforce  the  time  periods  pursuant  to  the  Schedule,
assuming  performance  of  the  Promissory  Note  shall  not
operate  as  a  waiver  of  the  right  of  the  Holder  thereafter  to
require  that  the  terms  hereof  or  the  terms  of  such  other
documents  be  strictly  performed.


6.    GOVERNING  LAW  AND  SEVERABILITY.      This  Security
Agreement  shall  be  governed  by  the  law  of  the  state  of
Virginia.    In  the  event  that  any  provision  of  this  Security
Agreement  conflicts  with  applicable  law,  such  conflict  shall
not  affect  other  provisions  of  the  Security  Agreement  which
can  be  given  effect  without  the  conflicting  provision.      To

this end the provisions of the Security Agreement are declared to be severable.

7.   SURVIVAL.    The provisions contained in this Security Agreement shall survive the Closing.

8.   BINDING EFFECT.   This Security Agreement shall inure to the benefit of and be binding upon the Holder and the Borrower and their respective heirs, executors, administrators, successors and assigns and legal representatives.

9.   HEADINGS.    Numbered and titled article and section headings are for convenience only and shall not be construed as amplifying or limited any of the provisions of this Security Agreement

_____
Williams Fund Private Equity
Group, Inc.
     By: _____
     Its: _____

_____
Engel Corporation t/a Budget
Communications
     By: David Engel
     Its: President

_____
David Engel

4

## AMERICAN ARBITRATION ASSOCIATION

|  |  |
|---|---|
| In the Matter of the Arbitration Between ) | Case No. 16 168 00185 06 |
| Williams Fund Private Equity Group, Inc., ) | Arbitrator: Roy L. Kaufmann, Esq. |
| Claimant, ) | |
| v. ) | |
| David Engel, ) | |
| Respondent. ) | |

## RESPONDENT DAVID ENGEL'S STATEMENT OF REMEDIES SOUGHT AND CALCULATION OF DAMAGES

Respondent David Engel ("Engel") respectfully submits this statement of remedies sought and calculation of damages and requests that the Arbitrator enter judgment in his favor on his counterclaim for fraud/illegality or, in the alternative, on his counterclaim for breach of contract.[1]

### I.   Fraud/Illegality Remedy

The Stock Purchase Agreement ("SPA") is void and unenforceable by Williams Fund because Williams Fund fraudulently induced Engel to enter into the SPA and victimized Engel and his company by committing a host of illegal acts before and after execution of the SPA.[2] Engel is thus entitled to rescission of the SPA and to recover compensatory and punitive damages caused by Williams Fund's tortious and illegal conduct.

---

[1] Under Virginia law, a victim of fraud in the inducement such as Engel may elect either to invalidate the fraudulently induced contract or enforce it. *United Leasing Corp. v. Resource Bank*, No. LM-1064-4, 2002 WL 337753, at *2 (Va. Cir. Ct. Feb. 22, 2002). As between the two alternative remedies presented herein, Engel seeks to void the Stock Purchase Agreement on the basis of his fraud and illegality counterclaim and be awarded the compensatory and punitive damages set forth below.

[2] See *VMC Satellite, Inc. v. Stevens & Assocs.*, No. 21421, 2005 WL 3579037, at * 3 (Va. Cir. Ct. May 19, 2005) ("Fraud in the procurement of any contract . . . makes it void and unenforceable."); *Packard Norfolk v. Miller*, 198

## A. Rescission

The entire transaction between Williams Fund and Engel should be unwound, and Engel and the Company should be restored to their original positions prior to the fraudulently procured SPA. In an order rescinding the SPA, the Arbitrator should declare that (i) Engel is the sole shareholder of the Company, and (ii) the stock certificate for the Company, which is currently being held in escrow in the name of Williams Fund, is null and void and should either be destroyed or returned to Engel.

## B. Direct and Consequential Damages[3]

In addition to rescission of the SPA, Engel should be awarded damages so that he may be fully restored to the position he was in prior to being fraudulently induced by Williams

---

Va. 557, 564 (1956) ("Because of the fraud practiced in the procurement of the contract, the entire instrument-the whole contract-is rendered voidable at the instance of the defrauded party."). Williams Fund submitted materially false financial statements to Engel's business broker to induce Engel to sell Engel Corporation (the "Company") on credit. *See* Exhibit R-144; *see also* Exhibit A, Transcript of August 14, 2006, hearing before Roy L. Kaufmann, at 304:16-306:18 ("Day 1 Transcript"). Further, Williams Fund's only representative in this transaction, Kenneth Mitan, used the alias "John Adams," to prevent Engel from accessing the www.mitanalert.com website and otherwise learning about Mitan's long history of involvement in civil, bankruptcy and criminal proceedings. Had Engel known Mitan's real identity, he would not have sold the Company to Williams Fund. *See* Exhibit R-62; Exhibit B, Transcript of August 15, 2006 hearing before Roy L. Kaufmann, at 13:10-14:20, 25:19-28:6, 343:19-345:14 ("Day 2 Transcript"); *see also US v. Sawyer*, 799 F.2d 1494, 1502 (11th Cir. 1986) (referring to the use of an alias as a "badge of fraud"); *Brame v. Guarantee Finance Co., Inc.*, 139 Va. 394 (1924) (indicating that the elements of fraudulent inducement are "positive statements of fact, made for the purpose of procuring the contract; that they are untrue; that they are material; and that the party to whom they were made relied upon them, and was induced by them to enter into the contract"). Williams Fund carried out its fraudulent scheme by, among other things, making false promises to pay various vendors, making "payments" with bounced checks, and misappropriating Company funds for non-Company purposes. *See, e.g.*, Exhibits R-22 - R-36; Exhibit R-159 at Bates Nos. 2266, 2270, 2271; Day 2 Transcript, at 380:9-382:18. At a minimum, Williams Fund's fraudulent and illegal scheme violated the following state and federal laws: Va. Code § 18.2-186 (false statements/false pretenses to induce sale and to induce Engel to forbear declaring default); Va. Code § 18.2-181 (passing bad checks); Va. Code § 58.1-485 (failure to pay payroll tax withholdings); 18 U.S.C. § 1341, 1343 (mail/wire fraud); Va. Code § 13-653 (improper taking of shareholder profits).

[3] Portions of the damages calculations set forth below may vary from those set forth in Respondent's Specification of Counterclaims, due primarily to the fact that Respondent did not have access to Claimant's discovery responses or document production to aid in the preparation of his Specification of Counterclaims. However, all documentation supporting Respondent's damages calculations was provided to Claimant in advance of the hearing. Further, due to the abundant evidence in the record in support of Respondent's counterclaims, citations to the record herein are illustrative and by no means intended to be exhaustive.

Fund to enter into the SPA. Thus, Engel is entitled to the following direct and consequential damages as a result of Williams Fund's fraudulent and illegal scheme:

Engel is entitled to recover the **$101,038.73** in personal loans he made to the Company during 2006 to preserve and protect the Company from further damage as a result of Williams Fund's fraudulent and illegal actions. This figure consists of a personal loan in the amount of $75,000 made by Engel to the Company so that the Company could make payments to vendors from which the Company was at risk of being cut-off.[4] Additionally, Engel incurred $26,038.73 on his personal credit card to help finance the business and reduce the amount of the current accounts payable.[5]

Engel also is entitled to damages in an amount equal to the diminution in the value of the Company between September 13, 2005—when Williams Fund took over the Company—and the present. As of September 13, 2005, the Company was valued at $310,000 (the purchase price of the Company).[6] Using a similar method of valuation, the value of the Company today is $188,400.65.[7] Thus, the approximate diminution in the value of the Company

---

[4] *See* Exhibit JT-33; *see also* Day 2 Transcript, at 328:16-329:4.

[5] Exhibit R-59; *see also* Day 2 Transcript, at 328:5-13. This amount was not included in Respondent's Specification of Counterclaims because Engel was unaware at the time that the use of his personal credit line for the benefit of the Company could be considered a personal loan to the Company.

[6] This valuation can be described in relation to the Company's average EBIDTA for the years 2004 and 2005. The average adjusted EBIDTA of the Company for the years 2004 and 2005 was $137,566. *See* Exhibit JT-3, at Bates No. 001327. Thus, a multiplier of approximately 2.25 can be applied to arrive at the $310,000 valuation of the Company as of September 13, 2005 ($137,566 x 2.25 ≈ $310,000).

[7] The adjusted EBIDTA for the year 2006 can be approximated in the same manner as reflected at Exhibit JT-3 at Bates No. 001327. The net loss of the Company as of June 30, 2006 was -$10,479.16. *See* Balance Sheet as of 06/30/06, Exhibit C-32, at Bates No. R 00828. This number should be doubled to arrive at an annual net loss for 2006 of -$20,958.32. To arrive at the EBIDTA, this amount should be adjusted upward to add, as applicable, officer's salary that exceeds a normalized amount, interest, and depreciation. No excess officer's salary should be added for 2006 based on Engel's testimony that he was not paid a salary for the first quarter of 2006, and that he has been paid a modest salary thereafter. *See* Day 2 Transcript, at 292:4-10. Annual interest of $6,898.56 is calculated as approximately twice the amount of the total interest paid as of June 30, 2006. *See* Exhibit C-32, at Bates Nos. R 00839-00846. Using the 2004 depreciation amount of $19,049 (none is available for 2005), the adjusted EBIDTA

3

between September 13, 2005 and the present is $121,599.35. To fully restore Engel to the position in which he would have been had the transaction with Williams Fund not taken place, he is entitled to recover this **$121,599.35** diminution in the value of the Company.

Further, Engel is entitled to recover the **$52,711.93** in Company funds that Williams Fund wrongfully (and admittedly) retained as "shareholder profits and distributions."[8] Because it has been shown that the Company was unable to meet its accounts payable obligations to various vendors during the time period that Williams Fund was in control of the company,[9] the retention of Company funds for such "shareholder profits and distributions" is in clear violation of Va. Code § 13-653. In any event, because the SPA should be declared null and void due to Williams Fund's fraud and illegality, Williams Fund should not be entitled to retain the alleged "profits" it took while wrongfully in possession of the Company.

Additionally, Engel is entitled to recover the **$5,226.24** in penalty and interest obligations incurred as a result of Williams Fund's failure to pay state and federal taxing authorities.[10]

---

for 2006 is approximately $4,989.24 (-20,958.32 + $6,898.56 + $19,049). Thus, the average two year adjusted EBIDTA for 2005 ($162,478) and 2006 ($4,989.24) is $83,733.62. Using the same multiplier of 2.25, the value of the Company today is $188,400.65.

[8] *See* Exhibit JT-10 at 10. Williams Fund only admits that it retained approximately $36,070.23 in "shareholder profits and distributions" based on its incomplete and incorrect calculation of the difference between funds transferred to the Company's Bank One account in Michigan from the Company's local (Virginia) SunTrust account and vice versa. *See* Exhibit JT-11, at 9-10. As demonstrated by Exhibit R-39, $111,851.93 was transferred to the Bank One account from the Company's local account, and only $64,858 was transferred to the Company's local account from the Bank One account (this amount takes into account a $4,858.78 payment to RIS Paper Company – the only vendor payment made from the Bank One account that was actually credited to the benefit of the Company.) Williams Fund incorrectly attributes six checks written to Xerox, totaling $10,930.99, as payments made on behalf of the Company; however, none of these six checks was ever credited to the Company's account with Xerox. *See* Day 2 Transcript, at 164:20-165:18. The total amount improperly retained by Williams Fund is thus $52,711.93.

[9] *See, e.g.,* Day 1 Transcript, at 218:14-219:20.

[10] *See* Exhibit R-21; *see also* Day 2 Transcript, at 317:3-15.

4

Engel is also entitled to recover the **$37,302.84** in transfers out of the Company's Bank One account in Michigan, which funds were admittedly not used for any legitimate business purpose related to the Company.[11]  Rather, as the hearing testimony reflects, these cash withdrawals and other transfers out of the Bank One account were used for Ken Mitan's personal vacation and other non-company-related purposes.[12]  Such use of Company funds is clearly improper, given that the Company was unable to meets it payment obligations as discussed above.

Finally, $128,906.43 of the purchase price paid to Engel for the Company was paid with funds held in the name of Super 1, Inc. ("Super 1").  Super 1 has demanded that Engel return the $128,906.43, and it has put a lien on the Company's assets and equipment.[13]  Williams Fund should thus be required to pay **$128,906.43** as damages to Engel resulting from its improper use of Super 1 funds, for which Engel is subject to an outstanding claim by Super 1.

## C.  Attorneys Fees and Costs

Engel is entitled to recover his attorneys fees expended in this arbitration and in connection with negotiating and seeking to enforce the SPA.[14]  To date, Engel has incurred $100,534 in attorneys fees and $12,990.04 in costs in connection with this arbitration and the SPA.[15]  Accordingly, Engel should be awarded **$113,524.04** in attorneys fees, costs and AAA expenses.

---

[11] *See* Exhibit R-159 at Bates Nos. 2266, 2270, 2271.

[12] *See* Day 2 Transcript, at 380:9-382:18.

[13] *See* Exhibit JT-9 at 4; *see also* Day 1 Transcript, at 228:2-9.

[14] *See* Exhibit JT-13, Section 13.1 at 27; Exhibit JT-14, Section 3 at 2.

[15] *See* Exhibit C, Affidavit of Daniel S. Krakower, at 2.

### D.  Punitive Damages

Engel is entitled to punitive damages as a result of Williams Fund's blatantly fraudulent and illegal scheme, which nearly drove the Company out of business and destroyed Engel financially.[16]  Williams Fund's actions in this regard were purposeful and malicious, which is further demonstrated by the clear pattern of conduct set forth in the numerous other complaints against Williams Fund by companies and individuals who have had the similar misfortune of dealing with Williams Fund.[17]

The Federal Arbitration Act (which governs this arbitration because the SPA involves interstate commerce) gives force to AAA Rule 43, which provides that the Arbitrator may "grant any remedy or relief that the arbitrator deems just and equitable," including punitive damages.[18]  Engel thus seeks a punitive damages award in an amount not less than three times the total compensatory damages awarded to Engel as a result of Williams Fund's fraudulent and illegal scheme.

### E.  Williams Fund is Not Entitled to Offset Engel's Damages.

Williams Fund should not be permitted to offset any portion of the **$560,309.56** in damages suffered by Engel to account for funds paid to Engel in connection with the SPA.  First, it has been established that none of the funds paid to Engel were actually paid by Williams Fund. Rather, they were paid from the Company's own checking account, or other victims of Williams

---

[16] *See, e.g.*, note 2, *supra.*

[17] *See* Respondent David Engel's Submission Concerning Related Proceedings.

[18] *See Lee v. Chica*, 983 F.2d 883, 887-888 (8th Cir. 1993) ("AAA arbitrators may grant any remedy or relief including punitive damages."); *Pyle v. Securities U.S.A., Inc.*, 758 F. Supp. 638 (D. Colo. 1991) ("In the commercial arbitration context, punitive damages may be awarded although the arbitration agreement contains no express mention of such relief.").

6

Fund's fraudulent schemes: Benny's Cheese or Super 1.[19] Any remedy requiring the re-payment of any such funds to Williams Fund would result in a windfall to Williams Fund, and would further Williams Fund's fraudulent schemes. The Arbitrator is empowered to prevent such an injustice.[20] Second, because Williams Fund entered into the SPA through fraudulent and illegal means, it is not entitled to its money back as a matter of equity.[21] Even if the Arbitrator does allow Williams Fund to offset any of the funds paid to Engel in connection with the SPA, such amount should not include the $75,984 in funds that were paid to Engel directly from the Company's checking account.[22]

## F.  Total Damages

As summarized in the chart below, Engel is entitled to damages totaling **$560,309.56** as a result of Williams Fund's fraud and illegality, which amount should be trebled as an award of punitive damages. Thus, Engel should be awarded total damages of **$2,241,258.24.**

---

[19] *See, e.g.,* Day 1 Transcript, at 97:13-109:11

[20] *See* AAA Commercial Arbitration Rules, R-43 (the Arbitrator may "grant any remedy or relief that the arbitrator deems just and equitable").

[21] *See Webb v. Webb*, 16 Va.App. 486, 495 (Va. App. 1993) (holding that "[t]he general rule of restoration is not strictly applied in the case of fraud, because it would become a loophole to escape the consequences of a fraudulent act" and that equity "does not permit the rule of restoration to become a shield for wrongdoing.").

[22] *See* Day 1 Transcript, at 97:13-109:11

7

| DAMAGES | AMOUNT |
|---|---|
| Personal loans made by Engel to the Company in order to preserve and protect the Company from further damage as a result of Williams Fund's fraudulent and illegal actions. | $101,038.73 |
| Diminution in value of the Company as a result of Williams Fund's fraudulent and illegal actions. | $121,599.35 |
| "Shareholder profits and distributions" wrongfully retained by Williams Fund. | $52,711.93 |
| Penalty and interest payments incurred by Engel as a result of Williams Fund's failure to pay the taxing authorities. | $5,226.24 |
| Transfers out of the Company's Bank One account, which funds were admittedly not used for any legitimate business purpose related to the Company. | $37,302.84 |
| Outstanding claim by Super 1 against Engel for funds improperly paid to Engel by Williams Fund. | $128,906.43 |
| Attorneys Fees and Costs. | $113,524.04 |
| **DAMAGES SUBTOTAL** | **$560,309.56** |
| Punitive Damages ($560,309.56 x 3). | $1,680,928.68 |
| **DAMAGES TOTAL** | **$2,241,258.24** |

## II. Foreclosure Remedy

Alternatively, if the Arbitrator rejects Engel's fraud and illegality counterclaims but accepts Engel's breach of contract counterclaim and enforces the SPA against Williams Fund, Engel would be entitled to foreclose on the stock and assets of the Company (held as collateral under the Security Agreement) due to Williams Fund's breaches of the SPA. Williams Fund's failure to pay the $22,434.12 MBNA payment within 30 days of closing is a Monetary Breach under the SPA because, as it was originally intended to be included in the closing payment and paid at closing, it was effectively turned into a Deferred Payment by written agreement of the parties. Because Williams Fund failed to cure this breach within the contractually prescribed 5-day cure period, Engel was entitled to assume control of the stock and foreclose.[23] Further, Williams Fund's failure to make the MBNA payment and the fourth

---

[23] *See* Exhibit JT-13, at Section 14.3; Exhibit JT-14, at Section 2.

$40,000 installment payment constitutes a "failure to close" under the SPA, pursuant to which Engel is also entitled to foreclose on the collateral.[24]

In ordering foreclosure, the Arbitrator should authorize Engel or his agent to proceed with a foreclosure sale in accordance with the Security Agreement and the Uniform Commercial Code as adopted in the Commonwealth of Virginia.[25] The Arbitrator should further declare that the deficiency amount to be satisfied by a foreclosure sale is **$272,428.80**, which amount consists of Williams Fund's indebtedness to Engel as set forth in the chart below.

| DEFICIENCY | AMOUNT |
|---|---|
| | |
| MBNA payment originally intended to be included in the Closing Payment and paid at closing.[26] | $22,434.12 |
| 4th installment payment due to Engel on December 13, 2005.[27] | $40,000.00 |
| Personal loans made by Engel to the Company in order to preserve and protect the Company from further damage as a result of Williams Fund's fraudulent and illegal actions.[28] | $101,038.73 |
| Penalty and interest payments incurred by Engel as a result of Williams Fund's failure to pay the taxing authorities.[29] | $5,226.24 |
| Expenses incurred by Engel in attempting to foreclose on the collateral.[30] | $1,166.04 |
| Attorneys Fees and Costs.[31] | $102,563.67 |
| **TOTAL DEFICIENCY AMOUNT** | **$272,428.80** |

---

[24] *See* Exhibit JT-13, at Section 14.1; Exhibit JT-14, at Section 1.

[25] *See* Exhibit JT-14, at Section 2.

[26] *See* Exhibit JT-19; *see also* Day 1 Transcript, at 111:15-112:15.

[27] *See id.*

[28] *See* notes 4-5, *supra.*

[29] *See* note 10, *supra.*

[30] Engel incurred these expenses in advertising the foreclosure sale of the Company. *See* Exhibit C-29.

[31] *See* Section I(C), *supra.* In connection with his breach of contract counterclaim, Engel only seeks to recover the portion of his legal fees and expenses incurred in prosecuting this arbitration and otherwise in seeking to enforce his rights under the SPA, which amount is $102,563.67.

### III. Conclusion

Williams Fund should be held liable to Engel on his counterclaim for fraud and illegality. Accordingly, the Arbitrator should declare the SPA (and the stock certificate in the name of Williams Fund) to be null and void, and order Williams Fund to pay Engel **$560,309.56** in compensatory damages as a result of Williams Fund's fraud and illegality, which amount should be trebled as an award of punitive damages. Thus, Engel should be awarded total damages of **$2,241,258.24.**

Alternatively, the Arbitrator should declare Williams Fund to be in breach of the SPA and authorize Engel or his agent to proceed with a foreclosure sale to satisfy a deficiency in the amount of **$272,428.80**.

Williams Fund's affirmative claims should be dismissed with prejudice.

Dated: August 25, 2006

Respectfully submitted,

Jeremy W. Schulman
Leslie Gallagher

SHULMAN, ROGERS, GANDAL,
    PORDY & ECKER, P.A.
11921 Rockville Pike, Third Floor
Rockville, Maryland 20852
(301) 230-5200

Attorneys for Respondent David Engel

10

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration Between ) | Case No. 16 168 00185 06 |
| ) | |
| Williams Fund Private Equity Group, Inc., ) | Arbitrator: Roy L. Kaufmann, Esq. |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| David Engel, ) | |
| ) | |
| Respondent. ) | |
| ) | |
| ) | |

## RESPONDENT DAVID ENGEL'S
## SUBMISSION CONCERNING RELATED PROCEEDINGS

Respondent David Engel ("Engel") makes this submission in support of the

motion by his counsel at the August 14-15, 2006 hearing in this matter to admit into evidence the

complaints and/or counterclaims in the following three proceedings: (1) *Doug Feeney, et al., v.*

*John Smith a/k/a John Adams Smith, et al.*, U.S. District Court, Eastern District of Arkansas,

Western Division, No. 4-05-CV-0017 WRW ("Feeney"); (2) *George Frazier v. Williams Fund*

*Private Equity Group, Inc., et al.*, Superior Court of Gwinnett County, State of Georgia, No.

05A-14405-5 ("Frazier"); and (3) *Williams Fund Private Equity Group v. Super 1, Inc., et al.*,

U.S. District Court, Northern District of Georgia, Atlanta Division, No. 1:05:CV-3166-BBM

("Super 1") (collectively, the "Related Cases").[1]

As shown in the attached chart, the allegations against Williams Fund Private

Equity Group, Inc. ("Williams Fund"), Kenneth Mitan and Frank Mitan made in the Related

Cases, combined with the evidence adduced by Engel in this arbitration tend to show that

---

[1] The relevant complaints and/or counterclaims in the Feeney, Frazier and Super 1 proceedings are attached hereto as Exhibits L-8, L-9, and L-11, respectively.

Williams Fund, Kenneth Mitan and Frank Mitan have engaged in a common scheme to defraud small business owners of substantial sums of money. As demonstrated in this arbitration, and by the allegations in the Related Complaints, the Williams Fund and the Mitans' common scheme consisted of inducing the small business owners to sell their businesses on credit, looting company assets once in control of the company, creating the appearance of regularity by falsely promising to pay vendors and sending them bouncing checks, and leaving the company in a position where it collapses or is in near collapse because of destroyed vendor, customer and employee relationships. Not only is such evidence of a "common scheme" admissible pursuant to the Arbitrator's broad scope of authority to "determine the admissibility, relevance, and materiality of the evidence offered," *see* AAA Commercial Arbitration Rule R-31(b), but it is also admissible under the guidance of Federal Rule of Evidence 404(b). *See U.S. v. Tripp*, 946 F.2d 896 (6th Cir. 1991) (finding that "[t]he 404(b) evidence demonstrated that defendants *intentionally and knowingly* engaged in a common scheme to defraud companies").

Accordingly, Engel respectfully requests that Exhibits L-8, L-9, and L-11 be admitted into the record of this arbitration and considered by the Arbitrator in connection with Engel's counterclaims against Williams Fund.

Dated: August 25, 2006

Respectfully submitted,

Jeremy W. Schulman /*cg*

Jeremy W. Schulman
Leslie E. Gallagher
SHULMAN, ROGERS, GANDAL,
   PORDY & ECKER, P.A.
11921 Rockville Pike, Third Floor
Rockville, Maryland 20852
(301) 230-5200

Attorneys for Respondent

2

## COMMON SCHEME ANALYSIS

| Element of Scheme (All Present in Engel Corporation Case) | Feeney | Frazier | Super 1 |
|---|---|---|---|
| **Broker:** Used broker to identify motivated seller. | Complaint, at ¶ 9 | Complaint, at ¶¶ 5, 31 | Complaint, at ¶ 8 |
| **Alias:** Use of nondescript alias by Kenneth Mitan. | Complaint, at ¶¶ 23, 26, 54 | Complaint, at ¶¶ 29, 30, 34 | Complaint, at ¶¶ 9, 69 |
| **Sole Contact:** No representative of Buyer other than Kenneth Mitan dealt with Seller. | Complaint, at ¶ 44 | Presumed from facts stated in Complaint | Complaint, at ¶ 82 |
| **False Representations:** | | | |
| Represented Buyer as private equity fund with substantial capital and sources of funds to acquire and develop businesses. | Complaint, at ¶ 10 | Complaint, at ¶ 31 | Complaint, at ¶¶ 11, 12 |
| Presented false financial statements that misrepresented Buyer's financial capability. | Complaint, at ¶ 10 | | Complaint, at ¶¶ 12, 102 |
| **Payment Arrangement:** Offered some money at closing and remainder deferred. | Complaint, at ¶¶ 14, 15 | Complaint, at ¶ 7 | Complaint, at ¶ 17 |
| **Transaction Structure:** Stock purchase | Complaint, at ¶ 11 | Complaint, at ¶ 6 | Complaint, at ¶ 15 |
| **Failure to Pay Funds Due at Closing:** Presented excuses at closing for not having funds available. | Complaint, at ¶¶ 14, 15, 16, 17 | Complaint, at ¶¶ 12, 31 | Complaint, at ¶ 19 |
| **Blank Signed Checks:** Convinced Seller to provide several Company checks signed in blank based on explanation that they would be used to pay Company's material expenses until transition of control to Buyer. | Complaint, at ¶¶ 29, 31 | Complaint, at ¶¶ 25, 31 | Complaint, at ¶¶ 20, 21, 22 |
| **Disposition of Closing Proceeds:** Agreed to directly pay certain of Seller's obligations (e.g., broker fee) out of closing proceeds otherwise payable to Seller, but either failed to pay, or delayed payment, thereby having the effect of reducing amount of cash required at closing, and buying additional time to generate sources of cash. | | Complaint, at ¶ 15 | |

| | | | |
|---|---|---|---|
| **Out-of-State Bank Account**: Directed Company employees to deposit Company revenues in out-of-state account controlled by Buyer. | Complaint, at ¶ 49 | Complaint, at ¶¶ 25, 31 | Complaint, at ¶¶ 65, 66 |
| **Personal use of Company funds or credit** | Complaint, at ¶¶ 28, 40 | Complaint, at ¶¶ 25, 31 | Complaint, at ¶¶ 66, 67 |
| **Focused Interest on Company Receipts**: Maintained constant contact with Company employees to inquire about daily receipts. | Complaint, at ¶¶ 34, 50 | Complaint, at ¶ 31 | unknown |
| **Shuffling of Funds:** | | | |
| Used Company funds to pay obligations with respect to other purported business purchases. | | Complaint, at ¶ 31 | Complaint, at ¶¶ 29, 56, 59 |
| Part of purchase price paid from acquired company's own funds without Seller's knowledge. | Complaint, at ¶ 35 | | Complaint, at ¶ 26 |
| No funds received by Seller came directly from Buyer. | Complaint, at ¶ 35, 37 | | Complaint, at ¶ 50 |
| **Failure to Pay Material Expenses**: Ultimate failure to pay material expenses such as payroll taxes, rent, etc., despite assertions that payments were made. | | Complaint, at ¶ 31 | Complaint, at ¶¶ 51, 58 |
| **Bounced Checks**: Multiple bounced checks. | | Complaint, at ¶ 16 | Complaint, at ¶¶ 47, 48 |
| **Ultimate Default in Payment of Purchase Price** | Complaint, at ¶ 37 | Complaint, at ¶¶ 12, 13, 14 | Complaint, at ¶ 95 |
| **Damage to Company**: Significant damage to acquired company jeopardizing its existence. | Complaint, at ¶ 56 | Complaint, at ¶¶ 14, 31, 34 | Complaint, at ¶ 46 |
| **Legal Proceedings**: Transaction resulted in legal proceedings including fraud claims. | Complaint | Complaint | Complaint |

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 16 168 00185 06
    Williams Fund Private Equity Group, Inc. (Claimant)
    and
    David Engel   (Respondent)

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Stock Purchase Agreement entered into between the above-named parties and dated September 02, 2005 (herein "Stock Purchase Agreement")[1], and having been duly sworn and having heard the proofs and allegations of the parties, and Respondent having made a motion to amend its counterclaim and the arbitrator having considered the same, hereby **FIND**, as follows:

A.    Respondent David Engel's Motion to admit into evidence the complaints and other materials in three proceedings not before the Arbitrator is denied and the documents submitted in support thereof are not admitted into evidence. Specifically, the pleading styled "Respondent David Engel's Submission Concerning Related Proceedings" and the accompanying exhibits marked as "L8", "L9" and "L11" are not admitted into the record.

B.    Respondent's initial response to the Claim included a counter-claim estimated at seventy-five thousand ($75,000.00). In subsequent pleadings, Respondent increased its claim substantially. The increased claim has been permitted by the Arbitrator. Any administrative matters that might arise because of this increase in claim amount are to be handled between the Respondent and the Case Administrator.

I hereby **AWARD** as follows:

1.    The Stock Purchase Agreement is void and unenforceable by the Claimant under Virginia law, the Respondent having been induced to enter the agreement by a pattern of intentional, fraudulent misrepresentations by Claimant and its principals, upon which the Respondent justifiably relied to his detriment. The misrepresentations continued after execution of the agreement.

2.    The Respondent is entitled to the remedy of rescission.

3.    The Respondent is awarded sole ownership of all corporate shares of Engel Corporation (herein the "Corporation").

4.    The single, current Stock Certificate representing the entirety of the corporate shares of the Corporation is null and void. The Corporation may re-issue a certificate, as it deems appropriate.

---

[1] Article 13 thereof provides for binding arbitration to be administered by the American Arbitration Association

5.  Further, the Claimant shall pay to Respondent the sum of TWO HUNDRED FOUR THOUSAND, SEVEN HUNDRED FIFTY-EIGHT DOLLARS AND FORTY-TWO CENTS ($204,758.42.) This figure is inclusive of entitlement to attorneys fees and is ordered after due consideration of the evidence and case law submitted by the parties. This Award is not a "split decision" as such nomenclature is utilized in Article 13 of the Stock Purchase Agreement, but is a decision in favor of Respondent.

6.  Claimant's claim is denied in its entirety.

7.  The administrative fees and expenses of the American Arbitration Association (the "Association") totaling SIX THOUSAND FIVE HUNDRED FIFTY DOLLARS AND NO CENTS ($6,550.00) shall be borne by the Claimant and the compensation and expenses of the arbitrator totaling FOUR THOUSAND SEVEN HUNDRED SIXTY-SIX DOLLARS AND FORTY-FOUR CENTS ($4,766.44) shall be borne by the Claimant. Therefore Claimant shall reimburse the Respondent the sum of SIX THOUSAND THREE HUNDRED EIGHTY-THREE DOLLARS AND TWENTY-TWO CENTS ($6,383.22) representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Respondent, **upon demonstration that these incurred costs have been paid.**

8.  The above sums are to be paid within thirty (30) days.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration[2]. All claims not expressly granted herein are hereby, **DENIED**.

Dated: September 27, 2006

Roy L. Kaufmann
Arbitrator

I, Roy L. Kaufmann, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

September 27, 2006

Roy L. Kaufmann

---

[2] Testimony at the Hearings included matters related to a lien asserted by a third party. The arbitrator declines to rule on any matters related to the third party's claim or resulting therefrom, because the third party is not a party to this Arbitration.

JUN 2 1 2006
AMERICAN Ar.
ASSOCIAT

# American Arbitration Association

In the Matter of the Arbitration between

Re: 16 168 00185 06
**Williams Fund Private Equity Group, Inc.**

**and**

**David Engel**

**ARBITRATOR: Roy L. Kaufmann**
Administrator: Paris Earp

Preliminary Hearing Scheduling Order #1

## REPORT OF PRELIMINARY HEARING AND SCHEDULING ORDER

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA), a preliminary hearing was held by conference call on June 20, 2006 before Arbitrator Roy L. Kaufmann. Appearing at the hearing were Daniel S. Krakower and Ms. Maura Molloy. By Agreement of the parties the following is hereby ORDERED:

1. <u>Service and Calculation of Time:</u> As used in this Order and in these proceedings "service" means delivery by electronic mail to counsel for the opposing party before 5:00 p.m. Eastern Time on the due date, and to the Arbitrator by such means and at such time as he/they shall direct. Documents provided in response to discovery requests shall be delivered in paper form via overnight delivery to arrive on the due date, unless the parties agree otherwise in writing. Discovery requests and discovery responses shall not be served upon the Arbitrator unless there is a dispute with respect to the requests, in which case the parties shall serve the Arbitrator with only those portions of the discovery requests and responses needed to decide the dispute. Time periods are counted in calendar days. When the due date of any document falls on a week end or federal holiday, the due date shall be extended to the next business day.

2. <u>Hearing</u>: The arbitration shall be held pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Hearings in this matter will commence before the Arbitrator at 1120 20th St NW, South Tower, Third Floor, Washington, DC 20036 on August 14, 2006 at 9:30 a.m. The parties estimate that the case will require one day of hearing time, inclusive of arguments, however, the parties shall reserve the following

308950v.1

day, August 15, 2006 for conclusion of the matter. One half of said time shall be allocated to each party. Direct testimony and cross examination of the opposing side's witnesses shall count against said one-half of hearing time. Hearings will start promptly at 9:30 a.m. until 5:00 p.m with one hour allocated to lunch and a ten-minute break in morning and afternoon, all subject to change only by subsequent direction of the Arbitrator.

3.  <u>Disclosure of Related Entities</u>:  Within fourteen (14) days of the date hereof the Parties shall provide to each other and to the AAA the identities of any affiliated, related or successor persons or entities connected with the case.

4.  <u>Schedule of Exchange of Documents and Interrogatories</u>: Within fourteen (14) days of the date hereof the Claimant may serve upon Respondent a document request and no more than ten (10) interrogatories upon Respondent to which Respondent must reply within fourteen (14) days of receipt of the production request. Within seven (7) days of Respondent's production (or, if Claimant has made no request for production of documents, then within seven (7) days after the expiration of Claimant's opportunity to request documents) Respondent may serve upon Claimant a production request and no more than ten (10) interrogatories, to which Claimant must reply within fourteen (14) days.

5.  <u>Method of Exchange of Documents</u>: The parties have agreed to participate in the American Arbitration Association Accelerated Exchange Program which allows parties and arbitrators to exchange documents directly[1]. Accordingly, unless specifically ordered by the Arbitrator:

   a)  All pleadings and submissions required to be made to the Arbitrator shall be sent directly to the Arbitrator with certification of simultaneous service upon the opposing party(ies) *and copy to the AAA case manager.*

   b)  Apart from the pleadings and submissions referenced above, there shall be no direct oral or written communication between the parties and the Arbitrator(s) except at oral hearings. All requests to the Arbitrator shall be made through the AAA case manager.

   c)  Notwithstanding the foregoing, the following communications are not subject to the Accelerated Exchange Program and discussions and communications concerning the following matters are to be directed to the AAA case manager and *not* to the Arbitrator:

      1.  discussions concerning fees, compensation or expenses of arbitration;

      2.  discussions concerning arbitrator disclosures and/or challenges, locale

---

[1] Counsel/Parties have agreed to execute such documentation as may be provided by AAA to evidence consent.

308950v.1

disputes, or settlement negotiations;

3.    direct communications after hearings have been declared closed. The Accelerated Exchange Program terminates once the hearings have been declared closed.

6.    <u>Resolution of Discovery Disputes</u>: No discovery dispute shall be presented to the Arbitrator until the parties have made a good-faith effort to resolve the dispute. The parties must confer in person or by telephone to resolve the dispute. Any party moving the Arbitrator to resolve a discovery dispute must describe, in detail, the efforts undertaken with the other party to resolve the dispute.

7.    <u>Identification of Expert Witnesses</u>: Not later than twenty-eight (28) days before the hearing, the parties must provide to the Arbitrator and to the remaining parties a list of expert witnesses, including, full names, resume, reports of experts, as well as a short summary of the anticipated testimony. These lists may be supplemented or amended not later than twenty-one (21) days before the hearing.

8.    <u>Identification of Non-Expert Witnesses</u>: Not later than twenty-one (21) days before the hearing, the parties must provide to the Arbitrator and the remaining parties, the identities of any affiliated, related, or successor persons or entities connected with this case as well as list of all non-expert witnesses reasonably expected to be called by the parties (exclusive of rebuttal witnesses) including full names, titles and a short summary of anticipated testimony. This list may be supplemented or amended as to additional witnesses not later than fourteen (14) days before the hearing.

9.    <u>Disclosures and Witness Arrangements</u>:

a)    Each party shall be responsible for updating its disclosures as such information becomes available. The duty to update this information continues up to and including the date that hearing(s) in this matter terminate.

b)    The parties shall make arrangements to schedule the attendance of witnesses so that the case can proceed with all due expedition and without any unnecessary delay.

c)    The parties are directed to make diligent inquiry as to whether any witnesses may require the assistance of an interpreter to be fully understood and, if so, the parties are further directed to co-ordinate with the AAA Staff as to AAA-approved interpreters and to provide the name of that interpreter no later than seven (7) days before the hearing.

10.    <u>Specification of Claims</u>: Not later than fourteen (14) days before the hearing, the parties must specify and quantify, in writing, the monetary amounts of any claim or counterclaim and any amendment to claims or counterclaims and deliver copy thereof to the Arbitrator and other

308950v.1

parties. Any claim for attorney's fees requests must be supported by evidence produced at the Hearing, as well as the basis therefor. This may be in the form of a statement from the party or counsel claiming fees, brought current through the end of the hearing. The Arbitrator's preference is not to keep the record open after the conclusion of the hearing.

11.   Exhibits and Uncontested Facts:  Not later than seven (7) days before the hearing, the parties shall have coordinated to produce a hard-covered binder for the Arbitrator containing labeled dividers as follows:

   a)   Stipulation of Uncontested Facts

   b)   Index of Exhibits (Exhibits to include schedules, summaries, diagrams and charts to be used at the hearing).

   c)   Consolidated and comprehensive set of copies of joint exhibits, with stipulation as to authenticity except where disputed, pre-marked as exhibits JT-1, JT-2, etc.

   d)   Copies of Claimant's non-joint exhibits, including all reports, summaries, diagrams and charts to be used, pre-marked as exhibits C-1, C-2, etc.

   e)   Copies of Respondent's non-joint exhibits, including all reports, summaries, diagrams and charts to be used, pre-marked as exhibits, R-1, R-2, etc.

This binder is to be produced at the hearing with no advance copy to be delivered to the Arbitrator or to the AAA.  Copies of the binder are to be retained by Claimant and Respondent with sufficient copies for witness identification and discussion.

12.   Pre Hearing Briefs:  No pre-hearing briefs will be considered unless permitted by the Arbitrator.

13.   Stenographic Record:  Any request therefor shall be made not later than seven (7) days before the hearing.

14.   Form of Award:  A Standard Award shall issue.

15.   Acknowledgment:  All parties and counsel have received and are familiar with the current version of the American Arbitration Association Arbitration Rules.

16.   Deadline for Asserting Preliminary Matters:  Pursuant to the direction of the Arbitrator(s), any other preliminary matters not otherwise provided for herein shall be raised not later than fourteen (14) days before the hearing.

17.   Deadlines/Postponements:  All deadlines stated herein shall be strictly enforced.  After such deadline, the parties may not proceed as to that matter without permission of the Arbitrator,

308950v.1

good cause having been shown. Specifically, but not by way of limitation, motions barred by the deadlines posed hereby shall not be filed except with the permission of the Arbitrator, good cause having been shown. Postponements are subject to a fee assessment, as set forth in the Rules and subject to cancellation fees by the arbitrator.

18.    <u>Authority of Arbitrator</u>:  Nothing in this Order shall diminish the express or inherent authority of the Arbitrator as the tribunal constituted by the parties for the settlement of their dispute.

19.    This order shall continue in effect until amended by subsequent order of the Arbitrator.

Dated:        June 20, 2006

Roy L. Kaufmann
Arbitrator

308950v.1